1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF VIRGINIA
 2                    Roanoke Division

 3

 4   UNITED STATES OF AMERICA,     Criminal No. 7:07cr00048

 5

 6          Vs.                    Roanoke, Virginia

 7   TED JAMES JOHNSON, JR.,

 8              Defendant.     October 10, 2008

 9

10         TRANSCRIPT OF TRIAL PROCEEDINGS
        BEFORE THE HONORABLE SAMUEL G. WILSON,
11      UNITED STATES DISTRICT JUDGE, and a Jury.

12

13   APPEARANCES:

14   For the United States:    U.S. Attorney's Office
                               JENNIE L.M. WAERING, ESQ.
15                             P.O. Box 1709
                               Roanoke, VA 24008-1709
16
                               U.S. Dept. Of Justice
17                             DAVID A. BYBEE, ESQ.
                               1400 New York Ave.
18                             Washington, DC 20530

19   For the Defendant:        ANTHONY F. ANDERSON, ESQ.
                               MELISSA FRIEDMAN, ESQ.
20                             P.O. Box 1525
                               Roanoke, VA 24016
21
22   Court Reporter:           Sonia Ferris, RPR
                               U.S. Court Reporter
                               255 W. Main St.  Room 304
23                             Charlottesville, VA 22902
                               434-296-9284
24

25   Proceedings recorded by mechanical stenography;
     transcript produced by computer.
```

```
 1              THE COURT:  I have been informed by counsel

 2   that there's some issues that have arisen in relation to

 3   the representation of Mr. Johnson.

 4              Mr. Anderson?

 5              MR. ANDERSON: May I approach?

 6              Good morning again, Your Honor. When I

 7   entered the courtroom this morning, I met with Mr.

 8   Johnson and a few of his family.  He has indicated to me

 9   this morning that he would like to discharge me as

10   counsel, for reasons I will let him state to the Court,

11   if it's all right with the Court.

12              THE COURT:  Thank you, Mr. Anderson.

13              Mr. Johnson, tell me whatever it is you want

14   to tell me, sir.

15              THE DEFENDANT:  Yes, sir, Your Honor.

16              On October 7th, I believe was Tuesday, Dr.

17   E. Scott Geller, testified in court here as the

18   government witness.  After he finished his testimony,

19   there was some discussion, of course, about books

20   concerning psychology and other areas of interest to my

21   attorney, Mr. Anderson, as well as to  Dr. Geller.  Dr.

22   Geller was a distinguished professor of psychology at

23   Virginia Tech and there was discussion concerning these

24   books and interests.

25              After Dr. Geller finished his testimony, he
```

1    went back beyond this place here into where the gallery

2    is and my attorney, Mr. Anderson, went back and talked

3    to Dr. Geller and talked to him a little bit about the

4    books that he'd written.  I assume this is in an e-mail.

5    From that discussion, my attorney, Mr. Anderson, asked

6    Dr. Geller if he would sign one of Dr. Geller's books

7    that he had written.  From that, there was a further

8    discussion where my attorney began to discuss with Dr.

9    Geller about his client.  Geller sent two e-mails out.

10   The first e-mail indicated that Mr. Anderson had said to

11   him that "my client is guilty and will receive 15 years

12   as a result of his guilt when this is all said and

13   done."

14            Subsequent to that, on October 7, and Your

15   Honor, I have to ask that you would please take into

16   consideration I haven't seen the hard copies of these

17   e-mails, I've only seen the first e-mail sent by Dr.

18   Geller which I think was sent in the afternoon of

19   October 7 after he had left this courtroom.

20            THE COURT:  Let me just say for the record

21   that before we came in here on this, those two e-mails

22   were shared with me so that I would have an

23   understanding what the e-mails were. So I have actually

24   seen those e-mails.

25            Go ahead.

1          THE DEFENDANT:  Thank you, sir.  I haven't.

2     I think Mr. Anderson maybe had it in his cell phone, had

3     one of those e-mails that I was not able to see it all,

4     but I saw just bits and pieces of it.

5          The first e-mail went out to several people.

6     I'm not quite sure how many.  But in the first list, the

7     one that the government was aware of and eventually that

8     my attorney was aware of, I think there are

9     approximately 20 recipients of that e-mail.  Just the

10    part I saw was talking about the highlight of Dr.

11    Geller's day was when TJ, referring to myself, the

12    defendant, attorney's asked for his autograph on this

13    book and started talking about I had a future of a

14    possible 15 years in prison.

15         THE COURT:  The second e-mail, Mr. Johnson,

16    that was shared with me, indicated that the way in which

17    Dr. Geller had positioned the matter was essentially not

18    correct and he retracted in the second e-mail what he

19    had -- the way he had said it in the first.  I think

20    it's important to see that second e-mail because the

21    second e-mail was essentially a retraction of the first.

22         Go ahead.

23         THE DEFENDANT:  I was aware of the

24    retraction of the second e-mail.  I was also aware of

25    the fact just from my attorney's communication to me the

1    following day, on October 8th, was the first I found out

2    about the first e-mail and at that time, Mr. Anderson

3    advised me this e-mail had gone out and it was one of

4    those things -- we talked about the book signing was the

5    highlight of his day and also the fact that Mr. Anderson

6    said that I was guilty. Later, there was a discussion,

7    they said, in the second e-mail that he said in some

8    way, to paraphrase, that he had misstated himself and he

9    meant to say if I were to be found guilty, then I would

10   receive 15 years.

11          The second communication from my

12   understanding from Mr. Anderson was a result of the

13   government getting in touch with Dr. Geller and saying

14   if this is not corrected or if it's not modified -- I'm

15   not quite sure of the language they used because I don't

16   think they were there for the communications between

17   Anderson and Geller, but they said if this is not

18   corrected, you possibly could be indicted for

19   obstructing justice. With that communication --

20          THE COURT: How do you know all of this

21   about being indicted and all that kind of stuff?

22          THE DEFENDANT: Mr. Anderson advised me the

23   government said they considered that as a possibility if

24   he didn't do a retraction or modification on that

25   original e-mail.

1                  Once again, Your Honor, I'm not an attorney.

2    I've never been in a federal thing other than to

3    bankruptcy, but when Mr. Anderson mentioned this to me

4    and he was somewhat upset about it or irritated by it,

5    but he went on to tell me supposedly if Dr. Geller

6    didn't do some sort of a correction on his original

7    e-mail that there would be some problems for Dr. Geller.

8    At least that's what the indication was from the federal

9    government.

10                 From that, there are several things, but the

11   first thing I guess I want to say is that we didn't have

12   court yesterday.  I thought about that a long time.  So

13   then when I asked Mr. Anderson when he got here this

14   morning if I could meet with him along with my family to

15   discuss this, I said, I haven't seen the e-mails, only

16   from what you have said, and that's when I first saw the

17   first e-mail, Your Honor. I said, I think this should be

18   brought to the Court's attention. I asked, him had it

19   been brought to the Court's attention either by the

20   United States -- because the United States got a copy of

21   that e-mail.  Once again, that's my understanding and

22   I'm not trying to do hearsay. I'm just trying to say

23   from what I've seen.  One of the prosecuting attorneys

24   received it, maybe the FBI received it. So there was no

25   question that the government had seen it, but nobody,

1  from the time it was seen, and maybe they don't have any

2  obligation other than to advise Mr. Anderson and Mr.

3  Anderson advised me on the 8th sometime during the day,

4  my goodness, I just heard Geller sent this e-mail out.

5          The bottom line is when eventually I met

6  with Tony this morning and said I want a copy of his

7  e-mail and retraction, I want to see that, from hard

8  copy, I wanted to see it and at that point, it was the

9  first time that I said, Mr. Anderson, I think it's

10  extremely important we let the Court know about this.

11  There are witnesses that received this. It's been sent

12  out to a lot of people --

13          THE COURT:  I've got a jury back here.

14  Let's finish this conversation and make sure we fully

15  air what we need to air. I've seen the e-mail.  I've

16  seen the retraction of the e-mail.  What is it that you

17  think should be done at this juncture?

18          THE DEFENDANT:  I don't think I can continue

19  on with my lawyer representing me when I believe that

20  even while I'm sitting here just after a witness

21  completes a testimony that we're getting autographs and

22  talking about my case and talking about what my future

23  is and the possibility of whether I'm guilty or not

24  guilty or if I'm guilty and the number of years I'm

25  going to get, et cetera, and then even by this morning,

1    once again, undermining my confidence in my attorney,

2    the fact I said, we need to guess this to His Honor and

3    to let him know this is going on, this is what has

4    transpired, and as a result of that, he said, I think

5    that might be a good idea. It was not even going to be

6    brought to the Court's attention or be made a part of

7    the record, once again, undermining my confidence in my

8    attorney.

9              THE COURT:  Frankly, there's no reason,

10   other than -- your current expression of your

11   dissatisfaction with counsel will be made a part of the

12   record.  Now it will be made part of the record because

13   of your dissatisfaction.  But that's really the only

14   thing that I see that it bears on, is your relationship

15   with your counsel.

16             Let me just say this.  I mean, this is --

17   there are three witnesses left in this case.  This has

18   come up here on the final day of the government's

19   evidence.  The government informed me this morning that

20   they would be resting their case within several hours.

21   This comes at the very end.

22             I have listened to the evidence patiently,

23   as has this jury.  I have seen your counsel perform

24   under what seems to me to be very difficult

25   circumstances.  There is some very challenging testimony

1    that has come out.  I have not seen or heard anything

2    that leads me to believe that it is not -- that he does

3    not have your highest and best interests in mind in his

4    handling of everything.

5            Now, in terms of his being friendly, as you

6    might view it, with a witness, perhaps you have noticed

7    that he does have that demeanor with witnesses.  He

8    treats them in a kindly fashion, even when he gets

9    something from him.  So the fact that he might have

10   sought the autograph of a witness is of no particular

11   moment.  In fact, it appears to me one of his strong

12   suits is the fact that the witnesses, even those that

13   have been cross-examined by him, like him.  Sometimes

14   that has benefit to the defendant himself.  So I don't

15   really read anything into the fact that he's been

16   friendly with a witness and got a witness' autograph on

17   a book.  That doesn't tell me anything about his

18   representation here.  Nor have I seen anything under

19   these very difficult and challenging circumstances that

20   leads me to believe he does not have your interests at

21   heart.  I've never seen, in any case, him do anything

22   other than represent to the best of his ability his

23   clients.  I'm not seeing anything here that would lead

24   me to believe that's not true.

25            That's where I am.

1          THE DEFENDANT:  I'm fully appreciative of

2    the Court's time and the 14 jurors who have been here

3    now for two weeks. It wasn't a question of Mr. Anderson

4    being likeable or anything like that. I like him --

5          THE COURT:  My point is that sometimes

6    reading into friendliness with an adverse witness is,

7    from your perspective, it doesn't say anything.  It

8    really doesn't tell me anything about the quality of his

9    representation.

10          THE DEFENDANT:  I was not really feeling

11    like that.  It undermined my confidence to discuss --

12    there's a possibility that Geller first says that my

13    attorney said that I am guilty.  The other one said that

14    I may be guilty and if found guilty.  I know both of

15    them are there and I haven't seen the second one. But it

16    wasn't him being friendly with the witness that

17    disturbed me so much as the fact that number one, there

18    was a discussion about how much time I would receive if

19    I were found guilty or if I am guilty.  Finally, the

20    discussion of this appeared to be significant enough

21    that the man was sending out e-mails to 20 something

22    people including witnesses who had not testified before.

23    With all that said, even with all that significance, it

24    was only until this morning we were able to get this on

25    the record and that's upon my own insistence. I feel

1    those elements alone certainly caused me to have an

2    undermining of my confidence in Mr. Anderson, who I like

3    and respect.

4            THE COURT:  Again, the standard for me is

5    the determination as to whether there is, at this

6    juncture, it would be appropriate for me to declare a

7    mistrial and begin this all over again and I see nothing

8    that would lead me to do that.  I have not seen any

9    evidence that he's done anything that was not in your

10   best interests, again, in this very challenging and

11   difficult case. There have been witnesses that have

12   taken the witness stand that frankly, I had no earthly

13   idea how they could be appropriately cross-examined and

14   he has handled himself, given the difficult

15   circumstances, as well as I would think counsel could be

16   expected.  So under those circumstances, I mean, Mr.

17   Johnson, it just seems to me a mistrial would not be

18   warranted.

19           Let me hear from the government, the

20   government's perspective on this before I conclude it

21   though.

22           MR. BYBEE:  Your Honor, although the e-mails

23   were sent to a select group of investors who are

24   interested in this case, Mr. Church was not in a

25   position to see that e-mail when he testified and even

1   if he was, it wouldn't make any difference because all

2   of the investors already have their opinions about Mr.

3   Johnson's guilt or innocence in this case.  No juror has

4   heard this or knows anything about it and it would have

5   no effect at all.

6              THE COURT:  Again, I return to this question

7   of representation and that's the only thing it bears on.

8   I don't see that it would be appropriate for me to

9   declare a mistrial and essentially start this lengthy

10  and complicated trial over again because of that one

11  incident which, frankly, I don't think demonstrates

12  anything in terms of an adverse handling of matters by

13  your counsel.

14             I guess it's best that we go ahead and move

15  on.  As I understand it --

16             THE DEFENDANT:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Johnson.

18             The government has three more witnesses; is

19  that correct?

20             MR. BYBEE:  Yes, sir.

21             THE COURT:  Why don't we go ahead and bring

22  the jury in?

23             COURT SECURITY OFFICER:  Your Honor, I have

24  a note here about the cost of their lunch that I'm going

25  to pass on to one of the jurors, if that's agreeable.

1                 THE COURT:  Go ahead.

2                 (Jury returned to jury box).

3                 Good morning, ladies and gentlemen.  I

4    apologize for us starting a little late.  I had some

5    procedural matters I had to deal with here.  I've now

6    dealt with them and we'll continue.

7                 I'm informed by the government that they

8    only have three remaining witnesses and they intend to

9    rest their case sometime early today.

10                We will hear from the government's next

11   witness.

12                Call your next witness.

13                MR. BYBEE:  United States calls Danny

14   Taylor.

15     DANNY TAYLOR, CALLED AS A WITNESS BY THE GOVERNMENT,

16                              SWORN

17                       DIRECT EXAMINATION

18   BY MR. BYBEE:

19      Q.  Would you tell us your name, sir?

20      A.  Danny Taylor.

21      Q.  Where do you reside, Mr. Taylor?

22      A.  Richmond, Virginia.

23      Q.  What is your occupation?

24      A.  I am a senior investigator and acting chief for

25   the division of securities with the Virginia State

1    Corporation Commission.

2       Q.   What does the Virginia State Corporation

3    Commission do?

4       A.   The State Corporation Commission consists of --

5            (The Court conferred with the court reporter).

6    BY MR. BYBEE:

7       Q.   What does the State Corporation Commission do?

8       A.   The State Corporation Commission actually

9    consists of many different divisions. There's the

10   insurance division, communications division and there's

11   my division, which is the division of securities and

12   retail franchising.  Specifically, that division has the

13   enforcement authority for that of investor protection

14   through the enforcement of the Virginia Securities Act.

15      Q.   Is the Virginia State Corporation Commission, is

16   it commonly or sometimes referred to as the SCC?

17      A.   Yes, sir.

18      Q.   That stands for State Corporation Commission?

19      A.   Yes, sir.

20      Q.   Where is it's office?

21      A.   It's office is located in downtown Richmond.

22      Q.   What kinds of authority does the State

23   Corporation Commission have?

24      A.   The State Corporation Commission, as a body, is a

25   civil authority.  Again, specifically as to the Virginia

 1    Securities Act, we have civil authority only within

 2    that.

 3        Q.   Can it bring administrative actions against

 4    individuals?

 5        A.   It can, yes, sir.

 6        Q.   Can it bring criminal actions against

 7    individuals?

 8        A.   We have no criminal authority, no, sir.

 9        Q.   What are your specific responsibilities, Mr.

10    Taylor?

11        A.   My specific role as senior investigator and

12    acting chief, I'm second in command of our enforcement

13    section.  Specifically, my role as an investigator is to

14    investigate potential infractions of the Virginia

15    Securities Act.

16        Q.   What training have you had with respect to

17    securities, generally?

18        A.   I've had numerous trainings that I've received

19    specifically through the Northern American Securities

20    Administrators Association, which is pretty much the

21    oversight board for all securities at the state level

22    throughout the country.

23        Q.   Have you taken or taught any securities classes?

24        A.   I have taken many securities classes, as well as

25    taught many securities classes, yes, sir.

Taylor - Direct                    16

 1    Q.  Does your job require you to make determinations

 2  about when securities are involved in certain financial

 3  transactions?

 4    A.  Absolutely.  It's almost 100 percent of our work

 5  within the enforcement section.

 6    Q.  Do you make those determinations on behalf of the

 7  State of Virginia?

 8    A.  Yes, sir, that's correct.

 9          MR. BYBEE:  Your Honor, at this time, I'm

10  going to ask that Mr. Taylor be qualified as an expert

11  in securities.

12          MR. ANDERSON:   I have no objection, Your

13  Honor.

14          THE COURT:  Go ahead.

15  BY MR. BYBEE:

16    Q.  Mr. Taylor, what laws, in general, govern

17  securities?

18    A.  Securities regulation is governed by both federal

19  and state law.  Specifically from federal law, you have

20  the Security Acts of 1933 and 1934 and then you have

21  within individual states, each state has a specific

22  state securities act.  That's where my reference was to

23  the Virginia Securities Act.  So both federal and state

24  law govern securities.

25    Q.  Is the term "security" defined by a statute?

Taylor - Direct                                    17

1    A.  Yes, sir, it is.

2    Q.  Could you display Government's Exhibit 26-3 --

3  I'm sorry, 26-16, page three.  Is the definition -- is

4  there a federal definition of security, Mr. Taylor?

5    A.  Yes, sir. In fact, what you have here on the

6  slide, this is considered the federal definition under

7  the 1933 Securities Act.

8    Q.  Could you just read that, please?

9    A.  Yes, sir.

10    "The term security means any note, stock,

11  treasury stock, bond, debenture, evidence of

12  indebtedness, certificate of interest or participation

13  in any profit sharing agreement, investment contract,

14  voting trust certificate, any put, call, straddle,

15  option or privilege on any security, certificate of

16  deposit or group or index of securities or in general,

17  any interest or instrument commonly known as a

18  security."

19         THE COURT:  Before you go on, ladies and

20  gentlemen, at the conclusion of this case, I will give

21  you instructions that will guide your determination of

22  these various matters. I'm permitting this evidence come

23  in at this juncture, but remember, ultimately, the Court

24  will instruct you as to what a security is. It will be

25  your responsibility to follow in terms of the law, the

1    law as the Court gives it to you on this matter.

2    BY MR. BYBEE:

3       Q.  Mr. Taylor, is a promissory note a security?

4       A.  Yes, a promissory note is a security.

5       Q.  Is it also an evidence of indebtedness?

6            THE COURT:  A promissory note can be a

7    security.

8            THE WITNESS:  Can be security.

9            THE COURT:  You said it is a security. It

10   can be a security.

11           THE WITNESS:  Your Honor, I started to

12   clarify that.  Presumption of the law, within securities

13   law, there's a presumption that any note in a promissory

14   form is a security.

15           Thank you.

16           THE COURT:  Let me just say, ladies and

17   gentlemen, again, I'm going to be the one to instruct

18   you on this, not him.

19           Go ahead.

20   BY MR. BYBEE:

21      Q.  Is it also evidence of indebtedness?

22      A.  Yes, sir.

23      Q.  Is it also an investment contract?

24      A.  Yes, sir.

25      Q.  Mr. Taylor, are you also familiar with the way

1    records are kept at the State Corporation Commission?

2        A.   I am, yes, sir.

3        Q.   Do you keep investigative files?

4        A.   We do.

5        Q.   What goes into an investigative file?

6        A.   During the course of investigation, any number of

7    documents, memorandum.  Anything gathered during the

8    course of investigation would go in that file.

9        Q.   When something is mailed to the SCC, how is it

10   processed?

11       A.   Generally, we have a secretary who handles all

12   the incoming mail for our division and generally

13   speaking, that mail is timed and Bate stamped to show

14   evidence of receipt.

15       Q.   When you say timed, you mean like a date stamp?

16       A.   Yes, sir.

17       Q.   Why do you do that?

18       A.   Just to show receipt of the document, more so

19   than anything.

20       Q.   On occasion, do you also keep envelopes and

21   mailing labels?

22       A.   We do, yes, sir.

23       Q.   Do you also have some familiarity with the

24   particular file that the SCC kept in this case on Mr.

25   Ted Johnson and Frank Farrier?

Taylor - Direct                                     20

1      A.   I do, yes, sir.

2      Q.   Can you tell us, have you reviewed that file in

3  it's entirety?

4      A.   I have, yes.

5      Q.   How did the SCC action against Mr. Johnson get

6  started?

7      A.   It is my understanding, in early January of 2001,

8  the division of securities, which I work at, had

9  received what we considered at that point an anonymous

10  complaint from another broker dealer which was in Giles

11  County, which was faxed to our division.

12      Q.   Did that fax also contain an advertisement?

13      A.   It did, yes, sir.

14      Q.   Would you display Exhibit 26-1, please?

15           Is this the fax cover page to what you were just

16  speaking about, Mr. Taylor?

17      A.   Yes, sir.

18      Q.   Would you go to page two, please?

19           Is that the ad that accompanied that fax?

20      A.   That is correct, yes.

21      Q.   Now, what was the SCC's response to this fax

22  communication?

23           THE COURT:  Would you put it back on the

24  screen, please, and highlight again so I can see?

25           Go ahead.

 1  BY MR. BYBEE:

 2    Q.  What was the SCC's response to the fax it

 3  received and this ad?

 4    A.  Based on having received the copy of this

 5  solicitation for investments, an investigation was

 6  opened by our division after which there was what we

 7  consider a request for information or an RFI, which was

 8  sent by the State Corporation Commission to Mountain

 9  Investments, Ltd.

10    Q.  Mr. Taylor, there is a book of exhibits near you.

11  I'll just tell you that the exhibits that we're

12  referring to are both in that book and on the screen.

13  If you'd like to see the paper copy, you may turn to

14  that exhibit or if you'd like to look at the screen, you

15  may do that also.

16        This 26-2, is that the initial letter that was

17  sent by the State Corporation Commission to Mr. Johnson?

18    A.  Yes, sir.

19    Q.  Could you read this second paragraph, and if

20  you'll look on the screen, you can see where I'm talking

21  about? Could you read that paragraph, please?

22    A.  "It has come to our attention that Mountain

23  Investments, Ltd., and/or its agents may have offered or

24  sold the reference investment opportunity in this state

25  prior to the required registration. In order to

1    determine whether or not the offer and sale of these

2    investment opportunities constitutes the sale of a

3    security as defined in the Virginia Securities Act,

4    please provide this division the following information."

5        Q.  Let me stop you there.  Then the letter goes on

6    to detail certain records that the corporation

7    commission would like to see.

8        A.  Yes, sir.

9        Q.  Would you go to page two, please?

10       A.  Okay.

11       Q.  Following the numbered list, among the items that

12   the State Corporation Commission --

13              THE COURT:  Let me also remind the jury the

14   defendant is not on trial here for any offense involving

15   the Commonwealth of Virginia.  He's on trial for federal

16   offenses.  I'll instruct you on that at the conclusion

17   of the case, as well.

18              Go ahead.

19   BY MR. BYBEE:

20       Q.  Mr. Taylor, if you would read paragraph six,

21   please, as an additional item that the State Corporation

22   Commission was requesting.

23       A.  Paragraph six states, "if applicable, please

24   provide the specific exemptions from registration being

25   claimed pursuant to section 13.1-514 of the Virginia

1    Securities Act for the sales identified above."

2        Q.   Did Mr. Johnson or an attorney representing Mr.

3    Johnson respond to the SCC's initial letter and these

4    requests?

5        A.   Yes, sir.  Mr. Johnson and Mr. Farrier had

6    obtained counsel by the name of Eugene Derryberry with

7    the law firm of Gentry Locke Rakes and Moore, and Mr.

8    Derryberry responded on their behalf.

9        Q.   Is this the response from Mr. Derryberry to the

10   State Corporation Commission, Mr. Taylor?

11       A.   Yes, sir.

12       Q.   Would you read the bottom paragraph here, the

13   bottom two paragraphs?

14       A.   "The partnership has never prepared" -- can

15   everyone hear me okay?

16             THE COURT:  We'll let you know if they

17   can't.

18             Go ahead.

19             THE WITNESS: "The partnership has never

20   prepared or used a prospectus or other offering

21   documents and has not used any agents, other than the

22   two partners. The partners did not prepare or use a

23   subscription, agreement, questionnaire or investment

24   contract, other than the notes themselves. As stated in

25   the narrative, there has been no standard sales pitch

1   and most of the investments were unsolicited.  The

2   partnership ceased accepting funds upon receipt of your

3   letter of January 22nd and has declined a number of

4   requests since that time.  We have not been able to

5   identify an exemption available to the partnership under

6   section 13.1-514 of the Code of Virginia."

7       Q.  What is Mr. Derryberry, on behalf of Mr. Johnson,

8   referring to when he's talking about not being able to

9   identify an exemption available to the partnership?

10  What is that?

11      A.  When the initial request for information went out

12  to Mr. Johnson in regards to the advertisement that was

13  run for the securities, it is our position, to make a

14  determination whether or not the specific instrument

15  being used at that time is, in fact, a security, under

16  the Virginia state code, under the Virginia Securities

17  Act, there a number of exemptions which are available to

18  specific issuers during the course of a securities

19  offering.  What this tells the State Corporation

20  Commission, through Mr. Johnson under counsel, is that

21  there have been no exemptions that they've been able to

22  identify in regards to that securities offering.

23      Q.  Mr. Taylor, is the federal -- does the state also

24  have a definition of a security?

25      A.  It does, yes, sir.

Taylor - Direct                                              25

1    Q.  Are there any important differences, for our

2  purposes here in this case, between the federal

3  definition of a security and the state definition of a

4  security?

5    A.  No, sir.  They're essentially the same.

6  Materially, they're the same.

7    Q.  Now, after the initial group -- let me direct

8  your attention, Mr. Taylor, to some notes that are

9  attached to this letter.

10      Were these all received by the State Corporation

11  Commission, the promissory notes?

12    A.  Yes, sir.

13    Q.  After that initial group of documents to the SCC,

14  did Mr. Johnson, through his attorney, periodically

15  supplement the records that the SCC was requesting with

16  additional submissions and additional records?

17    A.  Yes, sir.

18    Q.  I'm going to ask you to turn to one such

19  submission, which would be Exhibit 26-4.

20      Now, was this part of the ongoing dialogue

21  between the State Corporation Commission and Mr. Johnson

22  and his attorney?

23    A.  Yes, sir.

24    Q.  Was this particular document sent to the State

25  Corporation Commission?

1      A.  It was, yes.

2      Q.  Could you read, starting here with "enclosed" and

3   read down to "note"-- again, this is a letter from who?

4      A.  This would have been from Mr. Eugene Derryberry,

5   representing Ted Johnson and Frank Farrier, to the State

6   Corporation Commission.

7      Q.  What date was this letter dated?

8      A.  The letter was actually dated April 10, 2001.

9      Q.  Go ahead.

10     A.  "Enclosed are copies of bank statements for the

11  year 2000.  The deposits represent investment proceeds

12  while the checks represent a variety of expenses. I have

13  asked Mr. Johnson to obtain copies of the checks for the

14  last three months of 2000 as a representative sample and

15  I will forward these to you immediately upon receipt."

16     Q.  I'm sorry.  I don't think you read what I -- did

17  you start at the top where it says "enclosed"?

18     A.  I did not.

19     Q.  What I'm asking you to read, Mr. Taylor, is the

20  top, right under the salutation line, starting with

21  "enclosed" and ending with "note."  That's the part I

22  meant to ask you to read.

23     A.  "Enclosed, to give you an additional feel for the

24  operations of Mountain Investments, Ltd., as a financial

25  statement as of December 31, 2000, for it and its

1    affiliate company, Dogwood Farms, Inc., the letter

2    entity was formed to hold title for real estate

3    purchased by the venture and it's assets are considered

4    subject to the claims of the holders of the promissory

5    note."

6        Q.  Thank you.  Now, when Mr. Derryberry mentions

7    Mountain Investments and it's affiliate company, is that

8    a term the SCC uses or is familiar with?

9        A.  Yes, sir.

10       Q.  What is an affiliate company?

11       A.  An affiliate company being a related party in

12   terms of a corporate entity.

13       Q.  So it was the SCC's understanding at the time

14   that Mountain Investments and Dogwood Farms were

15   affiliates or related entities?

16       A.  At this point in the investigation, we would have

17   known that Mountain Investments was not incorporated

18   within the Commonwealth of Virginia, that it was

19   operating as a partnership and Dogwood Farms, Inc., of

20   course, we would have pulled Mr. Johnson and Mr. Farrier

21   as corporate officers of that corporation.

22       Q.  You would have known Mountain Investments and

23   Dogwood had some ownership in common.

24       A.  Yes, absolutely.

25       Q.  If you would go to the second page of that

1  letter, I'm going to ask you to read, starting with "as

2  you" and ending with "accepted."

3      A.  "As you were advised upon our first contact,

4  Mountain Investments and all of it's affiliates ceased

5  accepting new money upon receipt of the initial

6  notification from your office and no further funds are

7  being accepted."

8      Q.  So when Mr. Derryberry on behalf Mr. Johnson

9  makes the representation --

10          MR. ANDERSON:  I will object to the form of

11  that.  He's asking him to comment on Mr. Derryberry's

12  statement and I think it speaks for itself.

13          THE COURT:  I sustain the objection.

14  BY MR. BYBEE:

15      Q.  Mr. Taylor, if you will turn to page three of

16  that exhibit, do you see a financial statement?

17      A.  Yes, sir.

18      Q.  Was that part of the submission by Mr. Derryberry

19  at that time?

20      A.  Yes, sir.

21      Q.  Let me just -- this purports to be a financial

22  statement for both Mountain Investments and Dogwood

23  Farms?

24      A.  Yes, sir.

25      Q.  And the total assets, combined assets of both the

1    partnership and the corporation, do you see that at four

2    million, something?

3        A.  I do, yes, sir.

4        Q.  And then the accounts payable, some six million,

5    something?

6        A.  Yes.

7        Q.  And down here where the combined net worth of

8    both Dogwood Farms and Mountain Investments is a

9    negative $2 million?

10       A.  Yes.

11       Q.  $2.6 million?

12       A.  Uh-huh.

13       Q.  That was submitted on or about April 10, 2001?

14       A.  Yes, sir.

15       Q.  Did the SCC make it's own summary of investors

16   and then request additional documents, Mr. Taylor?

17       A.  They did, yes, sir.

18       Q.  Could I direct you to 26-5, please, second page?

19           Could you tell us what this document is, Mr.

20   Taylor?

21       A.  This is an additional request from the Division

22   of Securities and Retail Franchising, addressed to Mr.

23   Derryberry as counsel for Mr. Johnson and Mr. Farrier,

24   requesting additional information and documents.

25       Q.  Is one of those documents some personal financial

1  statements from the partners of Mountain Investments?

2      A.  Yes, sir.

3      Q.  Did Mr. Johnson, through Mr. Derryberry, respond

4  and comply with that request?

5      A.  Yes, sir.

6      Q.  I direct your attention to 26-6, please.  Is this

7  that reply, Mr. Taylor?

8      A.  Yes.

9      Q.  Do you see item three where they include signed

10 financial statements from Mr. Johnson and Mr. Farrier?

11     A.  I do, yes.

12     Q.  That was received what date?

13     A.  That would have been received July 13, 2001.

14     Q.  Would you turn to the second page, please? Is

15 this the financial statement that was supplied by Mr.

16 Johnson and Mr. Derryberry to accompany that letter?

17     A.  Yes, sir.

18     Q.  Does this purport to be a personal financial

19 statement of Mr. Johnson?

20     A.  It does.

21     Q.  Mr. Johnson lists his total assets of just over

22 $2 million?

23     A.  Yes, correct.

24     Q.  That his liabilities are just a little over

25 $2 million, as well?

Taylor - Direct                                31

1      A.   Yes, uh-huh.

2      Q.   And his net worth, he represents to the State

3  Corporation Commission, as a little over $25,000?

4      A.   That's correct.

5      Q.   Does Mr. Johnson certify this information at the

6  bottom?

7      A.   He does, yes.

8      Q.   I notice there is -- that the date's at 12/31/01,

9  but the certification is December 31, '00.  Do you see

10  that?

11      A.   I do, yes.

12      Q.   At some point in time -- strike that.  At some

13  point in time, did the SCC enter into a settlement

14  agreement with Mr. Johnson and the partnership, Mountain

15  Investments?

16      A.   They did, yes, sir.

17      Q.   I direct your attention to Exhibit 26-7.  Could

18  you go to page two, please?

19           Would you tell us what 26-7 is, Mr. Taylor?

20      A.   This would be a settlement order between the

21  Commonwealth of Virginia State Corporation Commission

22  and Mr. Frank G. Farrior and Ted G. Johnson, general

23  partners, doing business as Mountain Investments, Ltd.

24      Q.   Does the settlement order require Mr. Johnson to

25  repay all the investors?

 1      A.  It did, yes, sir.

 2      Q.  Could I direct your attention to the second page?

 3  Looking at the very bottom, D, did the settlement order

 4  also enjoin or bar the defendants or bar Mr. Johnson and

 5  Mr. Farrier from any future violations of the act?

 6      A.  It did, yes, sir.

 7      Q.  Would that include issuing any new promissory

 8  notes?

 9      A.  Absolutely.

10      Q.  If you will look at what is page six of the

11  settlement order.  I'm not sure what it is.  It's

12  probably the next to the last page of the exhibit.

13      Did Mr. Johnson and Mr. Farrier both sign and

14  date and agree to the settlement?

15      A.  They did, yes, sir.

16      Q.  Now, I'm going to ask you -- was Mr. Johnson

17  required to provide as part of the settlement agreement

18  periodic status reports on his efforts to repay the

19  investors?

20      A.  Yes, sir, that's correct.

21      Q.  Let me direct your attention to 29-9, please.  Do

22  you see --

23          THE COURT:  I have a different 26-9.  Maybe

24  there are two pages to it.

25          MR. BYBEE:  There are four or five pages to

Taylor - Direct                    33

1    it.

2              THE COURT:  Go ahead.

3    BY MR. BYBEE:

4    Q.  Do you see the mailing label as the first part of

5    this exhibit, Mr. Taylor?

6    A.  Yes, sir.

7    Q.  How did the State Corporation Commission receive

8    or obtain the mailing label?

9    A.  This would have been received from a mailing from

10   Mountain Investments to the Division of Securities with

11   the State Corporation Commission.

12   Q.  This happened to be copied and put in the file?

13   A.  That's correct, yes.

14   Q.  It shows that it was sent on or about 11/30,

15   2002, is that right, November 30?

16   A.  That's correct, yes.

17   Q.  It was sent from Mountain Investments to the

18   State Corporation Commission?

19   A.  Yes, sir.

20   Q.  Would you go to page two of that exhibit, please?

21   Would you just read that very short letter from Mr.

22   Johnson, please?

23   A.  "Please find the November 2, 2002 report from

24   Mountain Investments, Ltd.  Each reduction shown is by

25   agreement of the respective investor, with the remaining

1  investors to be satisfied within seven days of this

2  report.  Within ten days of this report, I will file an

3  amended report that I have full expectations will have

4  all investors' notes reduced to zero balance."

5      Q.  Was there a spread sheet accompanying this

6  letter?

7      A.  There was, yes, sir.

8      Q.  Would you go to the next page? Is this part of

9  that spread sheet?

10      A.  It is, yes.

11      Q.  Would you just tell us -- let me direct your

12  attention to just the first name and we'll go over that,

13  Mr. Allison.  Is this the balance that Mountain

14  Investments owed as of 11/5/02? Is that the

15  representation here?

16      A.  That's correct, yes.

17      Q.  His principle was reduced by a certain amount and

18  then the balance that was owed to Mr. Allison on

19  12/1/02, would be zero?

20      A.  That is what Mr. Johnson is reporting to the

21  state, yes.

22      Q.  Do you see in the third column these balances

23  where most of them, with a few exceptions, at least four

24  on this page, are all zero?

25      A.  Yes, that's correct.

Taylor - Direct                                          35

1    Q.  Is that the representation to the state that

2  these investors have at least a zero balance, at least

3  as far as what's being owed to them by Mountain

4  Investments?

5    A.  That's correct, yes.

6    Q.  Now, in the following month, in December, did Mr.

7  Johnson again make a submission to the state or send in

8  a status report of some kind?

9    A.  He did, yes.

10   Q.  Would you please turn to Government's

11 Exhibit 26-10? Is this a similar letter to the previous

12 one where he is sending in a summary of his efforts to

13 repay investors?

14   A.  It is similar. However, in this letter, he

15 indicates there are zero balances for all investors at

16 this point.

17   Q.  Is this where you're reading right there?

18   A.  That's correct, yes, sir.

19   Q.  If you would go to page two of that.  Is that in

20 reference to this third column where he represents to

21 the state that all the Mountain investors had been

22 repaid?

23   A.  At this point based on this letter and spread

24 sheet, he's representing that all investors have been

25 paid, that is correct.

Taylor - Direct                                    36

1    Q.   Could I retrieve Exhibit 54-1 from the exhibits

2    previously admitted, please?

3         Mr. Taylor, if you would look at Exhibit 54-1,

4    some excerpts from Mr. Johnson's personal journals.  I'm

5    going to ask you to locate an entry dated December 1,

6    2002.

7    A.   Yes, sir.

8    Q.   Could you just highlight that?

9         Would you read that, please, the December 1, '02

10   entry?

11   A.   "Sent report to state.  Should hear from

12   tomorrow."

13   Q.   Now, did Mr. Johnson continue sending reports on

14   into 2003?

15   A.   He did, yes, sir.

16   Q.   Let me direct your attention to 26-11.  Could you

17   explain what we're seeing on the first page of 26-11,

18   Mr. Taylor?

19   A.   Again, this would have been the mailing which

20   would have come to the State Corporation Commission

21   Division of Securities from a Mr. Ted Johnson, Jr.

22   Q.   What date was this received or sent?

23   A.   This is dated January 22, 2003.

24   Q.   From Mr. Johnson to the State Corporation

25   Commission?

Taylor - Direct                                    37

1      A.   That's correct.

2      Q.   Would you go to page two, please? Is this the

3  letter that was received by the State Corporation

4  Commission on or about that date?

5      A.   Yes, sir.

6      Q.   Again, accompanying this letter, was there

7  another spread sheet similar to the previous spread

8  sheets we've seen?

9      A.   Yes, there was.

10     Q.   Could you go to page three? Is this a further

11 spread sheet where investors are on the left side and

12 there's a series of balances for these investors and the

13 last column has a balance as of a certain date?  Do you

14 see that?

15     A.   Yes, sir.

16     Q.   Mr. Taylor, according to the records that have

17 been submitted so far to the state, up until this time

18 period, was there ever an indication in any of the

19 documents sent by Mr. Johnson that they were issuing new

20 promissory notes on the Dogwood Farms property?

21     A.   No, never.

22     Q.   Now, did Mr. Johnson at some point in time

23 attempt to summarize his efforts that he was making to

24 repay investors?

25     A.   Yes, sir.

1    Q.   Let me direct your attention to Exhibit 26-13.

2    Again, the first page of this exhibit is a postal

3    mailer.  Could you just walk us through that, please?

4    A.   Again, this would have been a mailer provided for

5    which it's addressed to the State Corporation Commission

6    from Mr. Ted Johnson, Jr.

7    Q.   This would have been sent on or about --

8    A.   The date of this appears to be April 9, 2003.

9    Q.   Would you go to the second page of this exhibit?

10   Is this part of the summary that Mr. Johnson was

11   submitting to the state?

12   A.   It is, yes, sir.

13   Q.   Would you read the third paragraph that starts

14   with "also previously"?

15   A.   "Also previously forwarded to the state was an

16   attachment indicating the source of the funds expended.

17   As indicated by the attachment, the funds were derived

18   from the sale of electrical products, trading accounts,

19   advances on inheritances, deeds of trust on personal

20   residences and real estates of Frank Farrier and Ted

21   Johnson and loans from family friends.  All of this was

22   done in an effort to satisfy notes created by Mountain

23   Investments, Ltd., and to comply with the agreed order."

24   Q.   Thank you.

25        Let me direct your attention to some further

 1  submissions.  If you would turn to 26-14, please.  Is

 2  this also a letter sent by Mr. Johnson to the

 3  Corporation Commission?

 4      A.  Actually, I think this letter was faxed to the

 5  Corporation Commission, yes, sir.

 6      Q.  Is that because of the fax information at the top

 7  of this?

 8      A.  Yes, sir.

 9      Q.  This would have been received on or about what

10  date?

11      A.  May 19, 2003.

12      Q.  Could you just read the bottom two paragraphs,

13  starting with "Mountain" and ending with "commission,"

14  please?

15      A.  "Mountain Investments, Ltd., is provide your

16  office on or before June 2, 2003, a final report that

17  indicates all of the remaining investors of Mountain

18  Investments, Ltd., have been satisfied in full.

19  Included in this report will be documentation that will

20  verify the payoffs to the investors. With this final

21  report, all of the investors of Mountain Investments,

22  Ltd., will be satisfied in full and reported to the

23  State Corporation Commission."

24      Q.  Thank you.  Now, did Mr. Johnson also send a

25  letter later that same month, on May 30, 2003?

1      A.   He did, yes, sir.

2      Q.   Let me direct your attention to 26-15.  Now,

3    could you please read for us the first paragraph?

4      A.   "When I last spoke to you, I fully anticipated

5    having the remaining investors satisfied in full by this

6    date.  Over the last 70 plus days, I have been working

7    on completing a trading program that I would utilize in

8    finalizing our obligations to the investors as shown on

9    the attached report."

10     Q.   If you go to page two, please? Would you read --

11   actually, just read these three paragraphs, please.

12     A.   "Two different trading methodologies were to have

13   been received several weeks ago, along with one that I

14   was expecting when I talked to you a couple of weeks

15   ago.  Neither was received timely and I am just now

16   receiving both of them as of today.  One of the trading

17   methodologies has been traded by the developer in real

18   time for over 14 months and yields over $400 per day per

19   unit. I have two different accounts that I am a

20   contractor and receive 50 percent of the profits. These

21   accounts can trade 90 units per day so within the next

22   30 days, any investor that is shown on the attached

23   report today will be satisfied in full. I would like to

24   point out that since Mountain Investments, Ltd., was

25   first notified by your department of our necessity of

1    complying with state regulations, we have reduced our

2    obligation to our investors by 86 percent, in the amount

3    of 4,711,414.60.

4         Q.  If you could pick up Exhibit 54-1 again and find

5    the line entry for June 1, 2003.

6         A.  Yes, sir.

7         Q.  Would you read that, please?

8         A.  "Sent the state a report yesterday.  They will

9    get it Monday."

10        Q.  Now, do you know when the SCC finally found out

11   that Mr. Johnson was issuing more promissory notes

12   through Dogwood Farms?

13        A.  At that point, I was fully engaged in the

14   investigation and it did not come to my awareness until

15   the early part of 2004.

16        Q.  Were you then the lead investigator on the case?

17        A.  That is correct, yes, sir.

18        Q.  Based on that, was the SCC preparing to take any

19   further action?

20        A.  Based on my investigation and having found that,

21   in fact, the notes had not been repaid as per the terms

22   of the original settlement order, yes.  The State

23   Corporation Commission and the Division of Securities

24   moved for what we call a rule to show cause hearing for

25   contempt violation of the original settlement order.

Taylor - Direct                                    42

1    Q.   Did anything prevent that?

2    A.   The actual hearing itself was continued twice up

3    until there was a bankruptcy filing in September of 2004

4    which preempted our pursuing that rule to show cause,

5    yes, sir.

6    Q.   Just a point of clarification, Mr. Taylor. The

7    settlement order that enjoined any future violations of

8    the Securities Act, did that include all promissory

9    notes, whether they were written on Mountain Investments

10   or Dogwood Farms?

11              MS. ANDERSON:  I'll object to that.  The

12   order is entered as an exhibit and speaks for itself.

13              THE COURT:  I overrule your objection.

14              THE WITNESS:  That order would -- yes, it

15   would have been all inclusive, regardless of whether it

16   would have been Mountain Investments, Dogwood Farms or

17   any other entity that Mr. Johnson and Mr. Farrier would

18   have entered into, yes.

19              MR. BYBEE:  Thank you.

20              No further questions.

21              May I move for the admission of Exhibits

22   26-1 through 26-16, with the exception of two?  26-8, I

23   believe is blank.  There is no exhibit there.  And

24   26-12, I intentionally omitted and am not asking to be

25   admitted.

 1              THE COURT:  They'll be received.

 2              (Government Exhibits 26-1 through 26-7;

 3    Exhibits 26-9 through 26-11; and Exhibits 26-13 through

 4    26-16 were admitted into evidence).

 5                        CROSS-EXAMINATION

 6    BY MR. ANDERSON:

 7      Q.  Good morning, Mr. Taylor.

 8      A.  Good morning.

 9      Q.  When did you first become involved with the

10    investigation on behalf of the State Corporation

11    Commission?

12      A.  I actually started with the State Corporation

13    Commission in November of 2003, and it wasn't too much

14    further after that that the case was actually reassigned

15    to me.

16      Q.  So from the inception of January of '01 to the

17    latter part of '03, another of your colleagues was

18    running this investigation.

19      A.  That's correct, yes, sir.

20      Q.  The correct way to pronounce his name is how,

21    sir?

22      A.  My understanding -- I don't know the individual.

23    My understanding, it's Chartier.

24      Q.  Did you ever have an opportunity after your

25    involvement to discuss the investigation with Mr.

1    Chartier?

2        A.  At one time, yes, I did.

3        Q.  Did he give you any insight on the investigation

4    or bring you up-to-date on what his role had been with

5    respect to Mountain Investments, Mr. Farrier and Mr.

6    Johnson?

7        A.  The only thing that would have been discussed

8    with Mr. Chartier would have been what was in the record

9    at that time based on the investigative file.

10       Q.  If I can ask the government to put up, please,

11   Government Exhibit 26-7 and then go to page six, the

12   signature page of that exhibit, please.

13           Mr. Taylor, does this look like to you it is the

14   signature page on the settlement order between State

15   Corporation Commission, Frank Farrier, Ted Johnson,

16   general partners, doing business as Mountain

17   Investments, Ltd.?

18       A.  It does, yes, sir.

19       Q.  The signatures you've identified earlier are

20   those of Mr. Farrier and Mr. Johnson?

21       A.  That's correct.

22       Q.  There's no signature of Dogwood Farms on that

23   order, is there, sir?

24       A.  No, sir.

25       Q.  If I may then, please, Ms. Vogt, go back to page

Taylor - Cross                                    45

 1   two of exhibit -- Government Exhibit 26-7, please.

 2        That's the front page of the settlement order

 3   between the State Corporation Commission and Mr. Farrier

 4   and Mr. Johnson, general partners, doing business as

 5   Mountain Investments?

 6        A.   Yes, sir.

 7        Q.   Please turn to the next page.  Under paragraph D,

 8   can I get you to highlight that, please, Ms. Vogt?

 9        That paragraph D says, "Pursuant to section

10   13.1-519 of the act, the defendants will be permanently

11   enjoined from future violations of this act;" is that

12   correct?

13        A.   Yes, sir.

14        Q.   Dogwood Farms is not listed as a defendant in

15   that order, is it, sir?

16        A.   It's not listed specifically there, no.

17        Q.   So when you testify that the Dogwood Farms notes

18   you would consider to have been enjoined pursuant to the

19   terms of this order, that's really your opinion as to

20   what this order says and not actually what the order

21   reflects; isn't that true?

22        A.   Under the Virginia Securities Acts, all the

23   provisions within that act would speak to any future

24   violations, regardless of whether it was a registration

25   violation or whether, in particular case of Dogwood

1    Farms, there were issues of misrepresentation or

2    omission of material fact.  It is conclusive.

3        Q.  You will agree with me, however, would you not,

4    sir, that Dogwood Farms is not listed as a defendant in

5    that order?

6        A.  It is not listed within the order.  However, it

7    is identified by counsel prior to, during dialogue and

8    correspondence with the division.

9        Q.  And you would agree with me, would you not, sir,

10   that Dogwood Farms nor any representative in an official

11   office capacity of Dogwood Farms is an endorser of that

12   order.

13       A.  That would be correct.

14       Q.  Thank you.  Mr. Taylor, I want to speak with you

15   now about Government Exhibit 26-10.  That exhibit has

16   several pages contained within it.  I will try to get

17   the correct page so we can pull it up on the screen.  I

18   may ask you to look at the second and third pages of

19   Government Exhibit 26-10.

20           These are what you identified earlier as

21   submissions by Mountain Investments through Mr. Johnson

22   as documents sent to Mr. Chartier during the course of

23   this investigation.

24       A.  That is correct.

25       Q.  Dated December 10, 2002.

1    A.   Payment schedule, that is of December 10th, yes,

2   sir.

3    Q.   It shows certain balances of the Mountain

4   Investments investors to be zero.

5    A.   Yes.

6    Q.   If you may, please put up page six of Government

7   Exhibit 26-10, please.

8        I apologize.  For the record, it should be

9   Government 26-11, the third page of that, please.

10       Mr. Taylor, this is a summary of the Mountain

11  Investments investors, submitted to the SCC by Mr.

12  Johnson?

13   A.   Yes, sir.

14   Q.   And again, the balance as of January 1, 2003, do

15  you see this area here?

16   A.   Yes, I do.

17   Q.   Those are left blank, are they not?

18   A.   That column in particular is blank, yes.

19   Q.   Did you inquire or were you involved in the

20  investigation at that time to determine what those

21  blanks referenced?

22   A.   I was not.

23   Q.   Were you aware that during the course of the

24  investigations Mr. Chartier was investigating that there

25  were times Mr. Johnson, on behalf of Mountain

Taylor - Cross                                    48

1   Investments, made amendments to the schedules that had

2   been sent to the State Corporation Commission?

3       A.   I understand there were numerous filings and

4   amendments that were made. I can tell you from my

5   assessment of what was on record, it was all over the

6   place.

7       Q.   Though you weren't involved in that

8   investigation, nor were you part of the agreement

9   reached by Mr. Chartier and Mountain Investments, you

10  have gone back and formulated your opinions after the

11  fact, have you not?

12      A.   I don't know what agreement there was between Mr.

13  Chartier --

14      Q.   You certainly know there was a settlement order.

15      A.   Right, yes, sir.

16      Q.   Prior to that, you don't know what was said to

17  Mr. Chartier by Mr. Johnson or Mountain Investments with

18  respect to any of these amendments, do you, sir?

19      A.   No, sir, I don't.

20      Q.   You can't testify to this jury what they were,

21  can you, sir?

22      A.   I can only testify as to what was in the record,

23  yes, sir.

24      Q.   Is it also true, Mr. Taylor, that the SCC, in

25  it's many divisions, particularly the State Corporation

Frye - Direct                                  49

```
 1   Commission Securities Retail Division, as you've
 2   testified earlier, is civil enforcement and not
 3   criminal.
 4       A.   That is correct, yes, sir.
 5       Q.   Is it also not true, Mr. Taylor, you or your
 6   agency in that level of investigation can make referrals
 7   to, say, the Attorney General's office, for criminal
 8   prosecution?
 9       A.   That is correct, yes.
10       Q.   Thank you, sir. I have no further questions.
11              MR. BYBEE:  No redirect.
12              THE COURT:  You may step down, sir.
13              Call your next witness.
14              MR. BYBEE:  Dave Frye.
15   DAVID FRYE, CALLED AS A WITNESS BY THE GOVERNMENT, SWORN
16                    DIRECT EXAMINATION
17   BY MR. BYBEE:
18       Q.   Can you tell us your name, sir?
19       A.   David T. Frye.
20       Q.   Where do you reside?
21       A.   Roanoke, Virginia.
22       Q.   What is your occupation?
23       A.   I'm a special agent with the Federal Bureau of
24   Investigation, here in Roanoke, Virginia.
25       Q.   Were you present during the search of Mr.
```

1    Johnson's residence, Mr. Frye?

2       A.   Yes, I was.

3       Q.   In a general sense, can you tell us what kinds of

4    records you were searching for?

5       A.   Any type of financial or business record related

6    to Mr. Johnson and the company, Mountain Investments

7    and/or Dogwood Farms.

8       Q.   Did that include documents which might establish

9    or document the defendant's own income or financial

10   condition?

11      A.   Yes, it did.

12      Q.   I'd like to talk to you, Mr. Frye, about some

13   specific documents found during the search.  I'd first

14   like you to turn to Exhibit 6-3.  Do you recognize that

15   exhibit?

16      A.   Yes, I do.

17      Q.   Was that found at -- taken from Mr. Johnson's

18   home during the search?

19      A.   It was.

20      Q.   What is this?

21      A.   This is an earnings statement for Mr. Ted Johnson

22   from the Social Security Administration.

23      Q.   It has Mr. Johnson's name on it and his address?

24      A.   Yes, it does.

25      Q.   If you could -- if I could direct your attention

1    to the third or -- I think it's the third page, where at

2    the top it says, "help us keep your earnings record

3    accurate."  Do you see that?

4        A.  Yes.

5        Q.  Would you just read, starting with "since you

6    began working" and stop at "earnings"?

7        A.  "Since you began working, we recorded your

8    reported earnings under your name and social security

9    number.  We have updated your record each time your

10   employer or you, as self-employed, reported your

11   earnings."

12       Q.  Could you now go to the right-hand column, and do

13   you see that, Mr. Frye?

14       A.  Yes.

15       Q.  Could you tell us or just read for us the amount

16   of tax social security earnings and Medicare earnings

17   Mr. Johnson reported from 1992 to 2002?

18       A.  The record reflects no earnings spanning 1992

19   through the year 2003 and reflects 2004 had not yet been

20   reported.

21       Q.  Have you also, in preparation for your testimony

22   here today, examined Exhibit 50, which are the tax

23   returns of Mr. Johnson which have previously been

24   admitted into evidence in this case?

25       A.  Yes, I've reviewed those records.

1    Q.  Do those -- are those tax returns consistent with

2    this record here reporting no earnings and no taxes

3    paid?

4    A.  Yes, they are consistent.

5    Q.  Now, could I direct your attention to 6-9? Could

6    you just -- it's in the back of your exhibit book.

7    Could you just hold that up and tell us what that is?

8    A.  This is a booklet that was found during the

9    search of Mr. Johnson's home and it is a booklet

10   entitled Virginia Securities Act, 1999 edition.

11   Q.  Thank you.  Now, let me direct your attention to

12   Exhibit 54-1.  Are you familiar with that exhibit, Mr.

13   Frye?

14   A.  Yes, I am.

15   Q.  Now, using the excerpts for the document

16   contained within 54-1, did you then do some other

17   calculation or addition to that exhibit?

18   A.  Yes.

19   Q.  What did you do?

20   A.  We took this particular -- this was actually

21   created in an Excel spread sheet. We took this document

22   and merged it with another spread sheet that was created

23   that reflected the deposits into the accounts of the

24   various investors.

25   Q.  Was that information taken from Exhibit 60, Ms.

1    Warner's master spread sheet?

2        A.   I believe that's the correct exhibit, yes.

3        Q.   So that the new exhibit would just contain the

4    excerpts, with the deposits.

5        A.   That's correct.  We combined the two exhibits

6    essentially and sorted that by the date so that you

7    could see the deposits reflected, with the journal

8    entries, in chronological order.

9        Q.   Mr. Frye, let me -- I've handed you or asked the

10   bailiff to hand you Exhibit 54-2.  Is this the document

11   that you were just talking about, the merged exhibit

12   between the excerpts and Ms. Warner's master spread

13   sheet?

14       A.   That's correct.

15       Q.   It just continues the excerpts, along with

16   deposits from investors.

17       A.   Yes, sir, noting the deposits are reflected in

18   red.

19       Q.   And they are reflected at the time the deposits

20   were made, merged into the spread sheets.

21       A.   That's correct.

22       Q.   Mr. Frye, were you also, as part of your efforts

23   or investigation, assisted in the collection of the

24   records from Federal Express?

25       A.   Yes.

Frye - Direct                                54

1    Q.  Is Federal Express a commercial interstate

2  carrier?

3    A.  Yes, it is.

4    Q.  Now, let me direct your attention to Exhibit 6-4.

5  In your efforts -- is that a sticky that's on your

6  exhibit, Mr. Frye?

7    A.  Yes, it is.

8    Q.  Was Dogwood Farms of interest to you during the

9  search, Mr. Frye?

10   A.  Yes, it was.

11   Q.  Would any documents relating to the value of

12  Dogwood Farms also have been of interest to you?

13   A.  Yes, sir.

14   Q.  Was this document also taken during the search?

15   A.  Yes, it was.

16   Q.  Can you tell us who this letter is to and who

17  it's from?

18   A.  This letter dated January 24, 2001, is directed

19  to Mr. Ted Johnson from Carnell Investments.

20   Q.  Would you read the letter, please?

21   A.  "Dear Mr. Johnson, after further review, we are

22  unable to provide you the financing you requested. We

23  wish you the best with your development.  Following this

24  page are just a few reasons we are unable to provide the

25  financing you requested.  Enclosed is your retainer

1    refund minus our expenses. If you have other investments

2    you would like to discuss or any questions, please call

3    me at 805-595-9302.  Sincerely, Greg Carnell.

4        Q.  Would you turn to page two?

5        A.  Yes.

6        Q.  This Dogwood Farms, 281 acres, is that what you

7    understand to be the acreage in reference to the Dogwood

8    Farms property?

9        A.  This is the property that would include the

10   Dogwood Farms property and some property that is also

11   owned by Mr. And Mrs. Johnson.

12       Q.  At least for our purposes in this case, has it

13   all been lumped together and referred to as the Dogwood

14   Farms property?

15       A.  Typically, yes.

16       Q.  Would you read page two, please?

17       A.  "Dogwood Farms, 281 acres, Virginia, do not

18   recommend. Property marketable value not sufficient.

19   Higher than allowed LTD.  Two quick sales estimates put

20   loan request over acceptable LTB. BK possibility too

21   high.  BK possibility very likely with Ted Johnson's

22   house as additional collateral. No verifiable income or

23   substantial assets beyond subject property.  Applicant

24   has very little, if any, cost basis into property.

25   Applicant is income poor, cash poor, with no assets.

1    Environmental report had too many tentative issues.

2    Market conditions have changed.  Subject property is

3    speculative property which doesn't fare well in current

4    environment."

5        Q.   The date of that letter, again, Mr. Frye, was?

6        A.   January 24, 2001.

7        Q.   Now, was there also an appraisal of the property

8    found during the search?

9        A.   Yes.

10       Q.   Let me direct your attention to 6-5, please. Is

11   this the same appraisal we've seen previously? I believe

12   Mr. Church made reference to it?

13       A.   Yes, it is.

14       Q.   That also was found during the search?

15       A.   Yes, it was.

16       Q.   The appraised value, at least as of

17   February 2001, was what?

18       A.   2.1 million.

19       Q.   Can you give us a better idea of what the two

20   tracts of land we're talking about is? Do they have

21   names? Can we refer to them and who owns them?

22       A.   It is my understanding from the review of the

23   various documents we found during the search that the

24   two pieces of property, one is typically referred to as

25   the Mason property, which was actually owned by Dogwood

Frye - Direct                                           57

1  Farms, Incorporated.  The other parcel of land is

2  typically referred to as the Shumate property and it is

3  owned by Mr. And Mrs. Johnson.

4      Q.  When you put those two pieces of property

5  together, they come up with the 280 or 81 acres?

6      A.  That's my understanding.

7      Q.  Was the value of this land also stated in the

8  bankruptcy petition?

9      A.  It was.

10     Q.  Can I retrieve Exhibit 6-7 and 8, the bankruptcy

11  petitions? Would you please turn to 6-7 first, please,

12  Mr. Frye? This is the bankruptcy petition for what

13  entity?

14     A.  This would be the Dogwood Farms, Incorporated.

15     Q.  Would you turn to page five, Schedule A, real

16  property?

17     A.  Yes.

18     Q.  Does that indicate -- is the Mason farm or the

19  Mason property listed there?

20     A.  Yes, it is.

21     Q.  And the value given by the debtor is what?

22     A.  $1.3 million.

23     Q.  Could you now turn to Exhibit 6-8, please?  What

24  bankruptcy petition is this?

25     A.  This would be Ted Johnson's, bankruptcy petition.

1    Q.   Page six, please.  Schedule A real property, are
2    you there?
3    A.   Yes.
4    Q.   Does this list the Shumate tract?
5    A.   Yes, it does.
6    Q.   And the value given by the debtor there?
7    A.   800,000.
8    Q.   The two figures together, 1.3 and 8 come out to?
9    A.   $2.1 million.
10    Q.   Thank you.  Now, I'd like, Mr. Frye, as part of
11    your investigation, have you looked into and made
12    yourself knowledgeable about the deeds of trust that
13    were filed on the Dogwood Farms property?
14    A.   Yes, I have.
15    Q.   Could I direct your attention to Exhibit 56, 1
16    through 6? Do you have that? Do you have that in front
17    of you, Mr. Frye?
18    A.   Yes, I do.
19    Q.   Would you walk us through the various deeds of
20    trust that were filed on the land, beginning with 56-1
21    to 56-5, please?
22    A.   Okay.  The first Exhibit, 56-1, is deed of trust
23    that was filed on behalf of Gourley and Gourley.
24    Q.   Who is Gourley and Gourley?
25    A.   It was an entity that had lent money to Mr.

1  Johnson.

2    Q.  Do you have a date this deed of trust was filed?

3    A.  It's 1999, in the summer of 1999.

4    Q.  What was the amount of that deed of trust?

5    A.  $875,000.

6    Q.  875 or 825?

7    A.  I'm sorry, it was 825.

8    Q.  What position would they have been as far as

9  being a lienholder on the land?

10   A.  That would have been in the first lien position.

11   Q.  So that would have been the first deed of trust

12  filed.

13   A.  Yes.

14   Q.  Is there -- on the deed of trust typically, is

15  there a description of the land which describes what

16  actually the deed of trust is security for?

17   A.  Yes, there is.  That's the final page in this

18  exhibit.

19   Q.  Does it list both the Mason and Shumate tracts of

20  land?

21   A.  Not by name, but it lists two different tracts of

22  land.  One is by Dogwood Farms and the other reference

23  is Johnson.

24   Q.  Do they roughly come up to the roughly 281 --

25   A.  Approximately.

Frye - Direct                                          60

1    Q.   Could you then go to 56-2, please, and would you

2    tell us what this deed of trust is?

3    A.   This is a deed of trust that was filed in the

4    second lien position on behalf of Patricia Neville, for

5    $400,000.

6    Q.   It was filed when?

7    A.   In March of 2000.

8    Q.   You say this was -- she was in the second

9    lienholder position?

10   A.   That's correct.

11   Q.   Again, on that description page for the property,

12   are the two tracts of land listed?

13   A.   It's on the final page of this exhibit.  It also

14   depicts both tracts of land.

15   Q.   Would you go to 56-3, please?

16   A.   This is a deed of trust that was filed in the

17   third lien position for $355,000 that referenced

18   multiple individuals.

19   Q.   And it was filed when?

20   A.   May 31, 2001.

21   Q.   Does it also reference the two tracts of land?

22   A.   Yes, it lists two tracts of land.

23   Q.   Would you go to 56-4, please?

24   A.   This is a deed of trust for $100,000, filed

25   May 31, 2002.

1   Q.   This is -- who's the beneficiary of this deed of

2   trust?

3   A.   This would have been Mr. Martin, Ross E. Martin,

4   and his wife, Gladys Martin.

5   Q.   Did you say it was filed in May of '02?

6   A.   Yes.

7   Q.   Again, is the same Dogwood property put up for

8   the security?

9   A.   There is also two tracts of land referenced in

10  the legal description.

11  Q.   Would you go to 56-5, please?

12  A.   This is a $200,000 deed of trust filed on behalf

13  Donald H. Church, listing the two tracts of land, once

14  again, filed in August 9, 2002.

15  Q.   Now, were there any other deeds of trust that you

16  found that were filed at the courthouse on that land?

17  A.   No, there were not.

18  Q.   Now, roughly, summing up the total of those deeds

19  of trust, roughly about $1.8 million?

20  A.   That is correct.

21  Q.   Now, during the search, did you find any other

22  deed of trust purporting to be secured by the Dogwood

23  Farms property?

24  A.   Yes, we did.

25  Q.   Would you turn to 56-6, please? What is this?

1     A.   This is a deed of trust which our investigation

2     has determined was never filed.  A copy of this deed of

3     trust was found during the search warrant of Mr.

4     Johnson's home.

5     Q.   Were there a number of beneficiaries of this deed

6     of trust, Mr. Frye?

7     A.   Yes, there were.

8     Q.   Mary, could you display page two or three? I'm

9     not certain.

10         Do you know how many investors were listed on

11    this deed of trust, Mr. Frye?

12    A.   I don't know a specific number.  I believe it's

13    well over 50.

14    Q.   Are there two pages of these names of note

15    holders?

16    A.   Yes, there are.

17    Q.   The total value of this deed of trust was what?

18    A.   5,632,600.13 -- I'm sorry -- 5,632 --

19    5,632.600.91

20    Q.   Is it 613?

21    A.   613.91.

22    Q.   Are those all the note holders on this deed of

23    trust, Mr. Frye?

24    A.   Yes.

25    Q.   Could you go to 56-7, please? Mr. Frye, this is a

1  summary of the information that you've just testified

2  to.  Would you look at it and make sure that's accurate?

3      A.  Yeah, I've added this up.  The figure at the

4  bottom is accurate.

5      Q.  So that if you combine both the filed deeds of

6  trust and the unfiled deeds of trust, this land -- or

7  had the deed of trust -- let me put it that way.  Had

8  the sixth deed of trust been filed on the land, the

9  liens would have totaled over $7 million?

10     A.  That's correct.

11          MR. BYBEE:  Your Honor, at this point, I

12 would ask to admit Exhibit 6-3, 6-4, 54-2, 6-5 and 56-1

13 through 56-7.

14          THE COURT:  It will all be received.

15          (Government Exhibits 6-3, 6-4, 6-5, 54-2 and

16 56-1 through 56-7 were admitted into evidence).

17          MR. BYBEE:  No further questions.

18                  CROSS-EXAMINATION

19 BY MR. ANDERSON:

20     Q.  Good morning, Mr. Frye.

21     A.  Good morning.

22     Q.  Mr. Frye -- I should say Special Agent Frye.

23 Excuse me.  When you executed the search warrant at Mr.

24 Johnson's residence, did it have an office in it?

25     A.  Yes, it did.

1      Q.   Did most of the documents that have been referred

2   to having come from the residence of Mr. Johnson come

3   from that office?

4      A.   A large portion came from that office, but not

5   all of the records.

6      Q.   Did you find any evidence to suggest to you that

7   in that office that any documents had been intentionally

8   shredded or destroyed in any way?

9      A.   No, sir.

10     Q.   Other than the exhibit that was prepared by the

11  FBI, by Mrs. Warner, regarding the four bank accounts

12  from National Bank of Blacksburg and others, a lot of

13  the investor documents came from the search of that

14  office.  Is that fair?

15     A.   We obtained many records pertaining to investors,

16  yes.

17     Q.   Special Agent Frye, in conducting your

18  investigation, do you know which counts Mr. Frank

19  Farrier pled guilty to?

20     A.   I have a record here, if I could refer to it.

21     Q.   Please do.

22     A.   Mr. Farrier pled guilty to Counts 1, 19, 22, 35,

23  36 and 42.

24     Q.   1, 19, 22 --

25     A.   35, 36 and Count 42.

1    Q.  Thank you, sir.  Special Agent Frye, you were

2  present in the courtroom when Mr. Donald Church

3  testified?

4    A.  Yes, I was.

5    Q.  Did you hear his responses to questions and know

6  from other experiences that at some point, he filed

7  certain complaints against the FBI, yourself and other

8  agencies involved in this case?

9    A.  Yes, sir.

10    Q.  Do you know, sir, what the outcome of those

11  complaints were?

12    A.  With respect to the complaint filed within my

13  office, it was not pursued as an administrative inquiry.

14    Q.  Thank you, sir.

15          MR. ANDERSON:   That's all I have.  Thank

16  you.

17          THE COURT:  Anything further of this

18  witness?

19          MR. BYBEE:  No, sir.

20          THE COURT:  How long do you expect your next

21  witness to take?

22          MR. BYBEE:  35 to 40 minutes.

23          THE COURT:  When are we expecting lunch to

24  arrive for the jury?

25          COURT SECURITY OFFICER:  12:15.

 1              THE COURT:  Let's do this.  Let me take a

 2   very quick break, not more than five minutes, and then

 3   we'll continue on.

 4              (Recess at 11:50 a.m. until 12:00 p.m.)

 5              MR. BYBEE:  United States calls Joanna

 6   McGraw.

 7     JOANNA MCGRAW, CALLED AS A WITNESS BY THE GOVERNMENT,

 8                          SWORN

 9                     DIRECT EXAMINATION

10   BY MR. BYBEE:

11     Q.   Can you tell us your name, ma'am?

12     A.   Joanna McGraw.

13     Q.   Where do you live, Mrs. McGraw?

14     A.   Roanoke City.

15     Q.   What do you do for a living?

16     A.   I'm a real estate auctioneer and real estate

17   broker.

18     Q.   Can you give us just a little thumbnail sketch of

19   what those jobs entail?

20     A.   Yes.  I go out and procure business. I sell both

21   real estate and personal property, but primarily I sell

22   real estate.  From the beginning of the process, I meet

23   with potential sellers, talk with them about their

24   property, look at their property and then engage in a

25   contract with them to sell their property.

McGraw - Direct                                    67

1              My clients include estates, banks, bankruptcy

2     trustees, individuals, corporations, just a variety of

3     type of clients and a variety of properties, everything

4     ranging from assisted care facilities, undeveloped land,

5     commercial properties, residential properties,

6     industrial properties and then an occasional sale of

7     cars and trucks and heavy equipment.

8         Q.   You also mentioned in your job description that

9     of an auctioneer. Is that also something you do?

10        A.   Yes. Almost all of my sales are as an auctioneer

11    of those properties.  The real estate properties are

12    sold through the auction process. I have probably one or

13    two listings in a given year.  95 percent of my business

14    is as an auctioneer.

15        Q.   Is that something that you need a license for?

16        A.   Yes, sir.  I attended auctioneer school in

17    Missouri, the Missouri Auction School, in 1997.  Then I

18    had to pass an exam there.  Then I had to take a state

19    licensure exam.

20        Q.   Are you also an attorney as well?

21        A.   Yes, sir, I am licensed in the State of Virginia.

22    I clerked for a bankruptcy judge here in Roanoke in 1986

23    and then I was in private practice as a litigator

24    between 1987 and 1997.

25        Q.   All tolled, your experience with real estate

1    would be how many years, approximately?

2       A.    Well, I have a general understanding of real

3    estate, obviously, as an attorney. I did not have a real

4    estate practice except in the context of a couple of

5    foreclosures and then in bankruptcy cases in which I was

6    involved in relief and stay motions for the sale of

7    property for bank clients.  Also for some debtors in

8    possession.  So I had the ten years as an attorney and

9    then eleven years as a real estate agent and auctioneer.

10   I also have a brokers license in the State of Virginia

11   to sell real estate.

12      Q.    Now, at some point, were you hired to sell the

13   Dogwood Farms property?

14      A.    Yes, I was.

15      Q.    Could you tell us who hired you and how that

16   occurred?

17      A.    When you say you, Woltz and Associates, the

18   company for which I work, was hired.  The contact was

19   through me to the company.  I spoke with Al McLean, who

20   was counsel for Dogwood Farms in it's bankruptcy case,

21   and he asked us to do a proposal for a debtor in

22   possession sale.  Then eventually what happened, through

23   some agreements between counsel, as I understand it, it

24   was a sale as a foreclosure sale for the substitute

25   trustee that held the deed of trust on the property for

1    Gourley and Gourley.

2        Q.   What role did Gourley and Gourley play then?

3        A.   Gourley and Gourley actually negotiated the

4    contract with Woltz.  We entered a contact with them and

5    as usual, there are all kinds of changes and request for

6    changes in the auction contract because it was reviewed

7    both by local counsel, which was Mark Black, and their

8    counsel in northern Virginia, which was Mark Albert.

9    Ultimately, they did sign off on that contract.  Mark

10   Black signed off on the contract.

11            THE COURT:  I'll ask that you slow down a

12   little for the Court Reporter.

13            THE WITNESS:  We entered into the contract

14   with Mark Black, who was the substitute trustee under

15   the deed of trust, with Gourley and Gourley, to do the

16   sale.  However, we met with Mr. Farrier and Mr. Johnson

17   to look at the property and they were aware that we were

18   entering into this contract.  That's how it progressed.

19   BY MR. BYBEE:

20       Q.   Was the purpose of this sale to sell the property

21   and take the proceeds and pay off the lien holdings?

22       A.   Yes, sir.

23       Q.   Now, let me direct your attention to -- first of

24   all, tell me when the sale occurred.

25       A.   The sale occurred on March 23rd -- let me get the

 1    right year.  I believe it was 2005.

 2        Q.  Now, did you --

 3        A.  Yes.

 4        Q.  Did you actually go out and see the property?

 5        A.  Many, many times. I spent a lot of time on the

 6    property.  My initial visit to the property was with Jim

 7    Woltz, who was the owner of Woltz and Associates. We

 8    looked at the property with Mr. Johnson and Mr. Farrior,

 9    drove all over the property, got an explanation of the

10    history of the property, potential development for the

11    property and spent some time that day with them.  Then

12    of course I spent several days on the property with the

13    surveyor.  I was at the property showing the property,

14    putting signs up on the property, putting brochure boxes

15    on the property.  I spent many hours on the property.

16        Q.  Is this property in Giles County?

17        A.  Yes, sir.

18        Q.  Ms. McGraw, how are you yourself compensated in

19    this whole process for your efforts?

20        A.  We have a brokerage agreement for auction sales

21    whereby our company receives 50 percent of the

22    commission from the sale and then the agent receives

23    50 percent of the commission from the sale.  In this

24    case, Jim Woltz and I were working on this project

25    together.  So I would have received 25 percent of the

McGraw - Direct                                                71

1    commission from the sale and Jim would have received

2    25 percent.  That is based upon the sale price of the

3    property.  So it's a total of ten percent of the sale

4    price, but then it gets split.

5        Q.  Ten percent of the sale price is the commission?

6        A.  Correct.

7        Q.  That commission gets divided up between you, Mr.

8    Woltz and?

9        A.  Woltz and Associates.

10       Q.  And someone else.

11       A.  No, no.  If this were my sale by myself, Woltz

12   and Associates would get 50 percent and I would get

13   50 percent. In this case, Jim Woltz was working on the

14   sale as an agent, so 50 percent went to the company and

15   50 percent went to the agents.

16       Q.  The ten percent commission is the ten percent of

17   whatever the land brings.

18       A.  Correct.

19       Q.  So the higher the sale price, the more your

20   commission.

21       A.  Yes.

22       Q.  So you have a direct financial incentive to

23   maximize the sale value of the land.

24       A.  Absolutely.

25       Q.  What happens if the land doesn't sell for enough

1    or doesn't bring the price to pay off the lienholders,

2    et cetera? Do you have to foot any expenses?

3        A.   Well, we need to split expenses versus

4    commission.  Before I get any commission, expenses have

5    to be paid.  So typically, we get the expenses up front

6    in order to ensure that they get paid.  If we went over

7    the expense budget, then that would have to come out of

8    my commission.  So assuming all the expenses are paid,

9    then I would get paid from a commission.  If for some

10   reason the property with a sale that had a confirmation

11   price or minimum bid or foreclosure, if we didn't meet

12   that amount, then either my contract would have to say I

13   get paid ahead of creditors or my contract would say

14   that I'm taking the risk of doing the selling without

15   getting paid.  Obviously, I prefer the first choice,

16   getting paid.

17       The sale for this property did not provide for

18   our company to get paid ahead of Gourley and Gourley.

19   To my knowledge, at least in my career, I've only had a

20   couple like that because typically, the banks know we're

21   going to do our best and make a best effort and they're

22   willing to pay us ahead of themselves. Gourley and

23   Gourley was unwilling to do that. So in this case, had I

24   not reached their number, then I would not have gotten a

25   commission and if I had gone over budget on expenses, I

McGraw - Direct                                        73

1   would have reimbursed Woltz and Associates for the

2   overage.  So I actually had a chance to lose money.

3       Q.  Out of your own pocket.

4       A.  Yes, sir.

5       Q.  So that was another financial incentive to you.

6       A.  Yes.

7       Q.  Could I direct your attention, in your book --

8   you should have an exhibit book there. The very first

9   Exhibit is 41-1.  Do you see that letter that, Ms.

10  McGraw?

11      A.  Yes.

12      Q.  Do you recognize this letter?

13      A.  Yes.

14      Q.  What is this?

15      A.  It's a letter that I sent to some real estate

16  people.  It was a reminder that we were going to be

17  having the sale.  It was sent about ten days before the

18  sale.  Wanted to let them know what a great property

19  this was, encouraged them to come to the auction,

20  letting them know the time that I could provide them

21  with bidders packs, telling them where the sale was.  It

22  was a marketing piece I sent out just as a follow-up.

23      Q.  Were you in charge of the marketing of this

24  property?

25      A.  Yes.

McGraw - Direct

1    Q.  What is your goal when you market a piece of
2    property?
3    A.  Well, to bring in as many people as possible in
4    order to have competition, in order to get the highest
5    price. You asked me earlier what my role is.  My role is
6    everything from procuring the contract, hiring a
7    surveyor, walking the land, doing the subdivision,
8    appearing before town or city councils or planning
9    commissions, zoning issues, dealing with town officials,
10   speaking on the phone with anyone who calls in,
11   designing the sale brochure, doing all the due
12   diligence, putting up the signs, picking up brochures.
13   Q.  We get the drift.
14   A.  Everything -- you say marketing.  Yes, it was my
15   job to do the marketing.
16   Q.  All of that is designed for the purpose of
17   maximizing the sale price.
18   A.  Yes.
19   Q.  That's the ultimate goal, is it not?
20   A.  Yes.
21   Q.  Now, about how many real estate agents did this
22   go out to; do you know?
23   A.  I honestly don't remember. I know I had someone
24   go to the phone books and we sent it to real estate
25   agents and also some investors that we knew.

McGraw - Direct                                    75

1     Q.   Did you also make up fliers or brochures to

2  distribute?

3     A.   Yes.

4     Q.   Could I direct you to 41-2, please?

5     A.   Yes.

6     Q.   Is that the brochures or fliers you sent out?

7     A.   Yes, it is.

8     Q.   Where did these go? How did you distribute these?

9     A.   These were distributed in a couple of ways.

10  First, we sent them out to a mail list from our in-house

11  mail list and then -- which includes about 750

12  investors. Then we target buyers or people who

13  registered at prior auctions that we think might be

14  interested in this type of property.  We may have chosen

15  the developers, investors and people that attended sales

16  in that area.

17       We also purchased a mail list of about 1500 --

18  not about, it was 1586 names from a mail list service to

19  which we subscribe and that would have included buyers

20  like Wendy's and hotels and types of businesses that we

21  thought might be interested in doing business

22  development.  Then we also purchased a list of real

23  estate developers. There may have been some others, but

24  those are the two I remember.

25     Q.   Now, there's a back page to this, Mary.  Do you

1    have the second page?

2           That's the reverse of this exhibit, Ms. McGraw?

3    A.  Yes.  Not only do we send to those mail lists, I

4    went around Pearisburg and distributed them in like the

5    library, in the town office, to real estate offices and

6    then for people who called in for our Internet ads and

7    from the newspaper ads. Those were mailed out as well.

8    Q.  Quite a wide net was cast.

9    A.  Yes.

10   Q.  Now, if you could go back to the first -- well,

11   let me move on.  I'm going to come back to this exhibit

12   in a few minutes. I want to stay on this one topic that

13   we're on.

14          In addition to the brochures, did you also

15   advertise in newspapers?

16   A.  Yes.

17   Q.  Could I direct you to 41-3, please?

18   A.  Okay.

19   Q.  What is this exhibit, Ms. McGraw?

20   A.  This is an exhibit that shows where we advertise,

21   the cost advertising.  It's basically the production

22   budget.

23   Q.  Go right here, Mary.

24   A.  With the 1586, that was the purchased mail list.

25   We actually mailed out 3796 brochures from our mail

1  house.

2      Q.  Did you advertise in these papers, Ms. McGraw?

3      A.  Yes, we did.

4      Q.  Some of them being Salem Times, News Messenger,

5  et cetera, Roanoke Times, but you also advertised in the

6  Wall Street Journal, Washington Post?

7      A.  Yes.

8      Q.  And several state newspapers?

9      A.  Yes.

10     Q.  Again, casting a wide net for as many people as

11 you could reach?

12     A.  Yes, and we did state-wide ads as well. The two

13 that were down at the bottom, which go to about -- as of

14 today, about 88 papers in Virginia.  So we tried to hit

15 some of the more expansive papers like Norfolk,

16 Charlottesville, Richmond, through our state-wide ads.

17 Running ads in all those papers, it would have been too

18 expensive.

19     Q.  Can I direct your attention to 41-4, please?  Are

20 these some of the ads you ran in these newspapers?

21     A.  Yes, they are.

22     Q.  This is another one.  One more.

23          THE COURT:  How much longer do you expect

24 this to take?

25          MR. BYBEE: 20 minutes.

1          THE COURT:  The jury's lunch is in.  Let's

2   go ahead and recess for one hour for lunch.

3          Is this your last witness?

4          MR. BYBEE:  Yes, it is.

5          THE COURT:  I hate to interrupt, but the

6   jury has ordered it's lunch and it's probably arrived

7   and this would be a good time to recess.

8          We'll recess for one hour for lunch.

9          (Recess at 12:15 p.m. until 1:15 p.m.)

10          (Jury returned to jury box).

11          THE COURT:  If the witness would return to

12   the stand.

13   BY MR. BYBEE:

14   Q.  Ms. McGraw, when we broke for lunch, we were

15   talking about newspaper ads that you had put in the

16   paper to advertise the sale of Dogwood Farms.  I'd like

17   to continue on the same topic of your marketing efforts

18   for the sale of the land.

19          Now, were there any open houses or visitors

20   sessions where perspective bidders could come and look

21   at the land?

22   A.  Yes, there were.  We had previews scheduled on

23   March 9th and March 16th, from 12 to 3, and we held

24   those at the Pearisburg Community Center, in Pearisburg,

25   and also encouraged potential buyers to go walk the land

1    on their own.

2        Q.   Mary, could you display Exhibit 41-5?

3            Is this somehow related to the visitors sessions

4    you were just talking about?

5        A.   No, this is not related to the open houses. The

6    open houses, there's not a document regarding that in

7    your materials, but we had about 13 or 14 people at the

8    first one and we had, I believe, 9 or 10 at the second

9    one.  Those were people who actually signed in.  There

10   were some folks who chose not to sign in. Then there

11   were, as I said, those that wanted to walk the

12   properties on their own.

13       Q.   What does this exhibit demonstrate? What

14   information are you capturing here?

15       A.   This is information regarding the people who

16   actually went on our website, not just clicked for

17   information, but actually went on and visited the

18   website and looked at this information that was on our

19   sale brochure.  That was also on the website.  The top

20   shows people who visited from February 13th through

21   February 19th.  That number is, I believe, 182 actual

22   interested parties who reviewed the information.  Then

23   the next column is 185 for the next week and then the

24   next period, but this does not show the period of time

25   through the sale date when we would have actually had

1    many more visitor sessions.  I just put this is in the

2    file.  We don't always keep this. I happened to have

3    this in the file and we could not go back and retrieve

4    the later data because we switched systems.

5        Q.  From your testimony, I take it you had a website

6    that had -- what information -- was the brochure on it

7    or what exactly was on the website?

8        A.  The information would have been the sale brochure

9    information.  It may not have been set exactly like

10   this, but it would have had the identical information in

11   terms of the photograph and verbiage.  But it would have

12   been on the website a little differently because of a

13   different program. I just don't remember, but the survey

14   was probably on there.  I don't remember.

15       Q.  Now, in preparation for the sale, did you

16   actually put together any kind of packet of information

17   for perspective bidders?

18       A.  Yes, we did.

19       Q.  Can I direct your attention to 41-6?

20       A.  Yes.

21       Q.  Did you put this together, Ms. McGraw?

22       A.  Yes, I did.

23       Q.  Who was this directed to?

24       A.  This was distributed to the bidders at the

25   auction, but prior to the auction, we had something that

1   was pretty much identical.  It was just entitled Primary

2   Real Estate Bidder Packet.  That was mailed out to

3   anyone who called in the office and wanted one and also

4   was handed out at the open houses.

5       Q.  This packet has many, many pages to it, does it

6   not?

7       A.  Yes, it does.

8       Q.  Could you please tell us what kinds of

9   information you included in the bidder packet?

10      A.  Sure; a copy of the sale brochure; a copy of the

11  survey; a copy of the tax maps for all the property we

12  sold; copies of all the tax assessor cards for the

13  property we sold; copy for the zoning for all the

14  properties; a copy of the title commitment we obtained

15  from Lawyers Title regarding the title to the property,

16  including any easements, liens, et cetera; and then the

17  final two documents would have been real estate purchase

18  agreement that the buyer or buyers would need to sign on

19  sale day; and the final document is the notice of sale

20  that was prepared by the substitute trustee and his

21  memorandum of sale.

22      Q.  Now, were any of the information that we've

23  talked about, either the bidder packets or the brochures

24  or any other fliers or marketing material, were any sent

25  to the adjoining landowners of the property?

McGraw - Direct                                          82

    A.  Yes, we pulled the tax map and identified each
1

adjoining property owner, got their address and mailed
2

them a brochure for the sale.
3

    Q.  Now, let me talk to you for a minute, Ms. McGraw,
4

about auction sales, generally.  As an auctioneer, does
5

the auction price or the sale of the property when you
6

auction it off, is it always lower than the price that
7

the land is listed for?
8

    A.  No.
9

    Q.  Sometimes, is it higher?
10

    A.  Yes.
11

    Q.  Now, when you're deciding the best way to sell a
12

piece of land that has many, many acres, such as this
13

one, do you have any software or any other tools like
14

that to help you decide what the best distribution of
15

the parcels is?
16

    A.  Yes.  We start with the property as a whole and
17

look at it. We look at issues of the matter of road
18

frontage to determine what kinds of subdivisions you
19

might be able to do with the whole property.  You have
20

to look at how many tax parcels of property is currently
21

identified in. You may have one tax parcel.  You may
22

have ten tax parcels.  The more tax parcels, the better
23

you are because you can do some adjustments among those
24

parcels to create divisions that might be more
25

1  marketable.  We do topographical mapping. We work with a

2  surveyor and Jim Woltz has been dividing and subdividing

3  land for about 30 years. He's an expert and works with

4  us in determining the best way to subdivide the

5  property.

6      Q.  In fact, did you come up with a system or way to

7  subdivide the property?

8      A.  Yes, we did.

9      Q.  How many tracts of land did you come up with?

10     A.  We did 12 tracts of land starting with, I

11  believe, four tax parcels.

12     Q.  Mary, could you bring up 42-2, I believe?  Could

13  you zoom in on this picture right here?

14         Ms. McGraw, do you see what's highlighted on the

15  screen?

16     A.  Yes.

17     Q.  What's in your monitor would be a better view of

18  it, I guess.

19     A.  Yes.

20     Q.  Does this represent the dividing up of land?

21     A.  Yes, it does.

22     Q.  Could you just discuss this generally, what it is

23  and what we're looking at?

24     A.  Sure.  We looked at the property and were able,

25  because some of the property had access from streets, we

McGraw - Direct                                          84

1    were able to create a lot more tracts like along 8

2    through 11 because you can have access from -- road

3    frontage from those streets. Likewise, tract 6 had some

4    road frontage we could get through. Tract 1, we had a

5    little way we could get in there so we made a tract

6    there. Then we actually were able to create a right of

7    way from 1 through 2 to tract 4, to get access to tract

8    four.

9         So we looked at trying to create as many

10   subdivisions as were reasonable, not to get as many lots

11   as were possible, but to create lots that would be

12   valuable to a lot of people, whether they be residential

13   buyers, commercial buyers.

14   Q.  This box in the right-hand corner, does that list

15   the number of tracts with the approximate acreage for

16   each contract?

17   A.  Yes, it does.

18   Q.  And this was all designed to get the most value

19   for the land?

20   A.  That's correct.

21   Q.  Let's talk about the actual sale, Ms. McGraw.

22   Could you tell us where it was and how you actually go

23   about the sale of the land?

24   A.  Yes.  The sale was held in Pearisburg, pretty

25   close to the property, in the community center.  We

McGraw - Direct                                          85

1    start registration about an hour before.  We display

2    large copies of the survey.  We have all the due

3    diligence materials available.  We register bidders.

4    Then we do announcements.  They may take 10 minutes,

5    15 minutes. We do go through the entire bidder pack with

6    the audience. Then we sell a country ham in order to get

7    rapport with the audience, have them get used to the

8    auctioneer's voice, have them feel comfortable with the

9    bidding. Then we start with the auction.

10       Q.  Let me back up.  Does the auctioneer auction off

11   a ham?

12       A.  We do.

13       Q.  And this is to kind of get them in the mood to

14   bid?

15       A.  Correct.  Then what we do is after the bidding is

16   over, we then tell the winner if it's not over $75,

17   we're going to give you the ham for participating and

18   that's the last thing that you get for free because now

19   we're selling valuable real estate, and then we just

20   launch into the auction.

21          We do a system different from a lot of other

22   auction companies and it's proved to be very, very

23   successful when you have multi parcel buildings. We put

24   boards up that have each of the tracts, in this case, 1

25   through 12.  Unlike a typical auction, we post bids so

McGraw - Direct                                    86

1   when someone bids on tract 1, we post their bid. They

2   don't win it.  We post it. We go through all 12 tracts

3   posting the bids.  Then we say "does anyone want a

4   group?"  You could group 1 through 12, as long as it's

5   more than the 12 individually.  You can put 1 and 2

6   together, 1 through 6, 7 through 12.  It's the ultimate

7   flexibility for buyers. If you're one guy that wants to

8   bid one house, you keep bidding as much as you want on

9   your one tract.  If you're a developer that wants

10  commercial, you put those tracts together.

11        We go through this process until we sell the

12  property in the highest amounts, whatever the

13  permutation is, whether it's twelve bidders or one

14  bidder. Everybody gets a chance.

15        We divide the room up. We have bidder receivers

16  in each section. We have a rapport with the bidder. If

17  someone has bid on 1 through 12 and they post that every

18  individual or group that's winning, we go through and

19  say, "hey, you're out, you need to bid more."  We keep

20  working the crowd until it slows down and then we put a

21  two-minute clock on it and say, "if nothing sells in two

22  minutes, then the price is there."  That encourages the

23  people sitting back to bid because now we're going to

24  move forward.

25        With this sale, we actually announced at the time

 1   we had met the minimum bid in order to encourage more

 2   bidding at that point.

 3       Q.   Do you have people helping you do this?

 4       A.   Yes, sir.

 5       Q.   How many people did you have?

 6       A.   I think we had about nine people that day.

 7       Q.   Is that who you're referring to as bid receivers?

 8       A.   Yes.

 9       Q.   Their job is to walk around the crowd and whip

10   them up?

11       A.   I wouldn't say that.  We would encourage them to,

12   say, bid the highest amount they're going to bid. We

13   don't beat up on them.  We encourage them to buy.

14       Q.   How many people attended? How many people came?

15       A.   My recollection, and again it's been since 2005,

16   the room was pretty full.  I would say that there were

17   at least 100 people there, at least.  We had 59

18   registered bidders. Usually, a bidder doesn't come

19   alone.  They have someone with them, a spouse or

20   business partner. I know we had well in excess of 59.

21       Q.   How many people actually bid on the property?

22       A.   I would have to go back and check.  I don't know

23   how many individual people actually bid.  I could look

24   and tell you, but we had 59 registered bidders.

25       Q.   A registered bidder is -- what makes a bidder

1    registered?

2        A.   Someone who comes in, gives us the driver's

3    license. We take all the personal information and

4    they're given a bidder card.  You cannot bid unless you

5    have a bidder card.

6        Q.   Let me direct you to 41-7.

7        A.   I can tell you we had 103 bids during the

8    process, but I don't know how many of those were repeat

9    bidders, without looking at records.

10       Q.   Is this a bidder card?

11       A.   Yes, it is.

12       Q.   They fill out their name and address and give you

13   the driver's license.

14       A.   We fill it out for them.  We take their driver's

15   license and we actually complete it for them.

16       Q.   I'm sorry.  How many bids were there?

17       A.   103.

18       Q.   Now, at the end of this process, how many actual

19   purchasers were there? How many bids won and actually

20   purchased property?

21       A.   There were four successful bidders.  It sold to

22   four different bidders.

23       Q.   So were all 12 tracts of land sold?

24       A.   Yes.

25       Q.   Those 12 tracts of land went to four separate

1  individuals?

2     A.   Individuals or entities.  Some were LLC's, but

3  four buyers.

4     Q.   Some of the tracts of land were combined and some

5  weren't?

6     A.   Correct.

7     Q.   Could I have you turn to 41-10?  Are you required

8  to fill out what's known as a HUD 1 or a settlement

9  statement?

10     A.   The closing attorney or settlement agent does

11  that.  We do need to fill those out.  We provide

12  information from the sale to the closing attorney or

13  settlement agent.

14     Q.   Do you also get copies of these?

15     A.   We do.

16     Q.   The information that you provide -- what

17  information do you provide to the settlement attorney?

18     A.   A copy of the contract and in the letter when I

19  send it, I tell them we're holding a deposit of X amount

20  of dollars.

21     Q.   So the settlement attorney takes the information

22  you give them and puts that on the HUD 1?

23     A.   Right. If we are owed any money for expenses, we

24  would also give that information to the closing attorney

25  or settlement agent.

McGraw - Direct                                    90

1    Q.   Now, if you could highlight maybe this top part

2  right here and zoom in a little bit?

3         Do you recognize this form, Ms. McGraw?

4    A.   Yes, I do.

5    Q.   The property location, does this represent what

6  property was sold to that bidder?

7    A.   Yes, parcels 1, 2, 3 and 4.

8    Q.   Those four parcels were combined into one and he

9  bid -- is the sales price right here?

10   A.   Yes.

11   Q.   So whoever this is bought four parcels and paid

12  $711,900, am I right?

13   A.   Yes.

14   Q.   Could I direct your attention to 41-11, please?

15        Is this the second HUD 1 from that sale?

16   A.   Yes, it is.

17   Q.   They bought parcels 5 and 11, is that right?

18   A.   Correct.

19   Q.   They paid $84,000?

20   A.   Yes.

21   Q.   Would you go to 41-12, please?

22        Did the third buyer buy these parcels?

23   A.   Yes; 6, 7, 8, 9 and 12.

24   Q.   And paid 472,500 for them?

25   A.   Yes.

McGraw - Direct                                    91

1     Q.   And the fourth bidder bought just one parcel.

2     A.   Correct.

3     Q.   And paid 54,6 for it.

4     A.   Yes.

5     Q.   Now, I'm going to ask you to display

6  Exhibit 41-9.

7          Is this the trustees report of sale, Ms. McGraw?

8     A.   I recognize it as Mark Black's signature and he's

9  substitute trustee.  Mr. Black never gave me this. It

10  appears to be, yes.

11    Q.   Let's go to the second page, please.

12         This substitute trustee, Mark Black, you

13  recognize that as Mark Black's signature?

14    A.   Yes.  I've had lots of correspondence from him,

15  yes.

16    Q.   Was he, in fact, the substitute trustee?

17    A.   Yes, he was.

18    Q.   Could you go back to the first page?

19         Does that figure, 1,323,000, does that represent

20  the sum of those four bids that you received?

21    A.   It represents the sale price, just to clarify.

22  We get a bid amount.  We add a five percent buyers

23  premium to create the contract price. This number

24  represents the total that was paid for the property.

25    Q.   All four tracts together?

1    A.   Correct, correct.

2    Q.   The trustee is responsible for disbursing that

3  money out to the right parties?

4    A.   That's correct.

5    Q.   Did Gourley and Gourley get paid?

6    A.   The HUD 1 says they did and this says they did,

7  but I have no personal knowledge that they did. I assume

8  they did or we would have heard about it by now.

9    Q.   Would you go to the second page?

10        After Gourley got paid, was some money paid to a

11 second lienholder?

12   A.   I have no personal knowledge of that, but I have

13 no reason to believe that didn't happen, based upon this

14 document.

15   Q.   How long does the sale take?

16   A.   We started right around 12:00.  We did the

17 announcements and sold the ham.  We sold the properties

18 and the print-out that was done immediately at the end

19 of the sale was at 2:46.  So the sale took approximately

20 2 hours 45 minutes, start to finish.

21   Q.   Was this a fairly drawn-out process?

22   A.   Yes, it is.

23   Q.   Let me direct you to -- are you familiar with the

24 way the expenses were paid in this particular instance?

25   A.   Our expenses?

1    Q.   How the money, what money was used to pay those

2   expenses and whether any money was paid back to anyone?

3    A.   Yes.  We would not go forward with the sale

4   unless we had some expense money to cover the expenses.

5   Al McCain, who was counsel for the Dogwood Farms, sent

6   us a check in the amount of $30,000 to hold to cover the

7   expenses if there weren't enough funds from the proceeds

8   to pay our expenses.  Mr. McLean told me that those

9   funds had come from the second deed of trust holder.

10    Q.   Would you display 41-14, please?

11         Did you receive this letter, Ms. McGraw?

12    A.   Yes, I did.

13    Q.   Who's it from?

14    A.   It's from Mark Black.

15    Q.   You recognize that as Mr. Black's signature?

16    A.   Yes.

17    Q.   Does this letter memorialize the testimony that

18   you've just given us, that $30,000 came from the second

19   lienholder?

20    A.   Mr. Black said so and Mr. McLean said so, but I

21   wanted them both to tell me that in writing and then I

22   would return the 30,000.

23    Q.   In other words, you weren't going to return

24   30,000 just on a verbal say-so?

25    A.   No, no.

1    Q.  Did you, in fact, return the 30,000?

2    A.  I did.

3    Q.  Could I go to 41-15, please? Do you recognize

4    this letter, Ms. McGraw?

5    A.  Yes.  This is a letter from me to Al McLean.  He

6    had asked me to write the check to Ms. Neville rather

7    than to his office, which I did, copying Mark Black on

8    it and then sent the check for $30,000 to Mr. McLean.

9    Q.  Is this, in fact, that check?

10   A.  Yes, it is.

11   Q.  You made this out to the order of Patricia

12   Neville?

13   A.  Yes, based upon Mr. McLean's instructions and Mr.

14   Black's.

15   Q.  Would you go to Exhibit 41-16, page three,

16   please?  Have you seen this check before, Ms. McGraw?

17   Are you familiar with check, 25,923, to Patricia

18   Neville?

19   A.  No, sir, I'm sorry, I'm not.

20   Q.  Does this figure, 25,923, does that match the

21   disbursement listed by Mr. Black in his trustee's report

22   of sale, which is Exhibit 41-9?

23   A.  Yes, it does.

24   Q.  If we could go to Exhibit 41-17, please.

25   A.  If you could give me a second.  It may be on the

1    settlement statement.  There is a reference on one of

2    the settlement statements for 23,977.  That's close, but

3    I don't see anything that says it went to Ms. Neville.

4    Sorry.

5        Q.  Do you recognize 41-17?

6        A.  Yes.

7        Q.  Does this summarize your expenses and

8    reimbursements from the sale of the land?

9        A.  Yes, commission and expenses, yes.

10       Q.  Exhibit 41-18, there is a series of four checks.

11   Are those checks paid to you as part of your commission?

12       A.  These were the deposit checks for each of the

13   four sales and we put those checks into our escrow

14   account.  The deposits were ten percent of the sale

15   price. Our commission is ten percent of the sale price.

16   We leave those in our escrow account until after each of

17   the closings occur.  As I said in my letter to Ms. Reed,

18   once we knew the transactions had closed and the deeds

19   had been recorded, then we would transfer those amounts

20   from our escrow account to our operating account for our

21   commissions.

22       Q.  Now, would you please turn to Exhibit 41-19?

23       A.  Yes.

24       Q.  Do you recognize that exhibit?

25       A.  Yes.  This is the print-out that I mentioned a

1   while ago.  This one was has a slightly later date

2   because we -- time rather.  We print three of them and

3   it's a couple minutes longer than referenced.  This was

4   printed at 14:49, which was 2:49 p.m. It shows how the

5   property ultimately sold.  Tracts 1 through 4 sold

6   together for a total of $711,900.  Tracts 5 and 11

7   together, for 84,000.  Tracts 6, 7, 8 and 9, plus 12,

8   472,500.  And then tract 10, for 404,600, for the total

9   of 1,323,000.

10      Q.  Now for dividing up this land into these lots,

11   did Mr. Johnson have any input into that?

12      A.  I remember speaking with him at the beginning of

13   the process about our getting together and coming up

14   with what we thought was the best subdivision. He talked

15   about some of the ideas he had about marketing the

16   property.  The surveyor worked with us to actually lay

17   out the subdivision.  Mr. Johnson never expressed any

18   dissatisfaction with the way we had done it and he

19   signed on the surveyor as the owner, he and his wife.

20      Q.  Ms. McGraw, is it your belief that you did

21   everything you could to maximize the sale of the land?

22      A.  Yes.

23          MR. ANDERSON:  Objection, relevance.

24          THE COURT:  Overruled.

25   BY MR. BYBEE:

 1    Q.   And you believe you got the best price you could?

 2    A.   Yes.

 3         MR. BYBEE:  No further questions for this

 4    witness.

 5         THE COURT:  Mr. Anderson.

 6         MR. BYBEE:  Your Honor, I move to admit

 7    Government's Exhibit 41-1 through 41-19.

 8         THE COURT:  Received.

 9         (Government Exhibits 41-1 through 41-19).

10              CROSS-EXAMINATION

11    BY MR. ANDERSON:

12    Q.   Good afternoon, Ms. McGraw.

13    A.   Good afternoon.

14    Q.   I notice you talk a lot faster now than you did

15    when you were a litigator.

16    A.   I'm an auctioneer.

17    Q.   You became involved with Dogwood Farms through --

18    did I understand, through a connection from Mr. Al

19    McLean?

20    A.   Al McLean called me and asked me to take a look

21    at the property for Dogwood Farms.

22    Q.   Did you do that?

23    A.   Jim Woltz and I did that, yes.

24    Q.   After that time, did I understand you to say that

25    you took over for Gourley and Gourley or became employed

McGraw - Cross

1  by Gourley and Gourley?

2      A.  Gourley and Gourley got relief from stay in the

3  Bankruptcy Court to do a foreclosure and they were going

4  to proceed with a foreclosure.  Mr. McClain recommended

5  to Dogwood that we be used for Gourley and Gourley

6  because of our marketing and because of our multi parcel

7  bidding process.

8      Q.  Let's go back just a little.  When Mr. McLean

9  contacted you about you and Mr. Woltz taking a look at

10  the property, that was as counsel for Dogwood Farms; is

11  that correct?

12     A.  Yes, he was counsel for Dogwood Farms.

13     Q.  When you did that, did you give Mr. McLean an

14  estimate as to what you believe -- when I say you, you

15  and your auction company -- could sell this parcel known

16  as Dogwood Farms?

17     A.  Not before we looked at it. We went and looked at

18  the property and as we tell every client, you don't know

19  what you're going to get at an auction.  It depends on

20  how many people come.  We're going to auction the best

21  we can.  We're going to get what we think is a fair

22  market price for what we have to offer at auction.  We

23  did not think we were going to achieve the appraised

24  value after we looked at it.

25     Q.  Did you believe the appraised value at that time

1    to be 2.1 million?

2        A.  Yes, I was given the cover sheet of that.

3        Q.  That was based on the appraisal done by Mr.

4    Derrier?

5        A.  Yes.

6        Q.  And Mr. Derrier has MAI after his name.  Do you

7    know what those three letters stand for?

8        A.  I believe it's Member Appraisal Institute.

9        Q.  After you looked at that appraisal, do you

10   understand that that appraisal considered what the value

11   of the land was in 2001 as one tract or the two large

12   tracts of land together, rather than divided into 12

13   individual lots?

14       A.  He did not actually appraise it that way.  He

15   broke it down into the industrial, the commercial and

16   the residential and he appraised each of the types of

17   properties separately and put different values upon each

18   of the types.

19       Q.  But that wasn't broken into the 12 lots that

20   ultimately your company divided?

21       A.  No, not into our 12 lots, no.

22       Q.  When you started about to market the property,

23   did you learn that this property was considered by many

24   to be most valuable tract of land in Giles County?

25       A.  No, it was the only remaining vacant large parcel

McGraw - Cross

1    in the Town of Pearisburg.

2        Q.    Did that mean it had more value or less value?

3        A.    It had more value in the Town of Pearisburg.    I

4    don't know if it has more value in the county of Giles

5    County.    I don't know that.

6        Q.    Are you aware of what's happened to the real

7    estate since it was sold?

8        A.    No.

9        Q.    You're not familiar with Carilion purchasing it

10    and putting a hospital on it?

11        A.    No.

12        Q.    After you spoke with Mr. McLean, you had this

13    meeting with him to try to develop a value of Dogwood

14    Farms.    You mentioned that the Gourley and Gourley got

15    relief from the stay.    How did that occur?

16        A.    I don't know.    I wasn't a party to that.

17        Q.    Do you know whether the trustee in bankruptcy had

18    to abandon it's interest in that property so Gourley and

19    Gourley could go forward with the sale of the property?

20        A.    I recall seeing something in my file at one point

21    from Mr. McLean saying that the trustee was going to

22    reserve the right.    He didn't want to proceed with the

23    sale of it himself because he didn't want to take the

24    risk in case it didn't bring enough to pay off

25    creditors, but he was going to wait to abandon it until

McGraw - Cross                                          101

1    later in the process.

2       Q.  So after you had these conversations with Mr.

3    McLean, your firm becomes employed on behalf of Gourley

4    and Gourley, who's the first lienholder?

5       A.  I wouldn't say we had conversations with Mr.

6    McLean.  My conversations were with Mr. Johnson and Mr.

7    Farrier.

8       Q.  After those conversations, did your firm become

9    engaged by Gourley and Gourley?

10      A.  Yes.

11      Q.  And that's who you entered into the contract with

12   to conduct the ultimate sale of this property?

13      A.  That's right, with input from Dogwood Farms.

14      Q.  And the input from Dogwood Farms came from Mr.

15   Johnson and Mr. Farrier?

16      A.  Correct.

17      Q.  And you now are doing your advertising, when you

18   start out in earnest, is it fair to say, that you're

19   working for the first lienholder of the property on

20   Dogwood Farms?

21      A.  Yes.

22      Q.  And you knew the extent of their interest to be

23   approximately 875, 825,000?

24      A.  That's what I thought initially, yes.

25      Q.  Did you ever learn that was incorrect?

1    A.   Yes -- well, it may have been initially, but the

2    expenses just kept going up.

3    Q.   From Gourley and Gourley?

4    A.   Correct.

5    Q.   Late fees?

6    A.   Yes.

7    Q.   Interest due?

8    A.   Yes.

9    Q.   All the types of charges, in your experience,

10   that are typically related to foreclosure sales.

11   A.   I wouldn't say that they're typical. The

12   attorney's fees and the first pay-off, which was in the

13   exhibits that we went over, it went up $100,000 in a

14   couple months.

15   Q.   Most of that was interest and late fees, wasn't

16   it?

17   A.   The interest was $15,000 a month.

18   Q.   Late fees?

19   A.   The late fees, they were not accelerating because

20   I think the bankruptcy, for some reason they didn't keep

21   accelerating that amount.

22   Q.   40-some thousand in late fees.

23   A.   Yes.

24   Q.   When you're in a foreclosure sale situation, it's

25   usually because the borrower has defaulted on the terms

McGraw - Cross

1  of the note.

2     A.  Yes.

3     Q.  So there's some delinquency involved.

4     A.  Yes.

5     Q.  When delinquencies are involved, interest and

6  expenses occur.

7     A.  Correct.

8     Q.  When you have a foreclosure sale, typically,

9  those are included in the trustee sale as part of the

10  trustee's expenses and they are recovered from the sale

11  price.

12     A.  Yes.

13     Q.  Now, in this particular case, you become engaged

14  by Gourley and Gourley to sell this tract of real estate

15  that they have the first lien on.

16     A.  Yes, yes.

17     Q.  And you are trying to maximize the cost or the

18  sale price of that property, to the extent it takes care

19  of your client as first lienholder and to the extent you

20  record the highest number you can for your own financial

21  interests?

22     A.  I try to get the highest price I can for the

23  property for everyone involved.

24     Q.  In this particular case, did you have a minimum

25  bid requirement?

1    A.  We did not have a minimum bid requirement in

2  terms of just a confirmation type sale, but any time

3  there's a foreclosure, the secured creditor will have an

4  amount that they intend to bid.  That amount would be

5  conveyed from the secured creditor to the substitute

6  trustee.  I was made aware of that right before the

7  sale, right before the sale.

8    Q.  Let me make sure I understand that and the jury

9  understands that.

10        Are you saying that the secured creditor, in this

11  case, Gourley and Gourley, has told the substitute

12  trustee, in this case, Mr. Black, what they will accept

13  as a minimum bid for this property?

14    A.  That's what they told -- that was the print-out I

15  got before the sale.  Sometimes a secured creditor will

16  change their mind depending on how bidding goes and that

17  sort of thing, but this was the number we were working

18  from.

19    Q.  That number known to the substitute trustee, Mr.

20  Black, is made known to you before the sale.

21    A.  Yes, yes, it was.

22    Q.  And you want to make sure that you at least -- I

23  won't say, whipped them up, but at least get the price

24  up to that minimum bid.

25    A.  Yes.  I mean, we want to get the most.

McGraw - Cross

1    Q.  It's only obvious.

2    A.  Yes.

3    Q.  In this particular advertisements that were used

4    for the sale of this property, I saw the word absolute

5    auction.

6    A.  Yes.

7    Q.  Could you relate to the ladies and gentlemen of

8    the jury what absolute auction means in that context?

9    A.  Sure.  Some folks advertise a foreclosure auction

10   with a banner at the top that says foreclosure.  We have

11   found that if you use the term foreclosure auction,

12   sometimes people think they're going to get a bargain.

13   We spoke with Mr. Johnson and he asked if we would not

14   use the word foreclosure in the heading because of the

15   negative connotations and that was not a problem for us,

16   as long as we put in our terms and conditions that it is

17   a substitute trustee sale, which we did.

18       An absolute auction means the property will

19   transfer title to a third party.  In this case, Mark

20   Black was the trustee.  If in fact a bid was placed by

21   Gourley and Gourley, Gourley and Gourley would then be

22   the owner if no one else bid more and they would take

23   title as a third party, meaning that it went to the

24   highest bidder, whether it was Gourley and Gourley or

25   any of these other bidders.

McGraw - Cross

1    Q.   That's what happened at the bid, third party bid.

2    They got to the minimum bid, you knocked it down and

3    said sale?

4    A.   No, no, no.  We got to the minimum bid and then

5    we announced, it's going to sell now. If you've been

6    sitting back waiting to bid wondering how much you're

7    going to have to bid, now is your time.  It's going to

8    sell today. We used the minimum bid as a way to

9    encourage bidding. We didn't slam the hammer down as

10   soon as we got there.

11   Q.   What you said was, we've now reached the point

12   where we can sell this property and if anybody out there

13   wants to buy or bid, now is the time or forever hold

14   your peace?

15   A.   What we said is the secured creditor will not be

16   bidding.

17   Q.   In your experience as an auctioneer, when you

18   have these type of foreclosure sales, do the distressed

19   sales bring same, equal or lower prices?

20   A.   Sometimes more, sometimes less.  I have actually

21   gotten for one property that had an assessed value of

22   35,000 or 38,000, I got 135,000.  I've had other sales

23   where you have an appraised or assessed value of 500 and

24   you get 400.  It goes both ways.

25   Q.   Based on your experience with this type of

McGraw - Cross

 1  property and this tract size, would you say the interest

 2  in this property was keen, not many people interested at

 3  all or is it about average?

 4    A.  I'd say we had, with it subdivided, it was about

 5  average.  If it had been sold as one tract, I don't

 6  think we would have had nearly the interest.

 7    Q.  Was it known or was it made known to the people,

 8  other than the term absolute auction, was it made known

 9  at this particular auction sale that this was an auction

10  being conducted on behalf of the secured creditor?

11    A.  Yes, it's in the terms and conditions on the back

12  of the brochure, paragraph seven, and then our

13  announcements also indicated that it was a foreclosure

14  auction and Mr. Black had to read his notice, as

15  required by law.

16    Q.  Mr. Black was the substitute trustee?

17    A.  Yes.

18    Q.  Had to read the foreclosure notice at the

19  auction, required by Virginia statute.

20    A.  Yes.

21          MR. ANDERSON:  Thank you.  That's all.

22          MR. BYBEE:  No questions.

23          THE COURT:  You may step down, ma'am.

24          Any other evidence?

25          MS. WAERING:  Your Honor, we need to clarify

1  some exhibits being admitted before we actually say the

2  word rest, but we have no other witnesses.  We just need

3  to clarify some exhibits.

4          THE COURT:  All right.  Let's clarify them.

5          MS. WAERING:  There's an Exhibit 42 that's a

6  stipulation regarding testimony of custodian of records

7  that allowed the records without the --

8          THE COURT:  It's received.

9          MS. WAERING:  Exhibit 43, which is the

10  stipulation of the testimony of Terry Montgomery who

11  gathered the trading records for us as to the trade

12  record authenticity.

13          THE COURT:  It's received.

14          MS. WAERING:  Exhibit 44, which is the

15  stipulation testimony of Joe Hower and he is the IRS

16  individual who took the search warrant bank records and

17  put them in a spread sheet form.  I believe that is also

18  Exhibit 51, which is admitted by stipulation.

19          THE COURT:  Received.

20          MS. WAERING:  Exhibit 45, that is a

21  stipulation as to the authentication of the search

22  warrant documents and they've been mentioned several

23  times throughout this case.

24          THE COURT:  Received.

25          MS. WAERING:  There is Exhibit 47 is Richard

1    Lee and he is the examiner of the computers that were

2    taken during the search at Mr. Johnson's residence. I

3    believe there are some exhibits attached to that, 17-1

4    through 17-5 that are admitted by stipulation.

5              THE COURT:  Received.

6              MS. WAERING:  Exhibit 46 is a stipulation

7    that says that the National Bank of Blacksburg has it's

8    deposits insured by the Federal Deposit Insurance

9    Corporation and their deposits and withdrawals are

10   subject to federal regulations and have an effect on

11   that interstate commerce and that the checks both to and

12   from Mountain Investments, Dogwood Farms, Ted Johnson

13   and Frank Farrier accounts at the National Bank of

14   Blacksburg and deposits and withdrawals that affect

15   interstate commerce.  That's Exhibit 46.

16             (Mr. Bybee conferred with Ms. Waering).

17             That is Exhibit 46, Your Honor.

18             THE COURT:  Received.

19             MS. WAERING:  Exhibit 5-26 is the Interstate

20   Commerce Corporation Commission documents that were in

21   the Frank Farrier notebook.  They were documents taken

22   from the search warrant.

23             THE COURT:  Received.

24             MS. WAERING:  Then 5-28, 5-2 and 5-30 were

25   documents taken by Mr. Johnson's computer and were in

1    the notebook and they were the security carrier deeds of

2    trust.

3              THE COURT:  Received.

4              MS. WAERING:  In the Thomas Buchanan

5    notebook, I believe we may have asked for them to be

6    admitted, but just to be sure, this notebook contains

7    both Exhibits 24-1 to 24-5 and 25-1 to 25-5.  I wanted

8    to make sure all those are in.  Those are all related to

9    the investments of Thomas and Kimberly Buchanan.

10             THE COURT:  If there are no objections,

11   they'll be received.

12             MR. ANDERSON:  None, Your Honor.

13             MS. WAERING:  51-1 through 51-5, but those

14   are part of the Joseph Howard stipulation.

15             THE COURT:  Received.

16             MR. BYBEE:  Your Honor, the Richard Lee

17   stipulation originally contemplated Exhibit 17H, 1

18   through 5.  We actually did not enter those.  We

19   renumbered them and reduced them to three.  Those

20   records are actually Exhibit 5-28, 5-29 and 5-30.  I

21   don't believe there are any exhibits numbered 17, 1

22   through 5.  Those are the records that belong to the

23   Richard Lee stipulation.

24             THE COURT:  Mr. Anderson, are you in

25   agreement?

1          MR. ANDERSON:  I am in agreement.

2          THE COURT:  They're received.

3          MS. WAERING:  Your Honor, that completes, I

4    believe, everything.  There are some exhibits attached

5    in these notebooks that are duplicates of the link

6    charts that are 62 dash something, but they are clearly,

7    I believe, understood as being admitted in the 62

8    series. If the record doesn't show them being

9    particularly in the --

10         THE COURT:  I notice they're in various

11   notebooks.

12         MS. WAERING:  Yes, Your Honor.  They're

13   duplicates in the witness notebooks.

14         With that, we ask those exhibits be admitted

15   and the government rests, Your Honor.

16         THE COURT:  They're received.

17         (Government Exhibits 42-47; 5-26 through

18   5-30; and 51-1 through 51-5 were admitted into

19   evidence).

20         Ladies and gentlemen, for your purposes,

21   this will be an appropriate time for you to adjourn for

22   the day.

23         I'm going to ask that you -- it's vital that

24   you remember all the instructions you've been given.

25   You're going to be gone over a long weekend.  You're not

1    to read anything about it or listen to anything about

2    it.  I don't know whether there will be any news

3    accounts, but it's important that you not listen to

4    those things in any way.

5             With that in mind, I'm going to release you

6    until 10:30 on Tuesday morning.  You have a good long

7    holiday weekend.  For those of you who are actually

8    going to be off on Monday, we'll see you back here on

9    Tuesday morning at 10:30.

10            Have a good weekend.

11            (Jury left courtroom).

12            Rather than hear your motion at this time,

13   why don't we wait until 9:00 a.m. on Tuesday?  Is that

14   all right? I know you have some motions to make.

15            MR. ANDERSON:  Judge, I do, and that's fine

16   with us to do that.

17            I have just a little written memorandum.

18   I'll give a copy to the government that would be in

19   support of the motions.  I think it's probably

20   self-explanatory.  On Monday, it will reduce the time

21   I'm standing at the podium arguing this.

22            THE COURT:  On Tuesday.

23            Thank you.  We'll receive your written

24   submission and it will give us an opportunity to review

25   it.

```
 1              If there are any other jury instructions
 2    that y'all would like to offer me now so I can at least
 3    have them over the weekend, I would appreciate receiving
 4    them, if there are any additional jury instructions so
 5    that I'll have them.
 6              MS. WAERING:  Did Your Honor get the copy --
 7              THE COURT:  I did.  If there's anything
 8    else, I just ask that you submit it.
 9              MS. WAERING:  Your Honor, we do have an
10    updated count chart that we would like to give to the
11    Court.  We've given a copy to the defense.  We're going
12    to be updating this for Monday as well, but we have
13    listed the bare minimum of the exhibits that go to these
14    particular counts.  We'll be fleshing that out some
15    before Monday.
16              THE COURT:  I will be taking all these
17    matters up with you at 9:00 a.m. on Tuesday morning.
18              If there's nothing further at this time, we
19    will stand in adjournment.
20              (Proceedings adjourned).
21
22
23
24
25
```

1                                    **INDEX**

2      **WITNESS FOR GOVT.**

3      Danny Taylor

4        Direct Examination by Mr. Bybee..........13
         Cross-Examination by Mr. Anderson........43
5
       David Frye
6
         Direct Examination by Mr. Bybee..........49
7        Cross-Examination by Mr. Anderson........63

8      Joanna McGraw

9        Direct Examination by Mr. Bybee..........66
         Cross-Examination by Mr. Anderson........97
10

11     **EXHIBIT NO.**           **Marked**              **Admitted**

12     Govt. 26-1 - 26-7          43                      43
       Govt. 26-9 - 26-11         43                      43
13     Govt. 26-13 - 26-16        43                      43
       Govt. 6-3 - 6-5            63                      63
14     Govt. 54-2                 63                      63
       Govt. 56-1 - 56-7          63                      63
15     Govt. 41-1 - 41-19         97                      97
       Govt. 42-47                111                     111
16     Govt. 5-26 - 5-30          111                     111
       Govt. 51-1 - 51-5          111                     111
17

18

19     "I certify that the foregoing is a correct transcript

20     from the record of proceedings in the above-entitled

21     matter.

22

23

24     /s/ Sonia Ferris                    June 23, 2009

25