1     UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF VIRGINIA
2       ROANOKE DIVISION

3 **UNITED STATES OF AMERICA,**

4       Plaintiff,
          **No. 7:07-CR-48**
5   vs.      Roanoke, Virginia
          **October 14, 2008**
6 **TED JAMES JOHNSON, JR.,**

7       Defendant.

8    **TRANSCRIPT OF JURY TRIAL – DAY 9**
    BEFORE THE HONORABLE SAMUEL G. WILSON
9   UNITED STATES DISTRICT JUDGE, and a jury.

10 **APPEARANCES:**

11 **For the Government:**

12 **JENNIE L. M. WAERING**   **DAVID ALAN BYBEE**
 United States Attorneys Office U.S. Dept. Of Justice
13 PO Box 1709      1400 New York Avenue
 Roanoke, VA 24008-1709  Washington, DC 20530
14 540-857-2250      202-514-7021

15

16 **For the Defendant:**

17 **ANTHONY FRANKLIN ANDERSON**
 **MELISSA WINDHAM FRIEDMAN**
18 Anthony F. Anderson Law Offices
 PO Box 1525
19 Roanoke, VA 24016
 540-982-1525

20

21 Court Reporter: Carol Jacobs, Official Court Reporter
        Registered Diplomate, Realtime Reporter
22        U.S. District Court
        1101 Court Street
23        Lynchburg, VA 24504
        434-847-5722
24

   Proceedings recorded by mechanical stenography;
25 computer-assisted transcription.

```
 1        (Call to Order of the Court at 9:55 a.m.)

 2             THE COURT:  Good morning.

 3             Let's see here.  We'll begin with the motions here

 4    in just a moment.  Let me pick up my realtime here.

 5        (Pause.)

 6             THE COURT:  All right.  I take it the government is

 7    ready to proceed.

 8             Mr. Anderson, you are ready to proceed?

 9             MR. ANDERSON:  We are, Your Honor.

10             THE COURT:  All right.  Go ahead.

11             Good morning again, Your Honor.

12             THE COURT:  Good morning.

13             MR. ANDERSON:  If it please the Court, this -- both

14    sides have submitted, I think, a memorandum with respect to

15    the Rule 29 Motion for judgment of acquittal.  We will rely

16    on that.  And I won't belabor many of the points, other than

17    to submit to the Court that Mr. Johnson would respectfully

18    move for judgment of acquittal pursuant to Rule 29 to Counts

19    22 through 34, the money laundering counts, as outlined in

20    our memorandum.  I think both sides have argued to the Court

21    in these memorandums the question of profits, what proceeds

22    means.  After the opinion in Santos and the companion case,

23    there has been some question as to what that really means.

24             We recognize that, from the government's

25    perspective, this indictment was returned before that
```

1    decision was entered by the United States Supreme Court.

2    And so it is up in the air as to what specifically we

3    address when we look at the term "proceeds."

4            And I would also submit to the Court that, even

5    beyond that, that the question of merger is an equally

6    strong, if not stronger, argument with respect to where we

7    are in the money laundering issue, because in this case the

8    actual underlying fraud, the scheme, if you will, as alleged

9    by the government, is the scheme to take the investors'

10   money to pay other investors or to pay the continuing

11   operation of this Ponzi scheme.  And we feel --

12           THE COURT:  If you look broadly at the Ponzi

13   scheme.  But if you look at an individual count, for

14   example, of mail fraud, the question of merger, it would

15   seem to me, would not come into play in those counts because

16   the mail fraud was completed, according to -- all of the

17   necessary steps for mail fraud were completed and, of

18   course, at a later date monies were transferred to another

19   account.  And that other account was unnecessary to the

20   actual completion of the mail fraud, in the event that the

21   jury were to conclude that it was mail fraud; that they

22   would have already been completed at that juncture and it

23   would not have been necessary to have paid it out of that

24   additional account.  So under the question of merger, it

25   seems like, to me, that merger would not necessarily

1    control.

2        I mean, I -- is there a particular count where -- a

3    particular transaction where the doctrine of merger, you

4    think, is at its strongest that you could give me as an

5    example?

6        MR. ANDERSON:  No, sir.  I understand what the

7    Court is suggesting.  But we submit that the merger applies

8    to each count, because what is alleged in the indictment as

9    a specified unlawful activity, either the mail or the wire

10   fraud, is part and parcel of the scheme to return it, not

11   that it was -- not that the funds were disguised as a result

12   of that underlying activity.

13       THE COURT:  All right.

14       MR. ANDERSON:  With respect to Counts 36 through

15   38, we submit that the evidence and the allegations in the

16   indictment -- that the evidence in the case is -- proves

17   that any of the operation of the commodity polled had to

18   have occurred prior to July of 2002.  And, as such --

19       THE COURT:  Why July of 2002?

20       MR. ANDERSON:  Because the last activity in the

21   Mountain Investments accounts that was used with any one of

22   the commodity pool operators ceased -- I believe the last

23   was in the spring of '02.  And that's when one of the -- the

24   evidence is one of the funds sent a check back to Mountain

25   Investments.

1          The evidence from -- I believe it was Mr. Bloom
2    said that the last trade, or the last transaction, was in
3    2001, July of 2001.  And then, following in that early
4    spring of '02, there was a return of some funds.  So the
5    Mountain Investment account was not operated as a commodity
6    pool -- or evidence to support that it was operated as a
7    commodity pool after the early spring of '02.
8          THE COURT:  Wasn't there evidence that it was being
9    -- that they were holding themselves out as still engaging
10   in futures trading at various times past that date?
11         MR. ANDERSON:  Even if --
12         THE COURT:  The funds were coming in.  I mean,
13   there was some new money -- according to evidence, new money
14   was actually coming in at various times after that date.
15         MR. ANDERSON:  But not in the Mountain Investment
16   account to be used as a commodity pool under those
17   circumstances.
18         THE COURT:  So -- I mean, as you view it, the
19   commodity pool was Mountain Investment, the Mountain
20   Investment account?
21         MR. ANDERSON:  I believe that's -- yes, I believe
22   that's correct.
23         THE COURT:  All right.
24         Let me hear from the United States.
25         MS. WAERING:  I don't --

1              THE COURT:  Start with the commodities pool

2    allegations first.

3              MS. WAERING:  Your Honor, I don't know if you

4    received our --

5              THE COURT:  I did.

6              MS. WAERING:  Okay.

7              We believe that those offenses are committed when

8    Mr. Johnson tells the investor that he's going to invest

9    their money, if they give it to him; puts it in either

10   Mountain Investments, Dogwood Farms, Ted Johnson, any

11   account that he has told investors those funds are going to

12   be traded; and then pulls other investors' funds in that

13   account and doesn't trade them.  He is still accepting the

14   money as a commodity pool operator.  He is still pooling the

15   funds --

16             THE COURT:  It would still have to be for a

17   commodity -- he would have to be representing, essentially,

18   within -- he was holding himself out as trading in

19   commodities.

20             MS. WAERING:  Yes, Your Honor.  I think that's the

21   general gist of what the witnesses understood that their

22   money was being invested in.  And they were, I believe, all

23   consistent with believing that Mr. Johnson was going to

24   invest their money and trade it.  And so, therefore, when

25   they gave him the money, it was the expectation that it

```
1    would happen.  The trading doesn't have to happen for him to

2    be --

3              THE COURT:  When you say "all," I mean, there were

4    some after the -- that deed of trust note that was being

5    sent out, there were some that didn't understand that

6    necessarily to have been trading in commodities.  It was

7    simply a refinancing going on out there as they viewed it,

8    essentially.

9              MS. WAERING:  Your Honor, the witnesses were all

10   not completely clear on what Mr. Johnson was going to do.

11   They were all clear that he was going to trade the markets

12   in some sort of fashion.

13             THE COURT:  Well, but trading the markets doesn't

14   make it commodities, does it?

15             MS. WAERING:  Well, Your Honor, I think once he

16   takes any person's money and puts it in that account with

17   other person's money -- so at least two investors --

18             THE COURT:  But it still has to be for a

19   commodities pool.

20             MS. WAERING:  Correct.  If any two of those several

21   witnesses believed that it was commodities, then it would be

22   a commodities pool when it is commingled in any of those

23   four accounts that we have talked about during the case.

24   From the government's perspective, he would be operating as

25   a commodity pool operator.  And futures, I believe, would be
```

 1    considered commodities.  So when the witness talks about

 2    futures, I believe that would be the same thing.

 3            So the United States believes that these -- that

 4    -- he doesn't have to send it to a trading account to be a

 5    commodity pool operator.

 6            THE COURT:  I think I agree with you on that.  I

 7    guess my question is -- is what the -- all right.  Go

 8    ahead.  I'm listening.

 9            MS. WAERING:  I wish I could recite what the

10    witnesses said, but the witnesses -- I don't remember

11    exactly which witness gave money after 2002.  I just

12    remember the general gist of these witnesses was that he was

13    trading for them, and that meant commodities.

14            Is there anything else that Your Honor wants to

15    hear on the 36, -7, and -8?

16            THE COURT:  No.  Go ahead.

17            MS. WAERING:  And, Your Honor, I think that --

18            THE COURT:  But you are unable to give me a

19    specific date that -- to particularize a particular witness

20    on a particular date, from the evidence that we have heard.

21            MS. WAERING:  I could possibly do that, Your

22    Honor.  I have attached to my motion, the government's

23    motion, the summary of the exhibits that support the

24    evidence.  And let's see if there are witnesses -- I know

25    Patricia Neville was one of the witnesses who provided funds

1    after July of '02, and Mr. Elliott Gilmer, Mr. Edward

2    Kendall, Scott Geller.

3            THE COURT:  The question is not just whether they

4    are providing money, but whether they are providing money

5    such that it should be considered a commodities pool.

6            MS. WAERING:  If I may have just a moment.

7            THE COURT:  All right.  And -- well, go ahead.

8            In any event, is -- I mean, assuming that there

9    is -- there is conflicting evidence on it, assuming that

10   there is circumstantial evidence from which a jury could

11   conclude that he was acting as a commodity pools operator,

12   is the question of the statute of limitations in that

13   respect not one for the jury?

14           MS. WAERING:  That is correct.

15           THE COURT:  Where I would give the jury an

16   instruction that would define what the statute of

17   limitations is --

18           MS. WAERING:  The government does not believe that

19   is in the jury province nor should the Court give an

20   instruction as to that effect.

21           THE COURT:  What do you mean?  Why not?  I mean,

22   why not?  Why shouldn't I?

23           MS. WAERING:  I think the Court should decide

24   whether or not --

25           THE COURT:  Well, the cases all say that if there

1    is conflicting evidence, don't they, it is up to the jury to

2    decide whether it is within the statute of limitations, in a

3    criminal case?  I don't decide it, if there's conflicting

4    evidence.

5          MS. WAERING:  I don't know that I have had this

6    issue come up, except in pretrial motions where these kinds

7    of motions were made on statutes of limitation --

8          THE COURT:  Usually when a motion is made on

9    statute of limitations to the Court, it is that the evidence

10   in the light most favorable to the government still does not

11   establish an offense occurring within the statute of

12   limitations.

13         MS. WAERING:  And we believe that the evidence, in

14   the light most favorable to the government, does show it

15   occurring within the statute of limitations.  As to whether

16   or not that's a jury issue, I defer to the Court.

17         THE COURT:  All right.

18         MS. WAERING:  Secondly, I don't think that that

19   same argument would apply equally to Count 36, 37, and 38.

20   36 says that he is conducting business as a commodity pool

21   operator.  That might be considered differently than

22   embezzling money from a commodity pool.

23         THE COURT:  Well, I mean, obviously, it is

24   different.  But, I mean, it begs the question of whether

25   he's a commodity pool operator within the statute of

```
 1    limitations.  If he is taking money out of it, he's
 2    embezzling it, I mean, if he's taking it out for his
 3    personal expenses.  But it goes back to the question of
 4    whether he's a commodity pool operator.
 5            MS. WAERING:  So the Court believes the issue boils
 6    down to whether or not the witness was able to articulate
 7    that what their money was being used for was a commodity
 8    versus financial trading?
 9            THE COURT:  Whether there's circumstantial evidence
10    to establish that, that's correct -- I mean, direct or
11    circumstantial.  I mean, obviously, early on there was, but
12    the question is within the statute of limitations.
13            And, of course, I suppose one of your arguments is
14    that he started holding himself out that way, and there's
15    evidence that he was dealing with some of the same investors
16    later on, and there's no reason for them to conclude that he
17    was holding himself out as anything other than a commodities
18    operator.
19            MS. WAERING:  Yes, Your Honor.  Their initial
20    discussion with Mr. Johnson was the basis for which they
21    held their belief all of the way through their investments.
22            THE COURT:  Yeah.  But it is not just their belief,
23    but what the --
24            MS. WAERING:  Well, it is their belief in the sense
25    of why they gave them their money, and then what he told
```

1    them -- well, yes, it is what he told them that he was going

2    to do with their money which led to their belief that he was

3    going to trade commodities.

4            THE COURT:  All right.

5            MS. WAERING:  The United States believes that these

6    are all within the statute of limitations as the evidence

7    would show.

8            As to the money laundering, the government's first

9    line of argument is that *Santos* is inapplicable in this

10   case.

11           THE COURT:  Because it is not a 1955; I understand

12   that argument.  But what makes you believe that -- other

13   than the fact that it was a 1955 case -- and, of course, it

14   is a fractured opinion with -- Justice Scalia is talking

15   about the word "proceeds."  And, of course, there is some

16   suggestion from -- or a strong suggestion from Justice

17   Stevens that you would have to look at the legislative

18   history in context.  And I suppose that the legislative

19   history in context, when you go beyond 55 and you are

20   looking at it where there is, mostly, if the evidence is to

21   be believed, an unlawful transaction, then there is no

22   -- there is no business expense to -- contextually, there is

23   no reason for quiet there.

24           MS. WAERING:  That would be the second -- the

25   government's second position would be that if we are to

1    consider it an expense deductible, that all investment

2    proceeds in a Ponzi investment fraud scheme are profits,

3    because it is a legitimate business venture.

4         THE COURT:  I suppose, by analogy, if someone

5    embezzles from a bank, a bank teller embezzles from a

6    bank -- this would illustrate both the merger question and

7    the proceeds question -- and embezzles from a -- and places

8    it in their own account, that that is not -- under the

9    doctrine of merger, that would not be a violation; but if

10   she then transfers it for a person, disguises it into a

11   third party's account, it would be money laundering and the

12   proceeds would be -- because there are no expenses in that

13   kind of thing, there is simply -- everything is profit.

14        MS. WAERING:  Yes, Your Honor.

15        THE COURT:  And your argument here is essentially

16   everything in a Ponzi scheme, from the time the initial

17   fraud is carried out, is profit.

18        MS. WAERING:  Yes, Your Honor.  That's --

19        THE COURT:  Or at least contains -- contains

20   profit, such that when it is transferred to that --

21   essentially, taking into account the doctrine of merger --

22   to another account for purposes of disguising, then that is

23   sufficient to bring the statute into play.

24        MS. WAERING:  Yes, Your Honor.  The United

25   States -- as we said in our memorandum, we don't believe you

1   should give any consideration to expenses in a 1956

2   concealed money laundering for an investment Ponzi scheme.

3   And this sort of tends to go with Justice Stevens'

4   concurring opinion that it is different in different cases.

5   And we believe this is a case that expenses do not apply.

6           THE COURT:  Is there a strong case you could cite

7   me that holds that way?

8           MS. WAERING:  *Youseff*, perhaps, in the Third

9   Circuit, Your Honor.

10          THE COURT:  And tell me about *Youseff* again.

11          MS. WAERING:  Well, in *Youseff* the court said that

12  concealing money from a taxing authority, the defendant

13  retained the proceeds of a mail fraud because there were no

14  expenses associated with the scheme, and so everything was

15  profit; everything was proceeds.  There was no expenses to

16  be deducted in that kind of a scheme, all revenue, which

17  should be profits.  So that's, I believe, the case that is

18  most strongly in the government's favor.

19          And the United States believes that *Shelburn* is

20  distinguishable because in that case there was some sort of

21  legitimate business going on that had illegal money coming

22  into it.  In this case there was no legitimate business

23  activity whatsoever.  He was never licensed.  He never had

24  securities that were licensed.  He was never registered as a

25  commodity pool operator.  And so therefore there was never

1    anything legal or legitimate about his business.

2         THE COURT:  Well, if I were to say that there are

3    expenses -- I mean, could not make the argument that

4    expenses are, you know, his investment account, maintaining

5    an investment account, maintaining and paying the monies out

6    for the software and computers and for all of the things

7    that he -- that those are not essentially legit -- I mean,

8    even if he's going about his business in an unlawful

9    fashion, everything that he's doing is not unlawful.  I

10   mean, it is not like a -- it is not like money laundering

11   drug proceeds.

12        MS. WAERING:  That's true, Your Honor.  Payment of

13   his phone bill and for whatever computer equipment I suppose

14   is not an unlawful act in and of itself.  But even if those

15   just minimal business expenses were deducted, the United

16   States has proved profit beyond that sufficient to cover

17   each and every money laundering.  So --

18        THE COURT:  But essentially your argument is that

19   anything that he -- that comes from the mail fraud itself,

20   the essential mail fraud itself, which requires no

21   particular investment, is profit.  And it is being -- it is

22   being laundered at that point when it is placed into a

23   distant account or an account for purposes of disguising or

24   whatever those other purposes are that are set forth under

25   1956 and 1957.

1          MS. WAERING:  Yes, Your Honor.  And I believe that

2     the Department of Justice would say that the definition in

3     1957 would be different and should be treated differently.

4     I know Your Honor is probably not inclined to do that,

5     but --

6          THE COURT:  I don't know whether I am or not.  I

7     don't know.  I mean, I'm trying to determine what is

8     appropriate.

9          MS. WAERING:  But "criminally derived property" is

10    a different term than "proceeds" as used in 1956.  And the

11    argument can be made that criminally derived property --

12         THE COURT:  It goes back to "financial transaction"

13    as defined.  And "financial transaction" talks about a

14    proceed, doesn't it?

15         MS. WAERING:  Yes, Your Honor.

16         THE COURT:  So, I mean, it always comes -- it comes

17    back to that.

18         MS. WAERING:  It does, except in this particular

19    case, in 1957, the intent element is a little different and

20    it is just an amount of money.  So there it is elevating the

21    amount of money involved in the transaction and it has

22    removed an intent to conceal or an intent to promote.  And

23    it is doing a financially unlawful transaction with

24    criminally derived property.

25         THE COURT:  All right.

1          MS. WAERING:  The witnesses I mentioned earlier,

2     Scott Geller, Edward Kendall, and Patricia Neville, were

3     told that he was trading in the commodities markets at some

4     point in their investing adventure with Mr. Johnson and had

5     no reason to believe that subsequent investments were not

6     for the same purpose.

7          THE COURT:  All right.

8          All right.

9          MS. WAERING:  And the United States believes

10    there's evidence sufficient for the record to go forward on

11    all of the government's charges.

12         THE COURT:  Mr. Anderson, do you want to respond?

13         MR. ANDERSON:  Just briefly, if I may, Your Honor.

14         THE COURT:  Do you want to unconfuse me?

15         MR. ANDERSON:  Your Honor, in Section 1957(f)(2)

16    the statute defines "'criminally derived property' means any

17    property constituting, or derived from, proceeds obtained

18    from a criminal offense."

19         So to the extent 56 and 57 --

20         THE COURT:  It comes back to proceeds.

21         MR. ANDERSON:  It comes back to proceeds.

22         THE COURT:  I agree with you.  I mean, I'm not

23    exactly sure how to apply the fractured opinion there, but

24    I'll do my best.

25         MR. ANDERSON:  I would -- I understand the

predicament with where we are with the opinions that we have
and I know that you have to look at the evidence in the
light most favorable to the government at this juncture,
but, even so, we submit that the substantial statement about
profits being -- proceeds being profits aren't such in this
case that it shouldn't go to the jury.

THE COURT:  All right.  I have thought about these
matters.  And as to the money laundering counts, the Court
is of the opinion that -- well, what the Court is going to
do at this juncture, it is going to reserve ruling on the
motion under Rule 29, as Rule 29 provides.  So essentially
I'll have the Rule 29 Motion under advisement as to the
money laundering.

As to the commodity pool, the Court is going to do
the same thing.  The Court also believes, but will hear
further from the parties again at the conclusion of all of
the evidence, that the question of the statute of
limitations as to the commodity pool is perhaps one that
should be submitted to the jury, with an appropriate
instruction.  And at this juncture the Court takes the Rule
29 Motion under advisement.

As to the remaining counts, of course, the Court
concludes that there is sufficient evidence from which the
jury could conclude -- in the light most favorable to the
government, the jury could conclude as to all of the other

JOHNSON - DIRECT

1  offenses in the indictment.  And, therefore, to the extent

2  that they are raised, although I -- the Court would deny the

3  motion as to those.

4          All right.  Are you ready to proceed?

5          MR. ANDERSON:  We're ready to proceed, Your Honor.

6  I might ask for just about two minutes to --

7          THE COURT:  All right.  We'll take a brief recess

8  and bring the jury in.  We told them 10:30, didn't we?

9          MR. ANDERSON:  Yes.

10          THE COURT:  All right.  At 10:30.

11          We'll stand in brief recess.

12      (Recess at 10:20 a.m.)

13      (Jury in at 10:30 a.m.)

14      (Call to Order of the Court at 10:35 a.m.)

15          THE COURT:  Good morning.

16          Mr. Anderson, are you ready to proceed?

17          MR. ANDERSON:  We are, Your Honor.

18          Good morning.

19          THE COURT:  Call your first witness.

20          MR. ANDERSON:  Your Honor, we would call Ted

21  Johnson, please.

22          TED JAMES JOHNSON, JR., DEFENDANT, SWORN

23                  DIRECT EXAMINATION

24  BY MR. ANDERSON:

25  Q.  Good morning, Mr. Johnson.

JOHNSON – DIRECT

```
 1   A.   Hello, sir.

 2   Q.   Would you please just state your name for the ladies

 3   and gentlemen of the jury.

 4   A.   My name is Ted James Johnson, Jr.

 5   Q.   And, Mr. Johnson, where do you currently reside?

 6   A.   I reside at 302 Woodland Drive, Pearisburg, Virginia,

 7   in Giles County.

 8   Q.   How long have you lived at that address, sir?

 9   A.   Approximately 11 years.

10   Q.   And prior to that, where did you live?

11   A.   I still lived in Pearisburg.  I lived in Giles County

12   all of my life.  I lived in another house in another

13   subdivision near to where I am now.

14   Q.   Okay.  So you grew up in Giles County?

15   A.   Yes, sir, I did.

16   Q.   Did you attend elementary schools there?

17   A.   Yes, sir, I did.

18   Q.   Did you graduate from Giles County High School?

19   A.   Yes, sir, I graduated in 1968 from Giles High School.

20   Q.   And after that did you continue your education?

21   A.   Yes, sir.  I went to Virginia Tech and received my

22   undergraduate degree from Virginia Tech.

23   Q.   And then after that did you do any postgraduate work?

24   A.   Yes, sir.  I received my master's degree in psychology

25   from Radford University.
```

1    Q.    All right.  And would you relate to the jury some of

2    your -- after you got out of college and after you obtained

3    your master's degree, what line of employment did you go

4    into?

5    A.    Yes, sir.  In 1971, when I was still at Virginia Tech,

6    I was elected Commissioner of the Revenue of Giles County.

7    And I served from January the 1st of '72 for four years.

8    And during that time, in the fall of 1975, I ran for Clerk

9    of the Circuit Court and was elected to that position.  That

10   was an eight-year constitutional office in the State of

11   Virginia.  And I served for eight years there, starting in

12   '76, January 1st of '76.  I served eight years.  And then I

13   ran for another term and finished that term on December 31st

14   of 1991.

15   Q.    And could you just give the jury an idea, if you would,

16   Mr. Johnson, of what a circuit court clerk does, in a

17   nutshell, if you can?

18   A.    Yes, sir.

19         It has been about 15 or 16 years since I have been

20   there, but I think I can give the general duties.

21         A clerk of the circuit court is an eight-year term and

22   does quite a bit of work with, obviously, the circuit court,

23   but it also -- I guess if we think about a county clerk, it

24   does recordings, recordations; it is also a probate

25   extension, and so we did probate of wills and other areas

JOHNSON – DIRECT

1    involving estates.

2              And then also I worked over, of course, with the

3    circuit court judge.  And we did certain things in the area

4    of getting court prepared for trials.  We would do jury

5    things that would be required under the Code of Virginia.

6    And particularly I worked quite a bit with the circuit

7    court, but there's also many other responsibilities other

8    than those.

9    Q.   Did you have deputy clerks that worked under you?

10   A.   Yes, sir, I did.  We had some deputies.  And it was a

11   situation that I knew a lot of different people as a result

12   of that.  And so I worked in a county extension, because you

13   are always recording deeds and doing certain things like

14   that, and judgments.  And at the same time, then I would

15   also -- would try to take on the duties of always doing the

16   estates, because I was very drawn to that particular area.

17   So when we had people that came in, they had a will or

18   probate or the person died without a will, intestate, then I

19   would help them work with that.  So I did a lot of the

20   estates.  It was an area that I enjoyed quite a bit.

21   Q.   Is it fair to say that the clerk essentially takes care

22   of papers of the court, the court's orders, the court's

23   legal documents, and you are in charge of maintaining those

24   records for the circuit court?

25   A.   Yes, sir.

1   Q.   After you retired from being the circuit court clerk,

2   what was your next line of employment?

3   A.   I didn't actually retire.  I had gone in as a

4   relatively young man.  I started at 22.  And after 20 years

5   -- and I had married in that time.  And as I had married, my

6   wife and I had a few children, five to be exact.  And so I

7   decided that I wanted to pursue some things other than being

8   in the circuit court.

9        And so I made a decision in December of '91 to -- not

10  to seek reelection.  I was -- would have been 42 -- I think

11  in that area.  And so I decided that I would go and try to

12  do some things in the markets, particularly in the area of

13  trading futures.  I had traded some stocks earlier in my

14  life, but I was more interested in futures.

15           And so in September of 1990 I went to my first

16  seminar, even before I even got out of the clerk's office,

17  to see what I could learn and if there would be something

18  that would be able to provide a little, you know, better

19  living for my wife and family.  And so I did that in 1990.

20  I went to a seminar of a Dr. George Lane in Watseka,

21  Illinois.  I think he has since passed.  He's a medical

22  doctor, but he was involved in some areas of the market and

23  designed some indicators.  And I spent a week with him.  So

24  I made a decision to leave and to pull my retirement out.  I

25  had about $25,000.  And I pulled my retirement out and put

1    it into an account to trade in January of 1992.

2    Q.   And did you trade that account?

3    A.   I traded that account, yes, sir.

4    Q.   Did you have any success with it?

5    A.   I had some success.  At the end of the first month I

6    was 80 percent correct in my trades and I lost money.  And

7    so when we talk about accuracy, and I heard that discussed

8    earlier, when we talk about accuracy, there's more to it

9    than just percentages.  There's also win/loss ratios and

10   things that -- it sounds like it is really complex; it is

11   nothing to it.  But it did have some success.  I made some

12   money and then you would lose some money.  And it occurred

13   to me "I'm going to have to do better than this, if I'm

14   going to feed my wife and five children."

15   Q.   Now, I kind of skipped through that, taking you through

16   your education and your employment, but you are married?

17   A.   I am married.

18   Q.   When were you and your wife married?

19   A.   December the 8th, 1979, in the Washington DC temple.

20   Q.   And you had five children in this marriage?

21   A.   We have five children, yes, sir.

22   Q.   All right.  Some of those are grown and some are at

23   home?

24   A.   I only have one left at home.  I have a 17-year-old.

25   She's a senior at the high school.  And then my oldest

1    daughter is 27 and is out in the world.  She works and does

2    quite a bit of traveling in the world.  And my second one is

3    getting her doctorate in physical therapy down in South

4    Carolina.  And I have a son that has graduated from college

5    and then I have another one that is about to graduate from

6    Virginia Tech.

7    Q.   Okay.

8         All right.  Now, with that background, talk to this

9    jury and tell them, if you would, Mr. Johnson, how, after

10   you opened this initial account, you came to be involved

11   with Mountain Investments.

12   A.   I put the money in an account; I think it was like

13   $25,000 I think is what came back from the retirement.  I

14   opened up an account with a futures broker.  And it has been

15   so long now, I don't even know which one -- it is sort of

16   hard for you as jurors or people here to listen to say,

17   "Well, it looked like you are in this account and then you

18   are in that."  People change accounts on that just on a

19   continuous basis.

20        But I had an account that I had set up.  And I traded

21   it for a while.  I said, "This is going to have to be better

22   than what I'm doing."  I was just -- even though I had had a

23   seminar and I thought, "This is going to be very easy.  It

24   shouldn't be a problem."  And after a few months and the

25   paycheck wasn't coming in, I said, "I'm going to have to do

1   better than this."  And so at that point then I began to

2   instruct myself and to learn from others what I might be

3   able to do to make these trades better and -- to be able to

4   make a better living than what I was doing at the time.

5   Q.  What did you do next with regard to the investing and

6   investments with Mountain Investment?

7   A.  We -- we hadn't formed Mountain Investments.

8       Frank I knew.  I had known him for many, many years,

9   Frank Farrier.  And I had known him for many years.  I knew

10  that he wasn't having a huge amount of success in his life

11  at the time.  I think he was selling mobile homes or cars or

12  something.  And I always had a regard for him.  And he had a

13  regard for my wife and family.  And so I invited Frank

14  -- and Frank, I actually invited him even earlier than

15  Mountain Investment days.  He came probably back in December

16  of '91, even before I even left the clerk's office.

17      And I set up some computers.  And we had data feed

18  coming in and things.  And the computers -- everybody that

19  deals in computers knows how it has changed over the last 15

20  years.  When I first got in, it was just so slow.  And we

21  had a satellite; we were trying to bring in data -- a

22  satellite receiver and we were trying to bring in data.  And

23  it was just very slow.  And I guess when we look at the

24  sophistication of computers and what we have now as opposed

25  to what I was doing, you know, in 1992, it is just so

1    different.

2        But I decided -- I said, "We have got to come up with a

3    way that we can computerize this."  And I was beginning to

4    become somewhat literate in computers in '92, because I had

5    set up the computer system for the clerk's office.  And we

6    had done a lot of things in the area of indexing and

7    bringing in database people to set up various forms of

8    indexing.  And so I had a knowledge of computers.  And even

9    though that's not my background, I had a cousin who is an

10   electrical engineer.  And he taught me certain things.  And

11   so eventually I got where I was almost versed enough.  I

12   said, "Okay.  We have got to do something different."

13       And I believe about the first person that I came up

14   with was a Ph.D. guy who -- a fellow by the name of T.R.

15   young, up in the Pittsburgh, Pennsylvania, area, who had had

16   experience in doing all sorts of programming and maybe even

17   almost had some sort of a military background, where he had

18   done tracking of tanks, where you could anticipate where a

19   tank was going to go.  And so he had some understanding of

20   computers and tracking.

21       And markets are more difficult to predict than tanks.

22   You know, a tank can only go so fast and it can only go in

23   so many directions.  A market can go very fast, as we have

24   already seen, or it can go very slow.  It can go up and

25   down, whatever.  I felt like this man would be the man that

1  I need to do.

2     And so we had somebody to put some money with us.  They

3  wanted to get some interest.  And so, well, that would be a

4  way that we could certainly go out and finance this Ph.D.

5  fellow, buy a lot of equipment and do different things, then

6  we'd be able to start tracking the market and I can start

7  being far more profitable than what I was.  And I said -- I

8  would make some profits and I would bring some in, and then

9  you would give it up.  And so it would be difficult to

10  maintain that.

11     And to say that 90 percent of the people make money

12  -- or lose money in the markets and 10 percent may or may

13  not make money -- it is a very, very difficult business.  I

14  thought it was going to be easy.  I had been in the

15  courthouse for 20 years.  And I tried to do my best in that

16  job.  I knew a lot of people.  I really liked a lot of

17  people.  I liked a lot of people that testified against me.

18  I still like them.  But I liked a lot of people.  And I knew

19  a lot of people.

20     But I said, "It is not really fair to stay here and do

21  this, when you really don't have your heart in it anymore."

22  And I had been there 20 years.  I said, "I've got to do

23  something different."  And so we got this Ph.D. fellow, T.R.

24  Young.  And we spent some time with him; we spent some

25  money.

1      And he would send his work in.  It would almost be done

2   through the computers.  Very unusual back in those days that

3   you would be able to bring the data into the computer or

4   that he could see your computer, but he was able to do those

5   things really far ahead of his time.  Of course, now

6   everybody knows you can do that.  But in those days it was

7   very sophisticated.

8      He worked for --

9           THE COURT:  I need you to slow down just a little

10   bit for the court reporter.

11          THE WITNESS:  I'm so sorry.  They tell me I speak

12   fast.

13   BY MR. ANDERSON:

14   Q.  It is okay.

15   A.  Anyway, we spent a lot of time with Dr. Young and never

16   met him.

17   Q.  Is that -- is that -- do you trace that to essentially

18   the start of or the formation of Mountain Investments?

19   A.  Yes, sir.  I think it was around April of '92 that we

20   filed our partnership form that said that we were going to

21   trade the markets and other things to try to make money,

22   other investments.  And that's -- and I'm thinking it would

23   be in that April '92 time period.

24   Q.  Okay.  And then thereafter that time period, did there

25   come a time when you offered, for return of interest, to

1    take money from individuals?

2    A.   Yes, sir.

3    Q.   And would you tell us about that, please.

4    A.   As has been testified, it ended up -- when I first was

5    leaving the clerk's office -- and I think that's how it sort

6    of began.  When I first was leaving the clerk's office and

7    everybody felt like -- from what they had told me, everybody

8    felt that, you know, you just don't walk away from a job

9    like that.  Most clerks, they stay there 49 years and then

10   they die.  You know, you put them away.  And so people were

11   sort of surprised to hear that -- they knew -- a lot of

12   people -- I know a lot of people.  And they were surprised

13   to hear that -- "You have a wife and you have got five

14   children and you are leaving this job.  What are you

15   doing?"

16           And I put in the paper -- because I owed it to the

17   people; the people had elected me three different times to

18   these constitutional offices.  And so I put it into the

19   paper I had decided not to seek reelection; I expressed my

20   appreciation to everybody; and that I was going to go and I

21   was going to be interested in maybe doing my own work in the

22   areas of, you know, trading the markets or -- I'm not quite

23   sure; I don't have the letter.  It has been, you know,

24   16-plus years ago.

25           And I said that I'm going to be trading the

1  markets; I want to spend a little more time with my family;

2  I want to do some things with my church.  And a lot of

3  people picked up and they said, "Are you a minister?"  "Oh,

4  no, no, no.  I'm not doing that.  I'm just saying I want to

5  be able to do a little something different than what I was

6  doing," because the clerk's office was very confining and it

7  was very demanding of me.  And I wanted to do a good job.

8      And someone had told me that I was not as bad as I

9  could be.  And so they said, you know, "You're an okay

10  clerk.  I can't imagine why you wouldn't stay, because you

11  have got a job.  You can probably stay here as long as" --

12  one of the clerks stayed 49 years.  And they said, "You can

13  stay 49 years in here, if you like."  I just -- it didn't

14  appeal to me.

15      And so I think a lot of people came because -- the

16  first one was a friend of ours.  Roger Robertson was the

17  very first person to come and bring some money.  I think

18  Frank had seen him up at Hardee's somewhere and he said, "I

19  would like to put some money in.  I don't know how you could

20  structure that."

21      "I could give you a note and give you some interest."

22      And that's how it started.

23      I knew Roger a long time.  My father got into business

24  years ago, Roger and his brother Corbin.  So I knew them and

25  so they came.  And then from there I had other friends to

1    come, different people.  We were still -- still investing

2    with these people to bring these models in for us.

3        And, you know, Dr. Young started out.  He was my first

4    one.  And I'm going to have to tell you, I just thought if

5    you were a Ph.D., they would know what they were doing.

6    Q.   Now, let me speed you up a little bit in terms of --

7    let's fast-forward all of those early years in the '90s.

8    You have people coming in, making these investments.  You

9    have people that are giving you sums of money.  And you are

10   promising them to get a high rate of return under the

11   current conditions at that time.

12   A.   Yes, sir.

13   Q.   Do you agree with that?

14   A.   Yes, sir.  That's true.

15   Q.   And how did you expect to pay those high rates of

16   returns to these individuals?

17   A.   I always thought -- I always thought that it would come

18   either from my trading or from land, because we did land, or

19   that it would come from all of the other business interests

20   that we had done.  It wasn't just the financial markets that

21   we were doing.  We did -- we did land.  I was known because,

22   as it has been testified by one of the witnesses, Giles

23   County is a little small place.  I just knew so many

24   people.  And if you do something in land, they immediately

25   -- you bought and you sold some land, it is open; they put

1    it in the little paper and everybody knows it.

2        And so I expected to pay these people -- as a matter of

3    fact, I never expected not to pay these people.  I always

4    thought that I would pay these people, either by the

5    financial markets that I was in, with all of these great

6    people that I had working for me or that I was doing

7    myself.  I eventually got where I thought -- I never thought

8    I was brilliant, but I certainly thought, well, I understand

9    how to create these computer models and all of these other

10   things.

11       So all of that time, all of those years, I always

12   thought the money would come from my trading, from my land.

13   I had a little mortgage company.  I thought, well, that will

14   bring in a few hundred thousand a year.  But I had all of

15   these different ideas that each one of these things would be

16   successful.

17       I had never in my life, up to that point, ever been

18   successful (*sic*).  It wasn't a pride issue.  I just -- if I

19   worked hard, I had always been rewarded for it, whether I

20   was working at Kroger's as a bag boy, they paid me.  If I

21   was working in the clerk's office and I went campaigning,

22   people would vote for me and I would do my job.  And so I

23   never had had the experience of having this where you

24   couldn't -- you couldn't make it work.  I said, "It has got

25   to be.  There's no way that this thing cannot work."  And so

1    I continued on.  Yes, I did.

2        I received money from a lot of different people, people

3    that say, "I hear you are paying a big return."  And I said,

4    "Yes, we are," and kept on going, kept on paying.

5    Q.   Did you work day and night?

6    A.   Yes, I did.

7    Q.   Let's talk about -- and shift gears for just a second

8    and talk a little bit about, if you would, the -- what the

9    government has seen -- or has introduced and the jury has

10   seen, some excerpts from what has been referred to as your

11   journals.  First question is did you keep a journal?

12   A.   Yes, sir.  Everything they showed up there, to my

13   knowledge, was correct extractions from what I had written.

14   I don't know how they ever read it, because I can hardly

15   read it.  But somehow they brought somebody in and they were

16   able to read my writing.  And the best I can determine,

17   those things that they have extracted, the various lines

18   that they have shown, Exhibit 54, maybe -- I don't remember;

19   I'm not so good anymore -- but every one of those are from

20   my journal; yes, sir.

21   Q.   And for how long had you kept journals, Mr. Johnson?

22   A.   Long before I was married.  It is part of my faith.

23   Q.   And as part of that faith, are you instructed to keep

24   journals like this for what purpose?

25   A.   To begin with, it is not a business journal.  It is not

1    a diary.  It is not anything like a -- a journal is supposed

2    to be kept by the faithful.  It has been done all -- from

3    the first president of our church all of the way until

4    current time.  If you are faithful in the church, you keep

5    this journal.  You write every day what is going on in your

6    life.

7        It could be mostly your goings and comings, if you have

8    a difficult time in your life, whatever it is.  It is not a

9    business journal and it is not a diary.  It is a very

10   serious thing that we keep.  And those journals are to be

11   actually given probably more to your grandchildren.  I have

12   never read my father -- my father was faithful and my mother

13   was too; I have never read their journals.  I expected my

14   journals never to be seen by anybody probably up into

15   -- maybe into a grandchild or a great-great-grandchild.  And

16   I thought maybe they would read what I was doing, what was

17   going on in my life.  So it was a religious --

18   Q.  I don't mean to cut you off, but here's the question

19   for that.  The question is, these journals were kept as a

20   part of a practice of your faith, and not for purposes of

21   litigation or that you thought you would see them in the

22   courtroom one day?

23   A.  I never thought anybody would see them, except my

24   children, grandchildren, whatever.

25   Q.  Did the journals, as you wrote them, accurately depict

1   what you were thinking and feeling at that particular time

2   you crafted that journal?

3   A.   Yes, sir.

4   Q.   Now, you were continuing to take money through Mountain

5   Investments, you and Mr. Farrier.  And there came a time

6   when you got a notice from the state corporation commission?

7   A.   Yes, sir.  January 24th, 2001.

8   Q.   Now, did you make a journal entry on that day?

9   A.   I did.  Yes, sir.

10  Q.   Have you reviewed your journals since we have been

11  involved in this proceeding?

12  A.   Yes, sir.  But I want to say that I got the CDs -- I'm

13  not complaining -- I got the CDs a few weeks ago, that they

14  had made copies of my journals.  And I don't want to say I

15  have read every page of them.  But I have read up to a

16  certain point and I have done some extractions on what I had

17  read to that point.  But I did see the 24th, yes, sir.

18  Q.   All right.  And --

19          MR. ANDERSON:  Excuse me one moment, Judge.

20      (Pause.)

21  BY MR. ANDERSON:

22  Q.   Do you see this entry for January the 24th, '01, on

23  your screen, Mr. Johnson?

24  A.   Yes, sir, I do.

25  Q.   And what are you -- what are you writing in this

1   journal?  What does your statement mean?

2   A.   It means that I received a notice from the state

3   corporation commission, the securities division, and that

4   they are saying to me, "There's a question of whether you

5   are appropriately in compliance with the regulations of the

6   State of Virginia."  And I said that this is -- this is

7   -- this is bad.  We didn't have a clue we were not doing

8   what we were supposed to do.  We are sick.  I went on to say

9   I went to Brian Schied, who is my next-door neighbor.  And

10  he suggested that we get a lawyer, Mr. Eugene Derryberry

11  from down here.

12  Q.   You did that?

13  A.   I did that.  Yes, sir.

14  Q.   And then if we may see January the 25th of '01.

15       What are you writing here, Mr. Johnson?

16  A.   Obviously on that day I was concerned that I hadn't

17  heard from my lawyer yet down here in Roanoke,

18  Mr. Derryberry.  And I said, "It is a really hard day.  We

19  want to try to pay these people off and maintain our

20  integrity."

21  Q.   And then on January the 27th of '01.

22  A.   Mr. Anderson, are you asking me to read these excerpts

23  or do you want me just to give you a summary of what is

24  going on?  I don't want to belabor.

25  Q.   Well, Mr. Johnson, I think we can read them, although

1    we have been reading them, I guess, to have them read into

2    the record.  It is reflected in Government's Exhibit 54.  I

3    think the jury and everybody can read them on the screen.

4    But I want to ask you specifically, what is it you are

5    saying?  What are you trying to say here?  What is going on

6    with you at that time?

7    A.   I'm not -- I'm not sure -- I've not been in a federal

8    proceeding, other than the bankruptcy.  I'm not sure what I

9    can say.  But I want to at least be able to preface by

10   saying that these were not written with the hope that

11   somebody would be able to read it on the screen down here

12   and to somehow mitigate or in some way lessen my

13   responsibility or anything else.  I didn't know anybody was

14   going to read it.  And so, with that said, I said, "We want

15   to pay everything we owe and be honorable.  These are the

16   most difficult times of my life.  I have to have help from

17   above.  Just can't stand the pressure."

18            MR. ANDERSON:  And then if I may ask, Ms. Vogt, to

19   go to September the 9th of '01.

20   BY MR. ANDERSON:

21   A.   September the 9th, sir?

22       I'm now pleading with the Lord for mercy and for

23   something to trade.  I want to pay what I owe.

24   Q.   Mr. Johnson, at any time, but particularly during this

25   period, what intent, if any, did you have with regard to

1    paying back your investors?

2    A.   As always, from the very first time that Roger

3    Robertson ever gave me a check until the last check I ever

4    got, my intention was always to pay every dime I owe.  I had

5    that obligation.  And all what to do was to pay what I owe.

6    Q.   Did you and Mr. Farrier have those kinds of

7    discussions?

8    A.   Many, many times.

9    Q.   So you received this notification from the state

10   corporation commission, Mr. Chartier, the investigator?

11   A.   Yes, sir.

12   Q.   And what steps do you take to come into compliance with

13   the State of Virginia's investigation and sale of

14   securities?

15   A.   We had so many steps.  We had to meet with

16   Mr. Chartier.  We discussed monthly reports.  We talked

17   about, you know, paying everybody off, which, of course, I

18   wanted to do anyway.  It wasn't -- it wasn't something I

19   wasn't interested in.  I wanted to pay them anyway.

20       So we went through all of these various ideas and what

21   we would do.  We talked it over with Mr. Chartier.  Just

22   different things that we were doing, we worked on.  I very

23   explicitly talked to him about land and about Dogwood

24   Farms.

25       And that came, eventually, where -- as we were looking

1    at Dogwood Farms, and because I knew what the appraised

2    value was, I eventually came to the idea that if I gave them

3    a deed of trust on that -- it came to me from someone else.

4    Actually, a friend called and told me the land is invaluable

5    -- I don't know if I can say that or not, but, anyway, I was

6    told that the land had such great value and that we should

7    consider that as a security for everybody, because it would

8    put them in a better position; it would be a secure

9    position.

10   Q.   Let me walk you through that, Mr. Johnson.

11        MR. ANDERSON:  Let me ask the government, please,

12   to put up Government's Exhibit 26-9.

13   BY MR. ANDERSON:

14   Q.   Mr. Johnson, you see what is on the screen as

15   Government's Exhibit 26-9?

16   A.   Yes, sir, I do.

17   Q.   Is that your signature on that letter to Mr. Chartier?

18   A.   Yes, sir, it is.

19   Q.   Now, that was not the first letter you had sent him?

20   A.   We had a continuous correspondence with Mr. Chartier.

21   He was a nice gentleman.  We had long, continuous

22   communication with Mr. Chartier.

23        MR. ANDERSON:  Ms. Vogt, would you go to the second

24   page of Government's Exhibit 26-9, please.

25   BY MR. ANDERSON:

1   Q.   Do you see that page, Mr. Johnson?

2   A.   Yes, sir, I do.

3   Q.   What are you representing on this page to Mr. Chartier

4   of the state corporation commission as of December the 1st,

5   2002?

6   A.   That's a representation saying that all of those people

7   who just show a zero balance had agreed to take a deed of

8   trust note on the property and therefore release Mountain

9   Investments as to any further obligations, and to show that

10  their note was satisfied -- not paid, but show that it was

11  satisfied in full.

12  Q.   Are those individuals with a zero balance individuals

13  who had accepted a note from Dogwood Farms to replace the

14  note they had from Mountain Investments?

15  A.   Yes, sir.  To the best of my knowledge, every person

16  that has a zero is someone that I have a release, that I

17  sent a copy to Mr. Chartier at the state.

18  Q.   All right.  Now, some -- in this column here there are

19  some that have a balance -- and, for the record, I touched

20  the column that says "Balance 12/1/02."  It is the last

21  column on this particular spreadsheet of Government's

22  Exhibit 26-9.

23      Mr. Johnson, those amounts show a balance.  Are those

24  individuals who had not received a Dogwood Farms note in

25  place of their Mountain Investment notes?

 1   A.   Yes.  But I think at this time there are some people

 2   who hadn't signed and I still showed them as zeros.  And I

 3   think when I originally sent these deeds of trust notes out,

 4   I just assumed, which was really foolish, that everybody

 5   that got one of these notes would prefer to have a deed of

 6   trust on a property that had a value as opposed to having an

 7   unsecured note.  And because of the fact that I had these

 8   notes out from Mountain Investments -- because I see that

 9   Mr. Bostic, I'm still showing a balance, but I don't know

10   why I would be showing Buchanans, because Buchanans never

11   signed anything.  And so I don't know -- unless I am just

12   looking at that wrong -- I don't think I am; no, sir.

13       Generally speaking, when I finally got into second and

14   third and fourth reports to Mr. Chartier, if that individual

15   hadn't signed that, they would show up on a column that they

16   still owed -- we still owed them money from Mountain

17   Investments.  The only time you would make the column -- in

18   the earlier part I think I sent out when I thought that

19   everybody was signing this deed of trust.

20       But I can assure you that I had a real strong and

21   healthy respect for Mr. Chartier and his responsibility and

22   his position.  And so I wouldn't be sending it out if I

23   didn't think they were going to sign them.

24           MR. ANDERSON:  Let me -- if I could ask Ms. Vogt to

25   put up Government's Exhibit 26-10.

1    BY MR. ANDERSON:

2    Q.    Is that the letter you make reference to, Mr. Johnson?

3    A.    Yes, sir.  "I anticipate it would take approximately 14

4    days for me to send you the signed statements," because I

5    must have been under some obligation to send a report by a

6    certain day.  And then I went ahead and just gave him that

7    this will come back with signed documents.  But when those

8    documents didn't come, then I filed amended reports all of

9    the way up until the year 2003 something.

10   Q.    I know -- I know you are excited to get going and tell

11   it all, but you are getting ahead of me.  I can't go as fast

12   as that.

13   A.    Forgive me.

14   Q.    It is all right.

15        MR. ANDERSON:  May I see page two of Government's

16   Exhibit 26-10?

17   BY MR. ANDERSON:

18   Q.    Just look at that a moment.

19        MR. ANDERSON:  And then page three of Government's

20   Exhibit 26-10.

21   BY MR. ANDERSON:

22   Q.    Now, Mr. Johnson, at the bottom of the page, is that

23   your handwriting that has dated and signed by you, partner

24   of Mountain Investment?

25   A.    It is definitely my handwriting and I definitely sent

JOHNSON – DIRECT

1    that in on the 10th of December, just like it indicates.

2    Q.   And is this the enclosures to Mr. Chartier with the

3    letter that you just referenced, where you anticipated the

4    balance as being reduced to zero?

5    A.   Yes.  I think the letter more clearly states that I

6    anticipate that all those will send -- I'll have these

7    releases for him, in his hands.

8    Q.   And these were the individuals you anticipated taking a

9    Mountain Investment note and trading it for a Dogwood Farms

10   note?

11   A.   Yes, sir.

12   Q.   Signing the receipt that the jury has seen that says,

13   "My Mountain Invest note has been satisfied as of this

14   date"?

15   A.   Yes, sir.

16   Q.   Now -- so this is what you anticipated were zero

17   balances.  You started to get responses back, where people

18   weren't going to sign --

19   A.   Yes, sir.

20   Q.   -- those statements of satisfaction?

21   A.   Yes, sir.

22   Q.   And you then amended it to the state corporation

23   commission and changed the amounts to reflect those

24   individuals who had not accepted; is that accurate?

25   A.   It is a hundred percent accurate.

1    Q.   All right.  Now --

2            MR. ANDERSON:  Excuse me a moment.

3        (Pause.)

4            MR. ANDERSON:  Government 26-11, please.  And then

5    the second page.

6    BY MR. ANDERSON:

7    Q.   Is this a letter that you prepared and had sent to

8    Mr. Chartier, with enclosures?

9    A.   It doesn't have my signature on it, but I believe this

10   is the letter that I sent him; yes, sir.

11           MR. ANDERSON:  Now if we may see page three of

12   Government's Exhibit 26-11.

13   BY MR. ANDERSON:

14   Q.   Do you see this spreadsheet, Mr. Johnson?

15   A.   Yes, sir.  I prepared it.

16   Q.   All right.  And what are you preparing here?  What are

17   you saying to Mr. Chartier of the state corporation

18   commission?

19   A.   That the original report that I sent is now reflecting

20   that there are some balances that are not zero.  If they are

21   zero, I show them on the last column there, which says

22   balance as of 1/1/2003.  If those people didn't sign that, I

23   wouldn't put it down.  And so if they didn't sign a release,

24   I wouldn't put it down.

25   Q.   When you say "release," you are referring to, again,

1   the statement of satisfaction that the jury has seen from

2   some signatures of investors?

3   A.   Yes, sir.  The state corporation commission referred to

4   that as a release, when we talked, when Mr. Chartier and I

5   spoke.

6   Q.   Now, after you had attempted to satisfy the Mountain

7   Investors notes with Dogwood Farms notes, did you have -- or

8   what -- what belief, if any, did you have regarding the

9   value of the Dogwood Farms notes at that time?

10  A.   One of the things I didn't discuss in my background is

11  that when I was a commissioner of the revenue my whole

12  responsibility was assessing property that hadn't been

13  assessed previously.  And then I went to a school to learn

14  about assessing appraisal, at the University of Virginia, as

15  part of my duties as commissioner of revenue.

16       When I finally left the clerk's office -- commissioner

17  of revenue, then clerk, and then clerk.  And when I left the

18  clerk's office, it became my experience to own some

19  property, my wife and myself to begin with, and then other

20  property, eventually Dogwood Farms, which is contiguous to

21  the property that my wife and I -- which is referred to

22  earlier as the Shumate land.  And so we had already done

23  subdivisions, etc.

24       I knew that the value of that property that was given

25  to me by Mr. Joseph Dour, who is an MAI appraiser, a member

1    of the Appraisal Institute -- it is a designation.  It is

2    higher than just a normal, from my understanding, of just

3    being an appraiser.  He is a sophisticated commercial

4    property appraiser.

5         When I received my first appraisal from Mr. Dour -- it

6    was probably about '99 -- it showed a value of like $1.8

7    million.  When I got the second appraisal from him, which

8    has been shown here in this court, it was like 2 million.

9    It was so close to being $2.1 million.  That was in its

10   entirety.

11        And even though there was a discussion about the

12   breakdowns of how this appraisal occurred, I knew that if

13   you have property and you can break it into small parcels,

14   which they had done when I sold to Wal-Mart; and then once

15   Wal-Mart developers got it, they broke down little lots, and

16   they would sell it for $175,000 an acre.  So I knew that

17   once I got that property and I got the opportunity to

18   develop it -- at least I thought I knew, that that land was

19   going to come into the 5, 6 million dollar, because it was

20   going to be my wife's and my property in Dogwood Farms.

21        And so we felt like if we could get that property

22   developed, if I could get it broken down into smaller

23   parcels, that there would be a strong, strong probability

24   that you are going to get certainly double, maybe even more,

25   what you would have if you had it in its entirety.  You are

1  going to sell a small parcel of land, it has been my

2  experience, that's what I have done, because I have done

3  some subdivisions.

4      And so I knew you are going to sell a smaller parcel of

5  land quicker and for bigger money.  So, yes, I thought if I

6  could get this property into -- you know, divide it into

7  smaller parcels, that we were going to have a strong value,

8  much, much stronger than what we had.  We were already

9  seeing a couple, $300,000 increase just from a couple

10  years.  And so I knew that if I could break it down, that I

11  could -- that I could get this thing sold and get everybody

12  paid.

13  Q.  What belief, if any, did you have with regard to

14  whether the value, as you believed it to be, would be

15  sufficient to pay the principal and interest to your

16  investors?

17  A.  I won't state that I thought that it would pay every

18  interest payment.  My concern at that point was if I can get

19  the principal, if everybody can get all of their money back,

20  and then I could spend the rest of my life, if it required,

21  to pay this interest, because this interest was, you know,

22  20-plus percent.  It is not their fault.  They were glad to

23  receive it and I was glad to pay it, because I thought I

24  could pay it.  And so I thought at least I would get the

25  principal back, that all of these people would get their

1  principal, maybe some interest, but I certainly thought
2  principal.
3  Q.  Now, during that time period, Mr. Johnson, where things
4  were getting bad, you are not able to make timely payments
5  on the interest --
6  A.  No.
7  Q.  -- did you or members of your family on your behalf put
8  your own money into this investment?
9  A.  Yes, sir.
10  Q.  Tell the jury about that, please.
11  A.  Well, throughout, as we were in this venture, my mother
12  and father, who had both passed away, my father in 2002, my
13  mother in 2004, when they were alive, and then my sisters,
14  and my mother and father-in-law, my mother and father-in-law
15  as well, if I needed anything -- I said, "We have got to
16  keep this going.  I can eventually pay these people all that
17  I owe" -- and so they would give me money.  My father-in-
18  law, who has since passed; my mother-in-law, I'll state this
19  on the record, who is like an angel.  I have been around her
20  29 years.  We have never had a cross word.  This is a
21  beautiful woman.  She's just such a fine, fine person.
22      And so I went to these people, as painful -- I had to
23  have money, because I had to pay things.  I went to my
24  sisters, my mother and father.  We put 555,000 of our own
25  money in, to make sure people got their payments.  And we

1   kept on keeping it up, where we could get Dogwood Farms paid

2   for.  Whatever was needed.  If Dogwood Farms was about to go

3   under and I needed to pay that, because I knew that that had

4   such a value, that people were protected with Dogwood

5   Farms --

6   Q.  Why didn't you just -- why didn't you just file

7   bankruptcy at that point and keep your 555,000?

8   A.   It has been taught -- this is disgraceful here, but it

9   has been taught to my family that it was a disgrace.  And so

10  even when I was threatened to be taken into bankruptcy, I

11  made even another mistake and I kept on trying to go and go

12  and go and go.  But I considered it to be a disgrace.

13       The first time they got a judgment against me, I

14  thought -- I thought it was the equivalent of just my life

15  was over.  I said, "This is going to be here for my future

16  generations -- instead of my journals to be read, this is

17  going to be here for my future generations to see that their

18  grandfather didn't pay it."  So I didn't want to take

19  bankruptcy.

20       We would have rather, as a family, had put all that we

21  had in it.  And we put $555,000 over this time period,

22  probably more.  I -- that's just all that I saw.  I don't

23  have my records.  They were taken in the search and I don't

24  have my records.  But I'm thinking -- the search was October

25  6th, 2005.  It was a year to the day from my mother's

JOHNSON - DIRECT

1    passing.

2         But we didn't want to not pay what we owed.  It was a

3    -- it was really a sin.  And I just didn't want to be

4    involved in it.  It was such an infraction of what we

5    believed we ought to do.

6    Q.   Let me ask you this, Mr. Johnson.  During that same

7    time period, did Mr. Farrier put any of his personal assets

8    into this investment as well?

9    A.   Yes, sir.  Yes, sir, he did.

10   Q.   Are you including that in the 550,000 or is that

11   separate?

12   A.   Definitely not.  His is separate.  His mama passed and

13   he tried to put what he could in it.  I saw what the

14   government -- I think it is 370,000.  But, I mean, he put a

15   lot in.

16   Q.   And eventually there did come a time when there was an

17   involuntary petition filed against you for bankruptcy?

18   A.   That was done after I did a voluntary on Dogwood

19   Farms.  We were about to be foreclosed upon by Grawley and

20   Grawley, a lender up in McLain, Virginia.  We were about to

21   be foreclosed upon, maybe like the following Tuesday or

22   something.  I don't know.  It was very close.  We were

23   within a few days of a Thursday or Friday.  And I went to a

24   high school friend of mine that we had known in McLain, who

25   was an attorney.  And we filed a voluntary on Dogwood.

1       The only way I could justify it in my mind was that

2   this is a corporation and we have to do this in order to

3   protect our asset, that we can make sure that we get this

4   money back to these people.

5   Q.   Do you remember if that was a voluntary Chapter 11?

6   A.   There have been some things that were converted.  And I

7   had never had experience -- my only experience in court was

8   in state court.  I think it might have been a Chapter 11.

9   It was -- it was a voluntary.  And then we had an

10  involuntary just two or three days later that were filed

11  against myself and against Frank.

12  Q.   Was it your belief, even then, that Dogwood Farms, the

13  real estate known as Dogwood Farms, would have sufficient

14  value to pay the principal back to your investors?

15  A.   I was completely comfortable.  I was confident.  I

16  felt, "Well, this is the end of it."  It was a terrible

17  embarrassment to have your land lost.  I even had four that

18  I thought that we would sell the land -- that Ms. Neville,

19  who I had only met one time, but we had had telephone

20  conversations, hundreds -- not 20, I think she testified --

21  we had hundreds of them.  And she had land in Springfield,

22  Illinois.  And she was going to sell that land.  And she had

23  hundreds, maybe thousands of acres, and been offered -- or

24  she was getting ready to be offered, we understood, a large

25  amount of money for it.  And so we had decided we would just

1    pay everybody off that we owe.  And then we'll go in and

2    develop this land ourselves.  And then we won't have any of

3    the pressure, this has to be sold this very second.  We

4    would have the opportunity of partitioning it in a way or

5    dividing it, subdividing it in a way that would yield the

6    most for us.  And so we talked about it.  And that's why,

7    when we had our meeting with the Buchanans and Mr. Magee,

8    the attorney, that we had had on the phone.

9         So, yeah, we had, all of the way up until the time,

10   even to the bankruptcy, always thought, no question, we'd at

11   least get the principal back.  And I'm not going to lie to

12   any jurors and say I think we were going to make $8 million

13   and all of this interest was just piling; there was just no

14   way.  But I thought if I could get the principal back, then

15   I could go back to these people with some integrity and say,

16   "I will then pay your interest.  It will take me, maybe, the

17   rest of my life, but I will pay that."

18   Q.   Do you still feel that way?

19   A.   Never -- never changed.  Always thought it.

20        (Pause.)

21   Q.   Mr. Johnson, you have been handed three exhibits.  If

22   you would take what is marked for identification as

23   Defendant's Exhibit 1 first, please.

24   A.   Yes, sir.  I have it in my hands.

25   Q.   All right.  Now, at the time of the execution of the

JOHNSON – DIRECT

1    search warrant at your home and office for Dogwood Farms,

2    had you prepared a letter for your investors?

3    A.   Yes, sir.

4    Q.   And is that what Defendant's Exhibit Number 1 is?

5    A.   Yes, sir.  I had prepared a letter, had done envelopes,

6    and I had had the little seal of -- excuse me, the little

7    label on it, I had prepared those.  And I had them in a

8    drawer, that I was getting ready to send out.  I'm -- I

9    think when they saw the picture of my office -- I'm not real

10   organized, but I did have it in the drawer on the day that

11   there was a search on my house.

12   Q.   Is that what Defendant's Exhibit Number 1 is?

13   A.   Yes, sir, it is.

14        MR. ANDERSON:  Your Honor, I would move for

15   admission of Defendant's Exhibit No. 1.

16        THE COURT:  It will be received.

17   (Defense Exhibit No. 1 was marked for identification

18   and received in evidence.)

19   BY MR. ANDERSON:

20   Q.   Mr. Johnson, could you please tell the jury what this

21   letter of September the 16th, 2005, is -- what your intent

22   with -- what you are doing with this letter?

23   A.   I wanted to advise the people that had given us money

24   -- and I don't mean that in the sense that they gave it to

25   us, that it wasn't theirs, but that had invested or whatever

1    it is that we want to say, but those people that I had funds

2    that were theirs, I wanted them to be advised of what steps

3    we were doing to try to protect them.  This was -- I believe

4    -- this was after the sale of the Dogwood Farms at a public

5    auction.  I'm sure it is.  Yes, sir.

6    Q.  And your testimony is that this letter was never sent?

7    A.  No, sir, it wasn't.

8    Q.  And why?

9    A.  Well, I was preparing to send it.  And I had it in my

10   drawer to do, of things to do.  And then it was a couple of

11   weeks later that the FBI and other folks from the government

12   came in and I had a search on my house, on that October

13   6th.  It is a couple weeks later.

14       I -- the delay -- I had the envelopes ready and

15   everything.  I guess probably the delay was I was just

16   derelict, but I was more interested in probably trying to

17   get the insurance done too.  I was hoping to have that in

18   place by the time they got that letter in hand.  And we were

19   -- we were in the process of getting our life insurance,

20   physical exams.

21       I don't want to misstate exactly when that happened.  I

22   can find out.  But we had to come to Roanoke because of the

23   size of the life insurance we were trying to get.  It wasn't

24   500.  It was several million dollars we were trying to get.

25   And they were going to do it proportionate to each

1  individual's amount that we owed according to our records at

2  that time.  So --

3  Q.  Let me -- I'm sorry.  I didn't mean to cut you off.

4  Had you finished?

5  A.  I was just going to say if a person had X -- one

6  percent of what we owed collectively, then they would get

7  one percent of however much life insurance that we could get

8  on our lives.

9  Q.  Let me ask you to next look at what is marked for

10  identification as Defendant's Exhibit No. 2?

11  A.  Yes, sir.

12  Q.  Do you recognize that?

13  A.  Yes, sir.

14  Q.  And can you tell the Court and the jury what

15  Defendant's Exhibit No. 2 is?

16  A.  Well, Defendant's Exhibit No. 2 is just my

17  correspondence with the Internal Revenue Service.  I tried

18  to keep them advised, because there had been -- because all

19  of my records were gone -- I believe when the -- when the

20  FBI came in on October the 6th of 2005, I believe I had

21  maybe a 2004 tax return laying up on an old copy machine

22  that my wife and I were getting ready to file.

23      And the reason is that I think my -- one of my

24  daughters was trying to get a student loan and she couldn't

25  get a student loan unless we had a tax return.  But then

1    that was gone.  And then 2005 and '6, because we had the

2    foreclosure sale and all of those, I didn't have any

3    records.  And so I advised the Internal Revenue Service that

4    I have a responsibility to file, it is just that I -- that

5    all of my records have been seized and that I don't have

6    -- I don't have records to even do the taxes right now.  But

7    I wanted them to know that I wasn't trying to evade or, you

8    know, not to do what I'm supposed to do.

9    Q.   And, Mr. Johnson, did you file a tax return for taxable

10   year 2007?

11   A.   I did, 2007, yes, sir.

12   Q.   And this letter is making reference to that?

13   A.   No.  This letter is making -- let's see.  I think this

14   record is making reference only to those that I have not

15   filed, not those things that I have.

16   Q.   You had filed '07?

17   A.   I had filed '07.  And there was not a question -- I

18   didn't get a notice "You haven't filed '07 yet."

19   Q.   Well, how are you employed in 2007?

20   A.   In 2007 my wife became a subcontractor to a janitorial

21   service.  And I helped my wife and did a lot of the

22   janitorial work.  And so I was working for Ms. Bossie

23   Willis.  She was my direct supervisor, if you will.  But she

24   owns a janitorial service.  And she does a lot of work

25   around Virginia Tech.  And so I would go and I would do

1    custodial work.  I would do commodes or whatever I was

2    -- and sometimes I would do her carpets and things, because

3    I knew how to do that.  So she let me go do her carpets.

4    She rents commercial stuff.

5    Q.   When did you begin that employment?

6    A.   Without misstating, I'm thinking probably more like

7    2006 maybe.  A couple years I have been with Ms. Willis.

8    Q.   And essentially you have gone to being a janitor?  Not

9    that there's anything wrong with that --

10   A.   No, sir.  I know you are not saying that.  I am a

11   janitor.  That's what I do when I'm not down here doing

12   this.

13           MR. ANDERSON:  Move for admission of Government's

14   Exhibit No. 2.

15           THE COURT:  It will be.

16       (Defense Exhibit No. 2 was marked for identification

17   and received in evidence.)

18   BY MR. ANDERSON:

19   Q.   And then you are looking at what has been marked for

20   identification as Defendant's Exhibit No. 3.  Can you

21   identify that document, Mr. Johnson?

22   A.   This is a receipt of my correspondence to the Internal

23   Revenue Service, pretty much saying that they have

24   received -- on the 24th of July, this year, they just

25   received my correspondence.  And they said that they are in

1    the process of checking out what I'm doing.  And they -- I

2    think they are saying that "We'll be in touch with you.  No

3    further action at this point."

4        I didn't want the Internal Revenue Service to come

5    back -- even though we only have janitorial work, I didn't

6    want them to come back and maybe try to think that we were

7    trying to not comply with the federal requirements of a tax

8    return.  And the reason I filed 2007 is that I had finally

9    gotten now where I didn't feel like there was going to be

10   any loss carryovers and other things that would have been

11   needed -- information as to loss carryovers, I was receiving

12   some money from a fellow who -- just a fellow who had bought

13   a trailer lot from me years ago and I carried the paper,

14   things like that.  So I didn't have the documentation to

15   file an accurate return.

16         MR. ANDERSON:  I move for admission of Defendant's

17   No. 3, please.

18         THE COURT:  It will be received.

19     (Defense Exhibit No. 3 was marked for identification

20   and received in evidence.)

21   BY MR. ANDERSON:

22   Q.  Now, Mr. Johnson, this is -- this is -- this is your

23   day.  You are on that witness stand.

24   A.  Yes, sir.

25   Q.  You are under oath to tell the truth.  And it is your

1    opportunity to say what it is you have wanted to say for a

2    long time in a very measured way.

3    A.    Yes, sir.

4    Q.    And what is that that you wanted to say?

5    A.    Generally speaking, for 16 years, Frank and myself, we

6    did everything we could make sure these people, who are

7    my friends, by the way -- a lot of them were -- there were a

8    couple that I didn't really know that came from a referral

9    from somebody in the family; I didn't know them.  But my

10   letter, even, on September the 16th of 2005, which the jury

11   will see -- in that statement I said, "We will not ignore

12   our debts, even if they are discharged by bankruptcy."

13       For the year that I was in bankruptcy -- it is almost

14   like being here.  You are not allowed to -- in a criminal

15   proceeding, you are not really allowed to chitchat and talk

16   to these people.  You feel like they are in the proceeding

17   and you don't want any way that they can come back and say

18   you are trying to say something that would be improper.  So

19   for a year I wasn't able to speak to these people, you

20   know.  It is the same in my church.  There has been two

21   years that I haven't been able to be at my own church.  I

22   went to another place in Peterstown where I would go.  It is

23   still my church; it is just not the branch or the order that

24   I ordinarily go.

25       But it said in this letter that I was writing to

1    them -- I was going to send it out.  I'm hoping that
2    somebody would take notice that that office is just
3    horrendous.  They said I cleaned it up, but my wife says she
4    doesn't ever remember me -- maybe clean it up -- but the
5    point being that I said, "We will not ignore our debts, even
6    if they are discharged by bankruptcy."  I couldn't say that
7    while I was in bankruptcy, by certain restrictions by
8    counsel.  "These are the steps we have and will take to
9    eventually pay for all that is due.  The road to achieve
10   total financial restitution to all parties has been long and
11   difficult, but our pledge is to continue on until all that
12   is owed is paid in full."
13        And so I talked to these people about we owe this
14   money; we thought -- in this letter I said we thought the
15   real estate was going to bring something.  I thought that
16   Pat Neville was going to sell the land in Springfield,
17   whatever.  And she -- we had a nice telephone conversation.
18   She would not have even recognized me.  I only seen her one
19   time.  But we had many conversations.  The last she had seen
20   me, years ago, I had a beard on my chest.  She wouldn't have
21   known me.  And so it wasn't like it was a person-to-person
22   thing.  But we had a good relationship.  And she was a nice
23   person.  And I don't recall every detail she said, about her
24   testimony, but she was a really nice and caring and kind
25   person.  And I really liked her.  And I kept thinking, you

 1  know, she has got a mentally challenged child.  From what I

 2  understand and talking to the child on the phone, she's a

 3  grown woman now, I think they told us.

 4      But I wanted her to be rewarded for her kindnesses to

 5  me.  She intervened and saved my house a couple times,

 6  which, since it is my dad, I need to speak about my house.

 7  The house that was referred to so many times in the picture,

 8  the house was on the market for 18 months to two years after

 9  the owner of that house died.  He died in the home, perhaps

10  at his own hand.  And so his wife, who was a realtor -- and

11  I have known her and I called her and I said, "This house

12  has been out here on the market for two years.  And now it

13  has gotten down relatively cheap."  Always thinking I'm

14  going to make money, whether it is off of land or

15  something.  The house has gotten cheap.

16      I called Vet Ballard up and I told her -- I said, "I'm

17  interested in your house.  Do you think you will be offended

18  or will you be offended if I go look at this house?"  It had

19  got down to $360,000.  That's a lot of money.  It is a lot

20  of money.  And I'm not saying to anybody that that was small

21  potatoes; it wasn't.  It was big.  But I had a wife; I still

22  do.  I had five children at home.  We were living in an

23  1849-square-foot house.  And I had been paying on that house

24  just several months before Pam and I married.  And then when

25  we married, she moved up.  I had been paying on that house

JOHNSON – DIRECT

1    with money that I had made at the clerk's office.  So I had

2    some equity.  So the time I get for equity for that house

3    and then I'll get something else that will work, we'll sell

4    something, and then I knew that I could take that house,

5    because they were only asking 360 for it.  It had 8,000

6    square feet, five acres.  I knew that that house had an

7    immediate built-in equity.  I knew that.  So I took the

8    house, of course.

9        And once I got it financed, then I turned around -- my

10   father-in-law, by the way, lent me money.  But once I got it

11   financed, then I went right back and financed it again.  I

12   got 50,000.  And then I gave it right back to Mountain

13   Investments, more and more, because I wanted to pay.

14       So the house, as it looks up there -- the "big house,"

15   we keep hearing that -- my wife and I don't heat the house

16   to begin with.  Some of the heat pumps -- it has got four of

17   them.  Some of the heat pumps don't work anymore.  My sister

18   bought me a stove.  And I go cut the wood.  And we have wood

19   in there that keeps us warm.  The house gets down to 47.  It

20   is not the palatial mansion where it was implied that I'm up

21   there in the lap of luxury.

22       And then, because I had borrowed against it several

23   times for the purposes of the business, it got to the point

24   there was so much against it, and then when the market

25   collapsed, I couldn't sell it if I wanted to.  And then

1    there are certain restrictions that I can't sell it now.

2        And so the house is another one of those things that it

3    has the impression that I'm just up there in the lap of

4    luxury; it wasn't the case. We didn't have anything. We

5    -- parents, grandparents of -- grandchildren -- or my

6    children, their grandparents were paying the payments, etc.

7        Then we came to a point that if we could sell the

8    house, I could get -- pay one of these investors off. So I

9    said, "Okay, let's sell the house." Well, my sister said,

10   "I'll buy the house. I'll buy the house," because she had

11   put so much -- she had put 150, 200,000, just making the

12   payments. "I'll buy the house." And then we'll hold it and

13   when the market gets better then we'll sell it and maybe at

14   least I'll get some of my money back.

15       So we get the finance ready to go. Everything is

16   gone. Just as Mr. Bote testified -- these people

17   testified. And they're honorable, decent people. And they

18   testified that he said Ted was going to get that house sold

19   to his sister. But the lender came to me and said -- by

20   phone, came to me and said -- whispered, the -- the broker

21   of the lender said, "They won't lend you that money unless

22   you can disassociate yourself with your sister. They won't

23   lend money to a family member to buy property. So all you

24   have to do is to sign a little document, your sister has to

25   sign, that even though you have a common name, your name is

1  Johnson" -- she's not married; her name is Johnson -- "just
2  because you have a common name, you just need to sign this
3  little affidavit, it won't amount to anything, and it will
4  just show that you-all are not kin," and then the deal was
5  done and then I was going to give Mr. Bote 50 percent, or
6  25,000.
7      And we said, "Neither one of us is going to sign that
8  statement. We're not going to put a false affidavit in
9  there saying that we are not related." She may not want to
10  say it, but I still claim her and I wasn't going to sign
11  it. And so the bottom line is that that's the reason that
12  the house is still setting there. That's the reason that we
13  have been in foreclosure I think four times.
14      And I would say that as to my journals, I have seen
15  them flashed up here now for two weeks. And the bottom line
16  is that just in what little bit I have been able to go
17  through in three or four years, I have had 871 entries, and
18  every one of those entries is working on something to
19  trade. I'm trying to do this; I'm trying to do that. I'm
20  very distressed. I want to make sure these people get
21  paid. I want their money back to them. I don't want any of
22  them -- I want to make sure that they are covered, that they
23  get their money. 871 times in this one section of notes.
24      I have others which the government didn't take, and
25  since they didn't take, I won't talk, but through the years,

1    16 years, there was an entry for every day for 16 years.

2    There are thousands of entries.  And every single entry says

3    I want to pay what I owe.

4        And I think, as we look at my life now, and you look at

5    it, and you say, "How foolish.  Didn't you somehow catch on

6    that this wasn't going to come to pass?"  No.  Even on

7    September the 16th of 2005 I was still saying this is going

8    to happen.  Even now -- nobody's money is involved now.

9    Even now I have eight computers and I work all of the time

10   to try to come up with something to trade.

11       Bobby Dally talked about the money coming in, didn't go

12   out, etc.  It did go out.  My journal reflected it.  It went

13   from a difficult account.  So money came in; it came out.

14   But there's no explanation, other than the fact that I

15   believed and probably have to say I still believe that -- I

16   have done so much programming, even since we have last

17   spoken, I still believe that I will eventually pay all of

18   these people all of the money I owe.

19       And so -- it is not going to come from Dogwood.  That's

20   long since gone.  I don't know that -- that has been my

21   position, my written statements.  I have done it for so

22   long, it looks like that it is not exactly what a normal

23   person would do.  And I would have to say perhaps it is

24   not.  But I don't like to quit on anything.  And I said I

25   was going to pay them.  And that's -- that's how I did it.

1  Q.   Mr. Johnson, because there has been some -- at least

2  you felt, from what I'm hearing, that there was some

3  restriction about what you could or could not communicate as

4  a result of proceedings, again, with this understanding that

5  it is your time now on this witness stand in this

6  proceeding, for the record, what is it, if anything, you

7  would say to some of the investors who have been here and

8  who have questioned whether or not you even had any sympathy

9  toward them?

10 A.   Well, to begin with, there was one witness who

11 testified that I went to his house --

12 Q.   Well, you don't have to go back to what witnesses have

13 said.  Just tell me -- tell them and tell this jury and for

14 the record what it is you wanted to say about that that you

15 felt like you couldn't have said in the past.

16 A.   You are not allowed to speak or have any communication

17 with any of the so-called investors.  And so when I would

18 see these people in here, even in this room now, I would see

19 these people, and you -- they have been your friends; they

20 have been people I have been around all of my life.  Some of

21 them I have known since I was a child.  Some of them were

22 high school friends, people that I have known, loved, still

23 do.  I don't blame them for their feelings towards me,

24 nothing like that, because they didn't get their money, not

25 yet.

JOHNSON – DIRECT

1          But every single one of those people, my heart broke

2    for them.  I came in here and I heard these different people

3    -- and that's not all.  I guess there's people I have known

4    from years past that didn't come or whatever.  I don't know

5    where everybody is.  But I just know that I was sick.  I

6    have mourned this.  I have mourned this more than I have

7    mourned the loss of a loved one.  I have thought about it.

8    I have pondered it.  I said, "Where were you?  What were you

9    doing?  Where did you come up with these ideals that this

10   would work or that it wouldn't work?"  Every single one of

11   these things that I did.  But the deep chagrin, the sadness

12   that I felt, and the sorrow -- and I think also to see your

13   own demise, to see yourself dead.

14         When I heard those people say "I trusted him and I knew

15   that whatever he said would be good," and whatever I said I

16   would try to be good and to make good.  But I was sick.  I

17   was sick about this.  And I'm still sick about it.  It won't

18   -- it won't make any money to the pocket, but I have always

19   had -- I have had a deep feeling for them.

20         I don't -- I don't hold them in contempt or have any

21   animus feelings towards them.  They are good, decent

22   people.  And the most -- I don't know all of them.  Some of

23   them I have only known for a year.  And then half of that

24   was in an adversarial type of environment.  But some of

25   these people I have known ever since I was probably 10 years

1    old.  And I'm sick.  I'm sad for them.

2        And it doesn't put the money in their pocket, but I can

3    assure you one thing, that my journals are complete with

4    just day after day, week after week, going and doing

5    whatever I could, going to every place I could go, bringing

6    Ph.D.s in, and then I started doing it myself because I felt

7    like I can obviously learn this thing better than they are

8    doing it, they don't know anything.  And they would be

9    professor types.  We just couldn't get on to trading until I

10   did it and did it and did it and kept on doing it and

11   confessed before this jury that I'm still doing it, not with

12   anybody's money, but now I'm still doing it, those

13   simulations, because the computer allows you to simulate.

14       And so if I had something that would come up -- and I

15   do it today.  I have something that will come up and it will

16   show no losing trades.  But it does lose.  And it has lost.

17   And I have told -- just like I did in a communication to

18   them, saying you can lose money in it.  If I have a

19   simulator and I can do that now, a computer, and if I put a

20   simulator on, and if that shows me that this is doing 70

21   percent or 200 percent a year, or whatever it is, then I

22   believe that and trust that until I put it into either

23   another account and try to trade it.  And if it holds up,

24   then people get their money.

25       There was never -- never a scheme, never a plan to try

1    to enrich myself with it.  It was quite the opposite.  Once

2    I owed the money, then I had to keep working, to try to pay

3    them.

4    Q.  Mr. Johnson, during that time that you were speaking

5    of, when you would write your journals, and particularly I'm

6    talking from 1999 through 2004, in that five-year time

7    frame, was there a period when you would meet with

8    individuals that you held in confidence and report what your

9    intentions were with regard to the money you was taking?

10   A.  Would you restate it?  I'm not quite sure I'm

11   understanding the question.

12   Q.  Yeah.  What I'm asking you is -- you said you always

13   intended to pay these people back; you didn't intend to

14   defraud any of them.  My question to you is, did you make

15   those kind of statements to individuals that you held in a

16   position of confidence with you?

17   A.   I think I told any one of them -- and particularly when

18   it became an issue that I couldn't make the monthly payments

19   anymore, I told them all, "I intend to pay you back."  Even

20   when some of them would speak to me in bankruptcy court or

21   something, when I would try to speak, it was always clearly

22   understood that -- at least it was from my side, "Yes, I'll

23   pay you back."

24        And so there was people I talked to.  And they would

25   say -- maybe wouldn't speak, was never -- I don't want to

JOHNSON – DIRECT

1    say I wasn't offended, because I think you are always in a

2    sense of offense if you have people you have known and they

3    won't speak to you and they turn their head, but I never did

4    have a feeling of animosity towards them.  I think more I

5    was sad --

6    Q.    And I'm not -- and I'm not talking about people at

7    those hearings.  I'm talking about people you went to for

8    counseling or for comfort, people within your church or

9    whomever it is you may have decided to talk to --

10   A.    In the church --

11   Q.    -- and told them how you felt.

12   A.    I'm sorry.  I didn't understand the question.

13   Q.    Maybe I misled you.  I'm sorry.

14   A.    No, that's fine.

15         In the church we have --

16   Q.    Well, you don't have to tell us who they were or not --

17   A.    Oh, I'm not.  I'm just going to tell you the process.

18   Q.    -- just answer the question, did you tell them those

19   things?

20   A.    Yes.  I told them that -- in the process of going to

21   our church leaders, I told them, "I'm working.  I'm trying

22   to do this."  And I made those -- those declarations to

23   these people.

24   Q.    And did you make the same or similar declarations to

25   these people with regard to how you felt and what sympathy,

JOHNSON – CROSS

```
 1   if any, you may have displayed toward your investors?
 2   A.   No one that I ever talked to would have ever gotten the
 3   impression of anything other than all I'm doing is I want to
 4   pay and I am sick that I haven't been able to.
 5        MR. ANDERSON:  Excuse me just one moment, please,
 6   Your Honor.
 7       (Pause.)
 8        MR. ANDERSON:  That's all the questions I have.
 9   Thanks.
10        THE COURT:  Would this be an appropriate time to
11   recess for lunch?
12        MR. BYBEE:  It would.
13        THE COURT:  Ladies and gentlemen, we'll go ahead
14   and recess for one hour for lunch at this time.
15       (Jury out.)
16       (Recess at 11:50 a.m.)
17       (Jury in at 1:10 p.m.)
18       (Call to Order of the Court at 1:15 p.m.)
19                    CROSS-EXAMINATION
20   BY MR. BYBEE:
21   Q.   Mr. Johnson, are you familiar with the phrase "No harm,
22   no foul"?
23   A.   Yes, sir, I am.
24   Q.   Do you know what that means?
25   A.   In basketball I do.
```

JOHNSON – CROSS

1  Q.  Do you know that it generally refers, in basketball, to

2  a very hard foul?  You knock somebody down, and unless they

3  have got blood on them or something, you just jump up and

4  you run and you keep on continuing?  "No harm, no foul."

5  A.  Yes, sir.

6  Q.  Is that your understanding as well?

7  A.  Yes, sir.

8  Q.  Okay.

9      Would you agree with me that in this context, the

10  context of this case, that intending to pay someone back

11  does not justify unlawfully taking that money from them in

12  the first place?  Would you agree with that?

13  A.  I agree that you certainly should try to pay somebody

14  back.

15  Q.  No, that's not my question.

16      My question is, intending to pay someone back does not

17  justify unlawfully taking it from them in the first place;

18  would you agree with that?

19  A.  Yes.

20          MR. BYBEE:  Mary, could you call up Exhibit 11-21,

21  please.

22  BY MR. BYBEE:

23  Q.  Mr. Johnson, did you see this exhibit when we were

24  talking about it with Mr. Farrier?

25  A.  Yes, sir.

JOHNSON - CROSS

1    Q.   Did you understand from Mr. Farrier that this chart

2    represents Mountain Investments' trading losses by year, as

3    taken from their tax returns?

4    A.   Yes, sir.

5    Q.   Now, you don't have any quarrel with this -- with the

6    accuracy of this exhibit, do you, Mr. Johnson?

7    A.   No, sir.

8    Q.   Was that a "No, sir"?

9    A.   No, sir.

10   Q.   So you would agree with me that in 1992 you lost over

11   $40,000 trading, would you not?

12   A.   Yes, sir.

13   Q.   And that in 1993 you lost a little over $20,000?

14   A.   Yes, sir.

15   Q.   And in '94 you lost, oh, somewhere around $8,000?

16   A.   Yes, sir.

17   Q.   And in '95 you lost around $13,000?

18   A.   Yes, sir.

19   Q.   And in '96, '97, '98, and '99 you-all had -- you had

20   losses every year for those years somewhere in the

21   neighborhood of between zero and $5,000?

22   A.   Yes, sir.

23   Q.   And then in 2000 and 2001 you lost over $40,000 and

24   over $25,000 respectively; would you agree with that?

25   A.   Yes, sir.

JOHNSON – CROSS

```
 1   Q.   Would you agree that you lost money trading every year,

 2   from 1992 to 2001?

 3   A.   Yes, sir, I would agree with that.

 4   Q.   Did you disclose that fact to any investor who you took

 5   money from?

 6   A.   No, sir.

 7   Q.   Pardon?

 8   A.   No, sir.

 9   Q.   Would you also agree with me that during all of that

10   time frame you never had a successful trading system?

11   A.   A sustainable successful trading system.  It might work

12   for a day or two or a week or a month, but not sustainable,

13   no, sir.

14   Q.   I understand.

15        On any given day you might have a successful trade;

16   correct?

17   A.   Could have a successful week or whatever, but it wasn't

18   sustainable, no, sir.

19   Q.   Right.

20        So over a period of time, over a week or two weeks or

21   three weeks, you would actually lose money, which would

22   offset any gains you had during that period?

23   A.   Sometimes.

24   Q.   Correct?

25   A.   Sometimes that happened.
```

1   Q.   And how many systems would you say you tried during

2   that time period, Mr. Johnson?

3   A.   What time period?

4   Q.   From '92 to 2001.

5   A.   Systems indicators, mentors, Neuro Nets would probably

6   be well over a hundred, maybe more.

7   Q.   Okay.  So you would try one, and it wouldn't work,

8   wouldn't be sustainable, and you would discard it; correct?

9   A.   Or take elements of it and discard it, yes, sir.

10  Q.   And then you would try a new one, and it wouldn't work;

11  you would discard that?

12  A.   Same answer.  Elements maybe would be discarded, maybe

13  it would be incorporated in something else.  And we would

14  just keep parting it out.  Some may be good; some may be

15  bad.  But, yes, we would discard it if it didn't have

16  sustainable profits.

17  Q.   And over this time period there were probably -- there

18  were, as you say, maybe a hundred of these that you tried,

19  didn't work, discarded?

20  A.   Yes.

21  Q.   All right.  And because none of these systems worked on

22  a sustainable basis, that's why you lost money every year;

23  isn't that true?

24  A.   Yes, it is.

25  Q.   And as we found out through your journals, you would

JOHNSON – CROSS

1   comment on these -- on your success or failure with these

2   systems periodically, wouldn't you?

3   A.   Yes, sir, I would.

4   Q.   So that on June 9 of '97 I'm going to just represent to

5   you that you said, "No success so far."  Do you want to look

6   or -- I'll let you look, if you want to look up the dates.

7   But, otherwise, I'll just go through them, if you want me

8   to.

9   A.   Yes, sir, that's -- I did say that.

10  Q.   June 17th, '97, "Big house, no way to pay."

11  A.   Yes.

12  Q.   December 6th, '99, "I'll be glad when I'm earning my

13  way."

14  A.   Yes.

15  Q.   February 3rd, 2000, "I've been writing that same line

16  for eight years, 'nothing to trade.'"  Did you say that?

17  A.   I did.

18  Q.   Did you write that?

19  A.   Yes, sir, I did.

20  Q.   In 2000, "Still waiting."  Correct?

21  A.   If you say so -- 2000 -- whatever date was in 2000 --

22  Q.   August 29th, 2000, "Still waiting.  Nothing to trade.

23  No system"?

24  A.   Yes, sir.

25  Q.   February 22nd, 2001, "Don't have a good system"?

1    A.    Yes, sir.

2    Q.    August 16th and 17th, 2001, "No system"?

3    A.    Yes, sir.

4    Q.    December 17th, 2001, "No system."

5          August 4th, 2002, "No success."

6          Would you agree that you wrote that?

7    A.    If you say I did, I believe you would represent that to

8    be true, and I would assume that would be true if I had my

9    journal in front of me.

10   Q.    August 6th and 8th, 2002, "Just don't have anything."

11   Correct?

12   A.    Probably said that, yes, sir.

13   Q.    December 27th, 2002, "Can't get it going."  Correct?

14   A.    Yes, sir.

15   Q.    Now, at any time during that time period did you ever

16   tell any investor that you did not have a system, that your

17   systems weren't working?

18   A.    I don't believe so.  No, sir.

19   Q.    And finally in 2002 isn't it true that during your

20   hearing at the bankruptcy court you testified that those

21   trading systems have no value; they are worthless to you?

22   A.    If they can't produce, they are worthless to me; yes,

23   sir.  I put a lot of money in them.  You can maybe resell

24   them.  But as to its face value, if it can't produce, then

25   it was worthless, as far as my purposes were concerned.

1  Q.  And they didn't produce, did they?

2  A.  Not -- no, sir, not sustainable production.

3  Q.  Now, if you would --

4       MR. BYBEE:  If I can have someone hand the witness

5  Government Exhibit 54-2, please.

6  BY MR. BYBEE:

7  Q.  Mr. Johnson, I'm going to ask you to turn to page 11.

8  And this is your journal, only it has added with it money

9  that was taken in during those time frames.

10      If you will look at -- starting on January 24th, 2000.

11 It should be on page 11.

12      Are you there?

13 A.  I'm on page 11.  January 24th, did you say?

14 Q.  Yes.

15 A.  Yes.

16 Q.  Do you see where it says, "Traded Neal G"?  Who is Neal

17 G?  What is his last name; do you recall?

18 A.  His name is Ned Galvanni.  I don't know that you can

19 read my writing.

20 Q.  Ned Galvanni?

21 A.  Yes, sir.

22 Q.  "Traded Neal Galvanni stuff to New York and lost

23 $16,000.  We are just sick.  Don't know what to do.  Trying

24 a bunch of" -- do you know what that would have been there?

25 A.  Not without looking at my journal.  Just a bunch of

1    systems.  But I don't know what I might have said.

2    Q.    And then did you see approximately on that same date,

3    four days later, you took in $40,000 from Buck Gilmer?  Do

4    you see that?

5    A.    Yes.

6    Q.    Then on January 31st, 2000, you said, "Was busy trying

7    to come up with something to trade."  And then that same day

8    you took $10,000 from Mr. Buchanan.  Do you see that?

9    A.    I do see that.

10   Q.    Did you tell either Mr. Gilmer or Mr. Buchanan that you

11   had lost $16,000 and that you didn't have anything to trade

12   and you didn't have a system?

13   A.    I don't recall ever telling them anything; no, sir.

14   Q.    Do you see on page 12, line -- February 8th, 2000, at

15   the top there, "No clear direction on what to trade.

16   Looking at three or four different techniques."  And then on

17   the 15th, "Still trying to learn something to trade."  Did

18   you tell Mr. Bote, when you took his $50,000, at that point

19   in time, that you just didn't know what to trade and didn't

20   have anything to trade?

21   A.    No, I didn't.

22   Q.    Did you tell Mr. Smith, when you took his $20,500, that

23   you didn't have a system, that you didn't have anything to

24   trade and had been losing money?

25   A.    I did not.

JOHNSON - CROSS

1  Q.  If you look at February 29th, 2000, where it says, "Ed
2  Moore.  Sure didn't show me much."  Who is Ed Moore?
3  A.  He's a trader/mentor out in, I believe, Reno, Nevada,
4  holds himself out to be a trading expert.  So I went there
5  to see him.
6  Q.  Apparently you weren't impressed with Mr. Moore?
7  A.  No, I wasn't impressed with Mr. Moore.
8  Q.  This would just have been another failed trading system
9  you were trying?
10 A.  It didn't fail on me, but I saw Mr. Moore trade it and
11 it failed on him.  And that was sufficient for my
12 information.
13 Q.  And then on March 9th, "Still working on learning a
14 trading system."  You still didn't have any system that
15 would create any sustainable wins for you, did you?
16 A.  No, sir.
17 Q.  But then that same day you took 50,000 from
18 Mr. Robertson, 27,000 from Joe and Pat Johnson, and 7,000
19 from Michael and Joyce Johnson; is that accurate?
20 A.  If it says that, I believe that to be true; yes, sir.
21 Q.  Did you explain to any of them what your true trading
22 situation was?
23 A.  No, I did not.
24 Q.  Now, if I could have you turn to page 15 of that
25 exhibit.  And I would like to direct your attention to the

1  line that starts, "June 27th, 2000.  This has been a hard
2  day.  I've tried to learn the Ostom system, and it doesn't
3  look good.  I'm pretty much out of answers.  I don't know
4  what to do with all that is on me."  And then that same day
5  you took 20,000 from Mr. Browning.  Did you explain to
6  Mr. Browning how you didn't have anything to trade and it
7  didn't look good and you were pretty much out of answers?
8  A.   No, I did not.
9  Q.   Did you explain to Mr. Geller, when you took his
10 $47,000, or Thomas Buchanan, when you took his $30,000, the
11 true state of your trading affairs?
12 A.   Not to my remembrance.  I don't believe so.
13 Q.   And if you look on page 16, on any of this money,
14 Mr. Johnson, the 20,000 you took from Carl Dunn, the 10,000
15 you took from Betta Dunn, the 5,000 you took from Tom
16 Buchanan, the $100,000 you took from Charles Gentry, and
17 another 140,000 that you took from Mr. Gentry's business, on
18 down to Betty Robertson, Robert Williams, and Mr. Lavender,
19 did you explain to them what your true state was with
20 respect to your trading programs?
21 A.   On this particular one I don't think I could have truly
22 expressed it because -- I say, "I spent the day with Hans
23 Copship."  At that time I believed that his system was one
24 that was going to be making a substantial amount of money.
25 And so if I had said anything, I would have said it from the

JOHNSON – CROSS

1    perspective that I just talked to Hans Copship and I have

2    spent this time with him.  And he's an internationally

3    renowned trader.  And so I would have said -- if anything, I

4    would have thought that I had something very substantial to

5    trade at that time.

6    Q.   Did you inform any of them about your trading history

7    or the losses that you sustained in the market?

8    A.   No, I did not.

9    Q.   Now, this is in 2000, is it not?

10   A.   It appears to be, yes, sir.

11   Q.   So by this time, this is in the midst of your over-

12   $40,000-trading-loss year; would you agree with me on that?

13   A.   Yes, sir.

14   Q.   Okay.  And up to that time, up until 2000, all of your

15   trading history, you would have lost 70 or $80,000 up until

16   that point; would you agree with me?

17   A.   Yes.

18   Q.   Did you explain that to any of those investors whose

19   money you took?

20   A.   No.  But I have also had times where I had made 40 a

21   week.  And so over a period of that many years -- I have had

22   one period of time when I had made over 40,000 in one week's

23   time.  And so those are enormous numbers, but there had been

24   times when I had come back.  And in the proper season, that

25   would have not been an enormous amount of money.

JOHNSON – CROSS

1   Q.   Well, I understand, Mr. Johnson, that you can have a
2   winning trade one day, the same way that, you would agree,
3   would you not, that a person can go Las Vegas and put a
4   number on number seven on the roulette wheel and come up a
5   winner?
6   A.   I don't know about that, but I'm sure somebody could
7   win some lottery or something.  This is not a lottery, but I
8   understand your question.
9   Q.   But what we're talking about, Mr. Johnson, is a
10  sustainable trading system which consistently makes winning
11  trades or consistently makes money.  You never had that, did
12  you?
13  A.   Not -- not for a period of time.  It would work like --
14  just below, as you are looking at, I have 4,000 for that
15  week or a thousand for another week, or made 2500 for the
16  day or something.  But it is the sustainability that I was
17  trying to get where I could continue on to pay these people.
18  Q.   Now, Mr. Johnson, you would agree with me, would you
19  not, that the money that you were paying your investors on
20  these promissory notes were -- the principal -- were taken
21  from the principal from the monies that the investors would
22  give you; isn't that true?
23  A.   Sometimes.  And sometimes my parents or family would
24  give me sufficient money to pay whatever I needed to pay.
25  Q.   Well, Mr. Johnson, isn't it true that, by far and away,

1  the money that you paid to other investors came from

2  investor money?

3  A.   A lot of it came from investor money.

4  Q.   All right.

5         MR. BYBEE:   Could I ask -- John, could you hand the

6  witness Government's Exhibit 60-1 and 60-2.

7  BY MR. BYBEE:

8  Q.   Would you turn to page 16 of that exhibit.

9  A.   I'm there, sir.

10 Q.   Do you see the $105,000 that you took from Kenneth

11 Buchanan on 11/29/99?

12 A.   Yes, sir, I see that.

13 Q.   And then you paid an AT&T bill out of that, three of

14 them?

15 A.   Yes.

16 Q.   Do you see that?

17     I'm moving down the amount of investments column; do

18 you see that?

19 A.   Yes.

20 Q.   And do you see that you then paid yourself $7,000?

21 A.   Yes.  I took an advance at that time.

22 Q.   Okay.  I understand you have a word for what you were

23 doing, Mr. Johnson, but what I want -- I'm trying to get at

24 is what action you took.

25     Is that a payment to yourself that you, yourself, wrote

1  out of that account, that pooled account?

2  A.  Somebody wrote that.  It is either myself or Frank.

3  But one of us wrote that check to me.

4  Q.  Well, didn't you normally write the checks to yourself,

5  Mr. Johnson?

6  A.  Probably so.  It wouldn't have been unusual.  We both

7  had check writing, you know, privilege.  And so if I write

8  myself a check, it would always be noted, and he would

9  always show it in our books that we still had an advance

10  that we had taken and we owed that in accounts payable.

11  Q.  Well, are you familiar -- did you see Exhibit 5-32,

12  5-32 when it was introduced?  Would you like --

13  A.  I can't see from here.  If you say I signed the check,

14  that's fine.

15  Q.  Well, I mean, there's 50 of them, or more, here.  Would

16  that be unusual?  Would you like --

17          MR. BYBEE:  Why don't you just give it to him.

18  BY MR. BYBEE:

19  A.  It wouldn't be unusual at all if I wrote myself the

20  check.  And I would also say it wouldn't be unusual for

21  Frank to write checks for anything, for bills or anything

22  else.  And so I wouldn't dispute it.  There they are.  I

23  wrote them.  But I'm just saying that I didn't recall if I

24  wrote this check or if it could have been written by Frank.

25  It doesn't make any difference.  I had the check and it was

JOHNSON - CROSS

1    payable to me.

2    Q.   Well, would you dispute the fact, Mr. Johnson, that I

3    hold in my hand probably 50 checks, all written by you, all

4    written to yourself on the Mountain Investment accounts?

5    A.   I would not dispute that at all.

6    Q.   And so in this particular instance, that $7,000 was a

7    payment to you out of the pooled commodity account funds?

8    A.   It was -- it was a payment to me.

9    Q.   Okay.  Then $20 goes to Chuck Gentry, 1700 to Henry

10   Gurnell, 500 to Barry Martin, 3,000 to Kain, another 1,000

11   41 to Robert Kain, etc., etc., etc.  None of that money

12   -- well, all of those are payments back to investors, are

13   they not?

14   A.   I would think that the majority of them are.  I just

15   wasn't watching each one you did.  But I would think that

16   many of those were the investors, yeah.

17   Q.   Well, you know, Mr. Johnson, there's a -- you know, a

18   200-page spreadsheet here.  You don't -- you are not

19   contesting -- you are not denying the fact, are you, that

20   most of the money that you took in from investors in

21   Mountain Investments was paid right back out to investors,

22   using their own money?  Do you dispute that, Mr. Johnson?

23   A.   I know that a lot of it went right back out to the

24   investors, no question.

25   Q.   Well, I mean, you say that like you don't have any

1   responsibility for it.  I mean, you knew that was happening,

2   didn't you?

3           MR. ANDERSON:  Judge, I'm going to object to the

4   form.  That's argumentative.

5           THE COURT:  Overruled.

6   BY MR. BYBEE:

7   Q.  I mean, you knew that that was happening, didn't you?

8   A.  Certainly we knew we were making payments to all of the

9   investors, yes, sir.

10  Q.  You knew that Frank Farrier was writing these checks,

11  didn't you?

12  A.  Yes.

13  Q.  And you knew that the money -- the source of that money

14  was the principal that investors had given you, didn't you?

15  A.  Many times that was true.

16  Q.  And you knew that that same money being written on this

17  commodity pool account was going right back to the

18  investors.  You knew that, didn't you?

19  A.  I didn't consider it a commodity pool account, but it

20  -- it was going into Mountain Investments.  And when it went

21  into Mountain Investments, if there was a bill that needed

22  to be paid, then we paid that bill.

23  Q.  And those bills included all of the payments on the

24  promissory notes to all of the investors?

25  A.  Sometimes they did, yes, sir.

1  Q.  Well, did you ever pay on the promissory note that

2  didn't come out of Mountain Investments prior to the state

3  coming in?

4  A.  Not to my knowledge.  I think we always went right out

5  of there.  And we put it in our books, what we owed and what

6  we received, etc.

7  Q.  Now, did you tell the investors that you were taking

8  -- that you were paying yourself out of the money that the

9  investors had given you to invest?

10  A.  I didn't say anything to them, no, sir.

11  Q.  Did you tell the investors that the money they were

12  getting on their -- as interest on their promissory notes

13  were from other investors' money?

14  A.  No.

15  Q.  Now, isn't it also true, Mr. Johnson, that the money

16  -- because Mountain Investments was a partnership -- and it

17  was, was it not?

18  A.  It was, yes, sir.

19  Q.  Because it was a partnership, the money that you were

20  paying to the investors you and Frank deducted on your

21  respective personal income tax returns; isn't that true?

22  A.  As interest paid?  Is that the question you are asking

23  me?

24  Q.  Yes.

25  A.  Yes, we considered that we were paying interest to the

1   people.  And when we paid it, we reduced -- if there were a

2   gain -- and I don't believe there were -- there were any

3   gains, but if there had been a gain, instead we had a

4   negative because of the fact that we were paying these

5   people interest on their investment.

6   Q.   I'm sorry.  Was that a "yes" to my question?

7   A.   Yes, we reduced our tax return net by the amount of

8   interest that we paid to someone else.

9   Q.   So if you had 400 -- let's say the partnership paid,

10  you know, a million dollars in interest during a year -- and

11  I'm just -- I'm not saying that is true; I'm just picking

12  that figure out of the air -- then you and Mr. Farrier would

13  split that, and you would deduct $500,000 on your individual

14  income tax return and Mr. Farrier would deduct 500,000 on

15  his tax return?

16  A.   In the hypothetical example you are giving, yes,

17  whatever the loss was would be equally divided, because we

18  were equal in our partnership.  And so when we filed our

19  partnership return with the IRS, whatever it was, then we

20  would bring -- whatever that balance or that loss was, or

21  gain, mostly loss, we would bring that back to each

22  individual's tax return and show it on the proper place on

23  our individual tax return.

24  Q.   And it is that deduction -- it is that huge deduction

25  which caused you to report zero income every year; isn't

1    that true?

2    A.   Yes, it is.

3    Q.   And at the same time that this is going on, you are

4    sending 1099s out, are you not?

5    A.   Yes.

6    Q.   And all of the investors are including that as income

7    on their tax returns, are they not?

8    A.   They should have.

9    Q.   Okay.  And they are paying taxes on that, are they not?

10   A.   Yes.  I would think so.

11   Q.   Now, you also said that you -- correct me if I'm wrong,

12   but on direct did you not say that you applied for or

13   received some loans for your children to go to college; is

14   that accurate?

15   A.   Oh, one year.  I think 2007.

16   Q.   Okay.  That wasn't -- that's not back in 2000, 2001,

17   2002, 2003?

18   A.   Not to my knowledge, because, to begin with, I hadn't

19   had the tax returns filed at that time.  And, secondly, my

20   oldest daughter would sign for my children, so there was no

21   requirement on my tax returns to be used.  My oldest

22   daughter, who is successful in her own work, signed for my

23   one or two children to receive financial aid or government

24   loans for their college.  And so she did the co-signature

25   for them, without a requirement of my tax return, except for

JOHNSON - CROSS

1    2007.

2    Q.   I understand.

3        And, Mr. Johnson, you, on your direct testimony, said

4    that people put money with you.  I think that was your

5    term.  Mr. Robertson put money with you.

6        I mean, people aren't just coming up to you and shoving

7    money at you, are they?  I mean, you had to say something to

8    them, didn't you?

9    A.   Principally, they would contact us.  And of course I

10   would speak to them.  Half of the people that came in were

11   people I had known all of my life, so of course I was

12   speaking to them.  I would talk to them about, you know,

13   "Here is your interest and here is what you'll get," you

14   know.  So, yes, I did speak to them.

15   Q.   And when they would ask you about your trading, you

16   would say, "Well, I'm trading commodities" or "I'm trading

17   futures," wouldn't you?

18   A.   They would ask about all sorts of things.  They would

19   ask about land eventually and what is going on with the land

20   and what is going on with this and this and this.  They knew

21   I had a mortgage company.  So, yeah, but they would -- they

22   would certainly would know about -- that I was trading,

23   because I always had my screens on, not as a -- anything

24   other than I always had them on because I worked all day.

25   Q.   Did you make it clear to every investor that you took

1   money from that you were trading in the commodity market?

2   A.   I would think that every single person that put any

3   money with Mountain Investments would have had a sense that

4   we do have an interest in trading in the futures market.

5   Q.   You are sure that every investor that put money with

6   you would have known that you were trading in the

7   commodities market?

8   A.   No, I wouldn't be sure of it, because I heard testimony

9   where some of them said "He was trading the stock market" or

10  "I heard he was doing this" or "I assumed he was doing

11  that," but I think most of them would have known -- even

12  though they wouldn't have known exactly of the investment

13  vehicle, they may have or probably would have known.  I

14  would be surprised if they didn't know that, you know, we

15  did have an interest in doing financial markets.  Now,

16  whether they understood it to be in equities or in futures

17  or whatever it is.  But I would -- I would think that the

18  majority of the people would have thought that we were

19  involved in the investment markets.

20  Q.   Well, why would they be confused about that,

21  Mr. Johnson?

22  A.   I'm not quite sure about it, because a lot of the

23  information had come from someone else had told them "I

24  heard you were doing this," etc., and you would hear a lot

25  of these things that would be said, like, "I assumed he's

JOHNSON – CROSS

1   doing this.  He's trading the stock market or he's doing
2   something with the stock market," and even though we
3   weren't, they equated what I was doing with something to do
4   with the market.
5   Q.   Well, you are the one taking the money, aren't you?
6   A.   Yes, sir.
7   Q.   Well, aren't you telling them what their investment is
8   for?
9   A.   Most of the people would come.  And when they came,
10  they would contact me and they would say, "This is how much
11  money we would like to receive -- put with you."  And that's
12  the word that was used, "put" with us.  And then we would do
13  a note and give them their monthly -- if they asked for a
14  monthly check, we would give them a monthly check.
15  Q.   And what about the people who did ask and said, you
16  know, "How is the commodity business coming?  Are you making
17  money?  Are you making enough money to pay back these
18  notes?"
19  A.   I never had -- I -- in all the time that I was
20  discussing anything with anybody, "Are you making enough
21  money to pay these notes?"  It would be just general
22  discussion of the market is up and down or whatever is going
23  on in the markets.  And most people -- not most, but a lot
24  of them would follow it.  And they would say, "Well, the Dow
25  is up so many points today," and this and that.  Even though

1  we didn't trade stocks, they would talk in stock language

2  because, you know, we understood we were trading a

3  derivative.  And so we knew what they were talking about,

4  obviously, because, even though I wasn't a stock trader, I

5  knew what they were speaking of because we were a

6  derivative.  And so we knew that that derivative that we

7  trade, which is like an S&P 500 or an E-Mini S&P 500, its

8  cousin, its cash market, is based in the stock market.  So

9  we -- you know, that's just what they asked us about.

10 Q.  Well, you really relied, then, on these people's

11 ignorance, didn't you?

12 A.  I never considered any of these people ignorant, never.

13 Q.  Well, they didn't know, by your account, what they were

14 -- what they were investing in.  Isn't that your job to tell

15 them?

16 A.  Well, it would certainly be my job if I considered it

17 an investment.  And I -- we talk about investments, but it

18 was always a note.  I gave them a note, as a promissory note

19 on what they were to receive.  If they asked me for any

20 particulars on that, I would have given that.

21      MR. BYBEE:  Bear with me just one moment, Your

22 Honor.

23      I'm looking for a particular document.

24  (Pause.)

25 BY MR. BYBEE:

1  Q.  All right, Mr. -- I'm sorry.  Mr. Johnson, we were last

2  talking about loans and investments.  And you maintain that

3  these were always loans; is that true?

4  A.  Yes, sir.

5       MR. BYBEE:  Could I ask you to hand the witness

6  Government's 54-1 again.

7  BY MR. BYBEE:

8  Q.  Mr. Johnson, let me direct your attention to July 3rd,

9  1998, on page four.  This is your journal entry, is it not,

10  Mr. Johnson?

11  A.  Yes, sir.  Every one of them are.

12  Q.  July 3rd, 1998, "Benny Wheeler came through with an

13  investment."  You called it "an investment," didn't you?

14  A.  Every loan is an investment.

15  Q.  Pardon?

16  A.  Every loan is an investment.

17  Q.  Every what?

18  A.  Loan.

19  Q.  Every loan was an investment?

20  A.  Yes.

21  Q.  So you used the words "loan" and "investment"

22  interchangeably?

23  A.  I used "investment" in my journal many times.  And I

24  used "loans" in my journal.  So, yes, I used them

25  interchangeably.

1   Q.   So when you say it wasn't an investment, it was a loan,

2   that's not true, is it?

3   A.   It is a -- it is a loan.  And in the sense that the

4   investment that you are referring to, that it is not a loan,

5   no.  But in my journal, when I spoke of investments and

6   Mountain Investments, etc., I always thought of it being a

7   loan.  If somebody had asked me for a financial statement,

8   if they were filing their interest on their note, because

9   they got a note, it is a promissory note, then I would send

10  a 1099.

11  Q.   I understand.  But if you had said that when an

12  investor gave you money it was not an investment, that would

13  be a false statement, would it not?

14  A.   It is not an investment as to what you are -- the

15  government has alleged.  But I used "investment" all of the

16  time.  And "loan" and "investment," I used it all of the

17  time.  I said the investors came by.  And I considered

18  that -- if they came by and they gave me money, I considered

19  that was an investor.  But it was not earmarked; it was

20  never --

21  Q.   So when an investor would come to you and give you

22  their money, you would talk to them in terms of

23  "investment," "this is an investment."  You would use those

24  words, wouldn't you?

25  A.   I would use "loan"; I would use a "note," "promissory

1  note," etc.  I don't think we ever did anything other than

2  just saying, "Well, here, this is Mountain Investments."

3  And I would give them a promissory note.

4  Q.  I'm sorry, Mr. Johnson.  I thought you just said that

5  you used "loans" and "notes" interchangeably?

6  A.  I did, in my journal.  And I noticed when I went

7  through there that -- I saw that -- as I saw, reviewing

8  that, "an investor came by."  I don't know if I said

9  "investment."  But I said, "an investor came by."  On Benny

10  Wheeler I see that I did say "an investment."  So I used

11  them interchangeably.

12  Q.  So we don't -- do we need to go through the 20 or 30

13  more references in your journal where you call it an

14  investment?  I mean, you agree with me, don't you, that all

15  the loans were investments and you used that word

16  "investments" with the people who came and gave you money;

17  wouldn't you agree with me on that?

18  A.  I don't know that I could agree with you, but I'm sure

19  that I have used interchangeably -- they would come and they

20  would say, "I have an investment."  And I would write them a

21  note and give them a promissory note.  I would sign it as a

22  individual as well as a partner in Mountain Investments.

23  Q.  Now, let me direct your attention to 5-7, please.  If

24  you would look on the screen.  And if you would like to see

25  the actual document, I can provide it to you.

1    Do you see this, Mr. Johnson?

2    A.   I do.

3    Q.   Now, that's your signature on the bottom, isn't it?

4    A.   It is.

5    Q.   And this was signed on August 22nd, 2000?

6    A.   Yes, it was.

7    Q.   And you remember -- this is an account-opening

8    document, is it not, for a federal -- for a futures

9    commission merchant?

10   A.   It is.  It appears to be, yes, sir.

11   Q.   And you are estimating that your annual income is

12   $250,000?

13   A.   Took probably whatever the draw was, because this was

14   not an application for a loan; it was not an application for

15   anything other than just simply the fact that you had to put

16   something down.  And so I took the draws, even though I

17   never showed those draws as income because they are not

18   income; I owed it back to the people.  And so that -- the

19   only thing I could figure, when I saw that, was simply the

20   fact that there must have been some sort of a draw that I

21   would have taken either up to that point or whatever.

22   Q.   So your estimate to the future commission merchant was

23   that you were taking out of the Mountain Investments account

24   $250,000 annually, at least in this year; is that accurate?

25   A.   It could have been an estimate, yes, sir.  I don't even

1    know where the figure came from.  It has been eight years

2    ago.  If I were making a loan -- but when you talked to

3    these people, it is so casual.  You talk to the introducing

4    broker, you ask them, "How do you fill that out?"  "Just

5    throw down a figure, because we're not interested in it."

6    And so I said, "Well, then I have to take what my draw was,"

7    because I didn't have a net income, I'm sure, in 2000.

8    Q.   Are you saying you didn't really care what number you

9    put down on this document?

10   A.   I cared because I think that we probably sold some land

11   -- Dogwood Farms sold some lands, I don't know exactly when

12   we sold to Wal-Mart, so I'm sure that I probably took

13   whatever I had done in timber, could have said in advance

14   because, see, I had Dogwood Farms that we had sold timber

15   one year and then the next thing you know we had sold to

16   Wal-Mart, we sold to Giles County, and I don't know if I

17   didn't just take a rough figure of what I pulled in from one

18   of those accounts.

19   Q.   And you estimated to the FCM that your net worth was a

20   million dollars?

21   A.   Yes, I did.

22   Q.   Was that true?

23   A.   It depends on the value of Dogwood and what all you

24   would determine as to the value of my home, etc.

25   Q.   Well, I'm asking you, Mr. Johnson.  Is that true?

JOHNSON - CROSS

1    A.   Probably understated, if, in fact, my Dogwood Farms

2    would have brought what I thought it should have brought.

3    But that's a close-enough estimate to go into, to give them

4    some rough estimate of whether or not we can open up this

5    account, put $5,000 in or something like that.

6    Q.   Close enough?

7    A.   It could have been more, but I didn't go and get some

8    sort of CPA to come and do some balance sheet, didn't get an

9    MAI appraisal, anything such as that.  Probably did a rough

10   estimate.  Here is the land, here is the -- either I sold

11   something or I took an advance, whatever I did, this is the

12   rough money that has come in, and that's exactly what I had

13   done.

14   Q.   I understand.  So your testimony is close enough?

15   A.   Yes, sir.

16   Q.   Right?

17   A.   Yes, sir.

18   Q.   All right.

19          MR. BYBEE:  Let's go to 5-8, please.

20   BY MR. BYBEE:

21   Q.   Now, you also recognize this as an account-opening

22   document for Rosenthal Collins Group?

23   A.   Yes, sir.

24   Q.   Is this your signature, Mr. Johnson?

25   A.   It is.  Yes, sir.

JOHNSON – CROSS

1  Q.  And this was about a month later.  Do you under -- do

2  you see that?

3  A.  Yes, sir.

4  Q.  Do you see that you are now estimating your net worth

5  at $2.6 million?  Do you see that?

6  A.  Yes, I do.

7  Q.  And is this now close enough?

8  A.  Yes, it would be.

9  Q.  So that a month ago you had a million-dollar net worth,

10  but a month later you have two -- $2.6 million in net

11  worth.  Close enough?

12  A.  I probably didn't include the Shumate land and some

13  others, because all they wanted when I did that original

14  application was just enough to show that you could trade the

15  markets.  They were never at risk.  We never did overnight

16  trades, probably didn't do much with the account in the

17  first place.  But we set it up with the anticipation of

18  eventually -- eventually probably funding it and trading the

19  markets with it.

20  Q.  But you did include the Shumate land, Mr. Johnson?

21  A.  I did with this one, yes, sir.  I'm not sure if I did

22  in the previous one.

23  Q.  You said the Shumate was 1.5 and the Mason land was one

24  million; that's 2.5 million?

25  A.  That's one half of my value on the Mason land.  And the

1    Shumate land was my wife and mine together.

2    Q.   Close enough; right?

3    A.   Yes, sir.

4    Q.   All right.

5         MR. BYBEE:   Let's go to 26-6, please.

6    BY MR. BYBEE:

7    Q.   Now, this is a letter that your attorney sent to the

8    state, is it not?

9    A.   It appears to be.  Yes, sir.

10   Q.   And one of the things that your attorney was sending to

11   the state was a financial statement; right?

12   A.   Yes.

13   Q.   If we go to page two, please.

14        And here is that financial statement.

15   A.   Yes, sir.

16   Q.   And do you see that now you are estimating to the state

17   that your net worth in the same year, about four months

18   later, is only $25,000?

19   A.   Yes, sir.

20   Q.   Is that close enough, Mr. Johnson?

21   A.   I'm getting pretty precise when I'm going to start

22   talking to the state, because I wanted to make sure that I

23   was doing everything exactly as I should.  When you set up a

24   brokerage account, you set them up -- as I previously

25   testified, you can set them up once every week.  These

JOHNSON - CROSS

1   brokers call you.  You set up something.  You are not lying;

2   you are not doing anything.  You are just trying to get the

3   account set up.  And then if you fund it, you fund it.  They

4   have never made a margin call to me.  There has never been

5   anything.  And so I just gave a rough estimate of what these

6   values were.  When I went down to the state, I am sure I got

7   pretty serious about exactly what I owed.

8   Q.  So this came as a shock or a surprise to you that you

9   really only had a net worth of $25,000 when you represented

10  to the FCM that you had a net worth of $2.6 million?

11  A.  It didn't come as a shock and it didn't come in

12  anything.  It was just what it was.

13  Q.  Close enough?

14  A.  This would be pretty precise, I would think.  I hadn't

15  studied this document, but I wouldn't be sending anything to

16  the state that I didn't make sure was exactly right, because

17  this was something that we went to the minute details.  The

18  other one didn't even include cars, nothing.  I just put up

19  -- they ask you, these introducing brokers, "Send us

20  something in.  It doesn't make any difference," you know.

21  And it really doesn't, because all you are going to do is

22  just to open up an account.  You never get a margin call.

23  You never put them at risk.  You are never doing anything.

24  Of course, if the market completely collapsed, could they be

25  at risk?  Yes.  But we have stops in place when we were

1    trading.

2         MR. BYBEE:  Please display Exhibit 26-4, please.

3    BY MR. BYBEE:

4    Q.  Now, Mr. Johnson, you recognize this as a letter that

5    your attorney sent on April 10th, 2001, to the state

6    corporation commission?

7    A.  It appears to be, yes, sir.

8    Q.  Okay.

9         MR. BYBEE:  Ms. Vogt, would you highlight the first

10   two sentences, maybe.

11   BY MR. BYBEE:

12   Q.  Mr. Johnson, this says, "Enclosed, to give you an

13   additional feel for the operations of Mountain Investments,

14   Ltd." -- I'm sorry.  Let me start that again.

15       "Enclosed, to give you an additional feel for the

16   operations of Mountain Investments, Ltd., is a financial

17   statement as of December 31st, 2000, and for its affiliate

18   company Dogwood Farms."  Do you know what an affiliate

19   company is, Mr. Johnson?

20   A.  I got the definition from the -- Investigator Taylor.

21   Q.  Okay.  And would you agree that Dogwood Farms is an

22   affiliate company of Mountain Investments?

23   A.  I didn't write this.  The only reason that I would

24   think it would be is that the principals of one partnership

25   are the principals of a corporation subchapter S.  So I

1    would assume that they are making some determination that

2    because the principals are the same that the company then

3    must be affiliated.

4    Q.   Did Mr. Derryberry know anything about you and your

5    business before you went to him?

6    A.   I never met Mr. Derryberry, so I just didn't know

7    anything about him to talk.

8    Q.   So when you went to him, right after the state sent you

9    that letter, was the first time you had met Mr. Derryberry?

10   A.   That meeting at that time is the 25th of April of that

11   same year, 2001.  I think we finally got a call from him.

12   And all I had was a telephone introduction.  And I think

13   that counts.  But, I mean, I didn't have a face-to-face

14   meeting with Mr. Derryberry for quite a while.

15   Q.   Well, my question is, Mr. Derryberry didn't know

16   anything about you or your business prior to you engaging

17   him as your lawyer, did he?

18   A.   No, he did not, no, sir.

19   Q.   So all of the information that Mr. Derryberry gleaned

20   in this letter to the state came from you or Mr. Farrier,

21   did it not?

22   A.   Yes, I would think so.

23        MR. BYBEE:  Would you go to the second page,

24   please.  And would you highlight again the first sentences

25   there.

1   BY MR. BYBEE:

2   Q.  "As you were advised upon our first contact, Mountain

3   Investments and all of its affiliates," which we now know

4   were Dogwood Farms, because your attorney just told the

5   state that, "ceased accepting new money upon receipt of the

6   initial notification of your office, and no further funds

7   are being accepted."  Now, that's not true, is it?

8   A.  I didn't write that.  But the thing of it is that I

9   didn't have Dogwood Farms in my mind and didn't really have

10  any conception of an affiliate firm until I started hearing

11  Mr. Taylor making his statement on it.

12      I saw the letter.  I'm sure that I received a copy of

13  it.  I assume this letter was written by Mr. Derryberry.

14  But Dogwood Farms was a separate entity and I treated it as

15  a separate entity, even though I think under here they were

16  the same principals.

17  Q.  Well, Mr. Johnson, this isn't some third party out

18  there writing a letter.  This is your attorney.

19  A.  Yes, it is.

20  Q.  This is the person you have hired to speak for you to

21  the state.

22  A.  Yes.

23  Q.  This is an official representation from you to the

24  state that Mountain and Dogwood have stopped taking money.

25  Now, that didn't happen, did it?

1  A.  I don't know when this was written.  Let me see it

2  again.

3  Q.  All right.

4  A.  April the 10th, 2001.

5  Q.  Yep.

6  A.  I don't know when we start taking other money for

7  Dogwood Farms.  I don't know if it were at this time or if

8  it were later.  I just don't know.

9  Q.  Well, even if it was later, isn't this still a

10  representation to the state that "We have stopped taking

11  money"?

12  A.  At that point it was, but I don't know exactly when we

13  started doing deeds of trust on Dogwood Farms.  And I told

14  Mr. Chartier about that, by the way.  I told Mr. Chartier

15  that we were doing deeds of trust.

16  Q.  Do you have a -- I understand the term "deed of

17  trust."  Did you use the term "promissory note"?

18  A.  With whom?

19  Q.  Mr. Chartier or anybody from the state?

20  A.  Yes, I think so.  I did with Mr. Chartier.

21  Q.  Do you have any letter to that effect?

22  A.  Definitely not.  We just --

23  Q.  Do you have a journal entry to that effect?

24  A.  We just had a conversation on the phone when I talked

25  to Mr. Chartier.

JOHNSON – CROSS

1  Q.  Do you have any written notation, any notes taken

2  contemporaneously with that kind of discussion?

3  A.  No, I don't.

4  Q.  So there's nothing that you can point to, except your

5  word, that you told Mr. Chartier that you were now issuing

6  promissory notes under Dogwood Farms?

7  A.  I talked to him about how we were satisfying the

8  original Mountain Investment notes, yes, sir.

9  Q.  Well, there's a difference between a deed of trust and

10  a deed of trust note, is there not?

11  A.  I believe there is, yes, sir.

12  Q.  And Mr. Chartier told you or the state told you that

13  you could not issue promissory notes under Mountain

14  Investments; isn't that true?

15  A.  They were unsecured, yes, sir.

16  Q.  But then Mr. -- you are saying that Mr. Chartier told

17  you, "Hey, you can't do it under Mountain Investments, but

18  just change the name to Dogwood and keep right on doing it"?

19  A.  He definitely did not tell that to me.  He sure

20  didn't.  I told him after the fact what I was doing.

21  Q.  After the fact.  After when?

22  A.  After I had sent the -- probably the first report to

23  him and I said, "Here is how I satisfied these notes."  I

24  told him that the Mountain Investment folks were given a

25  deed of trust note and there was a giant deed of trust.

1    There wasn't much of a discussion.  It was a general thing.

2    I wanted to make sure that I said it out loud.  I should

3    have documented it, and didn't.  I'm not saying anything,

4    that he sustained it or anything else.  I just made the

5    conversation and -- the comment to him.

6          MR. BYBEE:  Now, let's -- if you could go to page

7    three, please, of Exhibit 26-4.

8    BY MR. BYBEE:

9    Q.  Do you see this, Mr. Johnson?

10   A.  Yes, I can see it.

11   Q.  You recognize that as Mr. Farrier's signature, don't

12   you?

13   A.  That's his signature, I believe it to be.

14   Q.  And this is a document you submitted to the state,

15   isn't it?

16   A.  I think so.  Yes, sir.  I believe we would have done

17   that.

18   Q.  And, I mean, Mr. Farrier wasn't out there freelancing

19   on his own with the state, was he?

20   A.  Oh, definitely not.  I'm sure that we worked together

21   on it.

22   Q.  So whatever -- even though he signed it, whatever was

23   submitted to the state had to go through you as well; isn't

24   that true?

25   A.  I did a lot of the work on it.  He didn't need my

JOHNSON - CROSS

1    permission, but I did a lot of the work on it.

2    Q.   Now, you understand that this is a financial statement

3    combining your partnership with your corporation; is that

4    true?

5    A.   I see that now, yes, sir.

6    Q.   Do you -- are you familiar with financial statements

7    generally, Mr. Johnson?

8    A.   I'm no accountant, but I have some general

9    understanding of a financial statement.

10   Q.   Have you seen other occasions where partnerships and

11   corporations combine their financial statements?

12   A.   I don't have enough experience.  I don't know if they

13   do or don't.  This one is combined.  I don't know -- I'm

14   sure he went from the books that we have on both of our

15   entities and made this statement up.

16   Q.   Do you see where it says "Checking account of Mountain

17   Investments"?

18   A.   I do see that.

19   Q.   $171,000?

20   A.   Yes, sir.

21   Q.   Now, that $171,000 is investor money, isn't it?

22   A.   It could be.  It could be.

23   Q.   It could be?

24   A.   It could be, yes, sir.

25   Q.   Well --

JOHNSON – CROSS

1  A.   I mean, if it were in the checking account, it would

2  very definitely have a possibility it could be from

3  investors.  It could be from Dogwood.  It could be all sorts

4  of places.  I just don't recall where it came from.  I'm

5  sure we could look it up, but I don't know where it came

6  from at this point.

7  Q.   Well, could I direct your attention to Government's

8  Exhibit 60-1 and 60-2, please.

9       Do you have that spreadsheet in front of you?

10  A.   I do.  What page, sir?

11  Q.   65.

12      This would be -- if you look at 11/22/00 -- do you see

13  that?

14  A.   Yes, sir.

15  Q.   And that would show you an incoming wire transfer from

16  Rosenthal Collins of almost $150,000; do you see that?

17  A.   Yes, sir.  Yes, sir.

18  Q.   Now, that's all investor money, isn't it?

19  A.   I'm not sure.  See, Dogwood Farms started out.  And

20  they put a couple hundred thousand into an account.  And I

21  just don't even know.  It could have been from investors,

22  but I can't definitively say that for sure.

23  Q.   You don't even know where the investor money is,

24  Mr. Johnson?

25  A.   Not at this point, not eight years later.

JOHNSON - CROSS

1  Q.   Well, Rosenthal Collins was a commodity trading

2  account, wasn't it?

3  A.   Yes, sir.  Yes, sir.  I know who they are.

4  Q.   And the funds that you put with Rosenthal Collins were

5  funds that you received from investors to trade commodities;

6  isn't that true?

7  A.   It could be, yes, sir.  I'm just saying I don't have an

8  independent recollection eight years later of exactly where

9  this money came from.  It could have very well come -- but

10  we also did some loan closings on our land from Dogwood and

11  so we put a couple hundred thousand here and there.  We just

12  don't know exactly -- or I just don't know.  I'm sure

13  Ms. Warner from the FBI or somebody could tell you.  But

14  eight years later, no.  But I'm not arguing.  I'm just

15  saying that it could have come from investors, but I don't

16  want to definitely state that if I don't know for sure.

17  Q.   Do you see on 11/22 also the 13,000 from Kenneth and

18  Tracy Buchanan?

19  A.   I know where that came from, because that's clear.

20  Q.   That's an investor; right?

21  A.   They are.

22  Q.   Okay.  Pearl Compton, a thousand dollars?

23  A.   Yes.

24  Q.   Do you see that?

25       Do you see Revco on 11/30/2000?  It is on page -- I'm

JOHNSON – CROSS

1    on page 67 now.

2    A.    Excuse me, sir.

3          Okay.  I have got it.

4          Yes, sir, I see that.

5    Q.    And that's a commodity trading account, isn't it?

6    A.    Revco is, yes, sir.

7    Q.    And that 75,000 represent investors' funds, would they

8    not?

9    A.    Could.

10   Q.    Could?  You don't know?

11   A.    Yes, sir, I sure don't.  I don't know exactly where

12   this money came.  There's a strong possibility that it was

13   investor funds, but I just don't want to say I know exactly

14   where that money came from, because I don't know.  It could

15   have come from my family.

16   Q.    Okay.  If you look on 12/15/00, page 69, at the bottom,

17   do you see the $30,000 from Marcey Allison?

18   A.    Yes, sir, I do.

19   Q.    Now, that's investor money, isn't it?

20   A.    It is, no question.

21   Q.    And do you see the 25,000 from Professional Market

22   Brokerage?

23   A.    Yes.

24   Q.    On page 70?

25   A.    Yes, sir.

JOHNSON – CROSS

1   Q.   Now, that's investor funds, isn't it?

2   A.   I'm not sure.  Once again, I'm not sure.

3   Q.   Isn't Professional Market Brokerage a company in FCM

4   that you engaged to trade commodities?

5   A.   It certainly appears to be that way, yes, sir.  I just

6   don't know where the money came from.

7   Q.   Do you see the -- do you see on 12/20/2000 the $175,000

8   from Barbara Falls?

9   A.   I do.

10  Q.   And that's investor money, isn't it?

11  A.   It is.

12  Q.   All right.  Now, I believe we just tracked maybe

13  $250,000 into that account.  So I'm asking you again on

14  Exhibit 26-4, page three, checking account, Mountain

15  Investments, $171,000, most, if not all, of that is investor

16  funds; isn't that true?

17  A.   It appears to be.  Yes, sir.

18  Q.   Okay.  And you represented that as an asset of the

19  partnership Mountain Investments; true?

20  A.   Yes, sir.  That's what it appears to be.

21  Q.   Now, the -- no one else -- none of the investors were

22  considered partners in a partnership of Mountain

23  Investments, were they?

24  A.   No, sir.

25  Q.   So you represented to the state that all of the

JOHNSON - CROSS

1  investors' funds, for which they were not partners, was a

2  partnership asset; true?

3  A.   Yes.

4  Q.   Okay.  Also that these trading systems were worth over

5  $220,000; true?

6  A.   They were put in the books.  And any time we bought

7  something, it went into the books.  And since they hadn't

8  been written off, then they were still showing in the books

9  as an asset, if that's what Frank had relayed to me.

10  Q.   And these are the same trading systems that you now

11  view as worthless?

12  A.   I now view them as worthless, yes, and did in probably

13  2004.  At the time I didn't know.

14  Q.   And the accounts receivable for Mountain Investments,

15  that really is these advances that you are calling them;

16  correct?

17  A.   Yes, sir.  I assume that's what that is.

18  Q.   So that you and -- you and Frank Farrier, at least at

19  this time, were representing to the state that you both,

20  combined, I assume, had taken out over a million dollars

21  yourselves and paid yourselves with that money?

22  A.   I don't know if that's true, but that's what he's

23  showing here.

24  Q.   What do you mean you don't know if it is true?  Are you

25  quibbling about the number or the description of the asset

JOHNSON - CROSS

1  or the item?

2  A.  A little of both.  I'm not sure on this accounts

3  receivable if everything receivable was money that Frank and

4  I took in advances.  And, also, I'm not quite sure, when I

5  look at that, on that amount, if that's exactly the correct

6  amount.  I assume it was because he did the books.  And I

7  trusted him.  And so I assume that's a correct thing.  On

8  the other side we show the accounts payable.

9  Q.  All right.  Well, would you agree with me, then, that

10  give or take, you know, $98,000, that you and Frank Farrier

11  took out at least a million dollars from the -- paid

12  yourselves from the Mountain Investment commodity pool up

13  until this time period?

14  A.  I don't think I could agree on that, because I think

15  that the record shows that I actually put more money back in

16  than I took out.  And I just don't think this is a correct

17  amount, because I didn't have a million dollars.

18      Now, we're talking about over a period from 1992 to

19  current.  But, even at that, my journal and all of my other

20  information indicates that we put far more in there than we

21  took out.  So I don't really -- I'm not quibbling over it.

22  I certainly would never argue with you.  I'm just saying I

23  don't know, because I know, in the conclusion, we put more

24  in than we took out.

25  Q.  Now, this figure, trading account, Mountain

1  Investments, about $129,000, that's also investor money,

2  isn't it?

3  A.   It could be, yes, sir, for certain.

4  Q.   And you also -- and if it was trading money -- or,

5  excuse me, if it was investor money, that money would belong

6  to the investors, would it not?

7  A.   It is a loan.  And so if you borrow the money, you have

8  to show how much you owe.  And then you have to show the

9  other on the other side.  But -- however you interpret

10 that.  For me, if it were a loan, then that money is going

11 to be shown as we have this in a certain account, this is

12 how much we owe back before anything comes to us as a net.

13 Q.   But you are showing that as a partnership asset, aren't

14 you?

15 A.   I'm not sure --

16 Q.   I'm sorry.  A partnership liability.

17 A.   Yeah.  I'm not sure that that's a correct statement --

18 Q.   I'm sorry -- yeah.  An asset.  Right?

19 A.   I don't know, because he did -- he shows it as an

20 asset, but then he has them broken down again.  And so it is

21 almost like I would think one side would be assets, one side

22 would be liability, and then you come down to the total

23 liabilities and capital.  And so I have to say I don't know.

24 Q.   Well, is this the kind of thing where Mr. Farrier

25 looked at it -- or did it and you looked at it and you go,

JOHNSON – CROSS

1    "Close enough, send it to the state"?

2    A.   When I do state business and it is something of

3    importance, I would hope, particularly for him, because then

4    he would be very precise.  He's very precise in how he did

5    books.  And so I think he wouldn't be doing any "close

6    enough."

7    Q.   Let's just jump to the bottom line, then.  Do you see

8    this negative $2.6 million net worth?

9    A.   Yes, sir, I see that.

10   Q.   Now, did any -- were any of the investors, Mr. Johnson,

11   aware that the combined assets and liabilities of Dogwood

12   Farms and Mountain Investments was a negative $2.6 million?

13   A.   No, sir, I don't think they were.

14        MR. BYBEE:  Would you put up 5-15 and 5-16?

15   BY MR. BYBEE:

16   Q.   And while she's doing that, I mean, you mailed

17   everything -- all of those zero balance spreadsheets,

18   Mr. Johnson, you mailed all of that to the state, did you

19   not?

20   A.   Could have faxed it, could have mailed it.  I think I

21   saw where there was some mailings.  And so I -- I would

22   think that some of them had been mailed.  I think some of

23   them had been faxed.  And I'm going to have to tell you I

24   don't remember now which way, but I know that they were

25   gotten to the state.

1  Q.  Now, could you pick up Exhibit 54-2 again.  And let me

2  have you turn to page 43.

3      Are you there, Mr. Johnson?

4  A.  I am.  Yes, sir.

5  Q.  Do you see that you take in money from Mr. Gilmer,

6  Mr. Kendall, Mr. Geller, in August of 2002?

7  A.  I did.  Yes, sir.

8  Q.  Now, those are individuals that had previously invested

9  with you in your commodity business, isn't that true?

10 A.  I think Buck Gilmer and I think Eddie Kendall, I think

11 both of them -- they are brothers-in-law.  And I think both

12 of them did something earlier and then they came back and

13 did something else.  I believe that's true.  Yes, sir.

14 Q.  But this is in connection with your commodity trading

15 business, is it not?

16 A.  I don't remember.  I went to Eddie and Buck -- both of

17 them were good friends of mine.  And I went to them and

18 borrowed money from them.  I don't know if you want to call

19 it a connection with commodities business or not.  But I

20 just went and borrowed the money.  And then I used it and

21 paid some.

22 Q.  Well, when you went to them and said, "Can I have

23 20,000," and they said, "What for," what did you tell them?

24 A.  I don't recall telling them anything.  I just borrowed

25 the money and gave them a note.

1    Q.    Are you saying that these people just gave you money

2    without any explanation at all as to what it was for?

3    A.    Yes, sir.

4    Q.    Could you turn the page.  Look at page 44.

5        Joe, Pat, and Ellene, this is, again, August of 2002,

6    Steve McMurray and Freddie Shrader give you -- I think Joe,

7    Pat, and Ellene give you 30, McMurray 20, and Freddie

8    Shrader 30.  Again, Joe and Pat and Ellene Johnson were

9    earlier investors in your commodity pool trading business,

10   weren't they?

11   A.    Yes, sir.

12   Q.    And when you got the money from them there, that's what

13   they thought it was; isn't it true?

14   A.    You've spoken of commodity pool and I answered, but --

15   they were people that I did business with earlier, however

16   you -- the government wants to characterize it.  But I did

17   do business with them earlier, yes, sir.

18   Q.    And they were giving this money to you to invest for

19   them, weren't they?

20   A.    They were getting a note and that was all -- and so I

21   took the money and did whatever I did with it.  And it is

22   clear record --

23   Q.    Well, again, when you went to them and said, "Ellene, I

24   need $30,000," and she says, "Well, what for," what did you

25   tell her?

JOHNSON - CROSS

1    A.    I don't think that was asked.

2    Q.    She just -- you went and asked for it and she just

3    handed it to you, no questions asked?

4    A.    No, not that I remember, no, sir.  Now, we're talking

5    about six years ago.

6    Q.    And did you feel any obligation at all to tell her?

7    A.    I guess that I should say I should have done a lot of

8    things differently.  The only thing I didn't do was to just

9    come out and say "I did this" and "I'm doing that" and

10   there's disclosures and things like that.  There were notes,

11   I gave it to them, and that was it.  I didn't give them any

12   disclosure.

13   Q.    Could you turn the page, page 45.

14         You got $100,000 from Pat Neville in September of '02;

15   true?

16   A.    Yes, sir.

17   Q.    And did you hear her testify that she gave it to you

18   because she thought you had lost your trading indicator?

19   A.    I heard her say that.

20   Q.    Is that what you told her?

21   A.    No, sir.  We talked in great detail about my trades,

22   about investors.  She --

23   Q.    What was your explanation to her as to why -- what you

24   were going to do with that $100,000?

25   A.    I had somebody that I had borrowed money from.  And I

1    needed to get them at least some partial money back.  And so

2    it was clear -- there was never any question, because we

3    were -- at this point we had come to the point we were

4    almost thinking about doing something with the land and all

5    of this business.  And so she -- she was -- she's very much

6    interested in trying to keep me on my feet where eventually

7    she could get all of her money back.  And we thought that

8    she would -- actually, we thought that she would certainly

9    get a lot of her money back when we had the sale of the

10   property, because she had a second deed of trust on the

11   property, that $2.1 million MAI appraisal on its whole --

12   Q.   So your statement to Ms. Neville was, "Would you just

13   give me a hundred thousand dollars so I can pay off some of

14   my debts," and she gave it to you on that basis?

15   A.   Essentially, yes, sir.  She knew about Mr. Church.

16   Q.   Well, Mr. Daly, he wired the 8,000 to you in 2004, that

17   was in connection with your commodity trading business, was

18   it not?

19   A.   Yes, sir.  Yes, sir.

20   Q.   February the 5th of 2004.

21       Now, Mr. Johnson, did you engage at any time an

22   attorney to advise you on the matter of taking money as

23   investments and issuing promissory notes?

24   A.   One time.

25   Q.   And did they -- did you disclose to them that you were

JOHNSON - CROSS

1  taking money and issuing promissory notes?

2  A.   Yes, sir.

3  Q.   So you had more than a clue that there was some

4  regulatory body out there, either the SEC or some federal

5  agency, which had some rules and regulations about

6  securities, did you not?

7  A.   I certainly knew that there are security laws in the

8  United States and in the state of Virginia.

9  Q.   And did you research those issues and look into that

10  and educate yourself on the laws -- the security laws in the

11  United States?

12  A.   Not enough, obviously, no, sir.

13  Q.   And you also knew that there was a group called the

14  commodities futures trading commission, didn't you?

15  A.   Yes, I did.

16  Q.   And they have rules and regulations governing the

17  trading in commodity pools, didn't you?

18  A.   I principally knew about trading in CTAs and what the

19  requirements were.  I had never thought about a commodity

20  pool until after this came up.  I never had ever had a

21  thought about commodity pool.  Everything I thought about

22  was to make sure that if I ever traded for anybody, that I

23  complied with what I understood to be the certified trading

24  advisors' rules, which is under the CFTC, but had to have

25  less than so many people, you had to have less than 15

```
 1   people.  So if I ever traded for anybody else, I would

 2   always go through one of these compliance groups at one of

 3   these introducing brokers, and they'd eventually get it to

 4   the commission broker, futures group.  And they would send

 5   it through their legal team to make sure that I was in

 6   compliance.

 7   Q.   I'm sorry.  You didn't -- you didn't know anything

 8   about commodity pools or anything about commodity --

 9   A.   I had heard of pools, of course, but I had no

10   understanding of the requirements of what constituted a pool

11   unless I would take the money and make some representation

12   to somebody.  That's all I knew.

13            MR. BYBEE:  Mary, could I have you display 5-15,

14   please.

15            And would you highlight this first . . . .

16   BY MR. BYBEE:

17   Q.   Well, first of all, Mr. Johnson, do you see this

18   document?

19   A.   Yes, I do.

20   Q.   Do you see your signature here?

21   A.   I do.

22   Q.   And you see this is to ED&F Man International?

23   A.   Yes.

24   Q.   Do you know who they are?

25   A.   Yes, they're a brokerage house.
```

JOHNSON - CROSS

1   Q.   Commodities brokerage house, are they not?

2   A.   Futures.

3   Q.   Futures?

4         MR. BYBEE:  Mary, could you highlight this first

5   paragraph, please.

6   BY MR. BYBEE:

7   Q.   I'll read this, Mr. Johnson, and then I would like you

8   to -- I'm going to ask you a question about this.

9         This is a letter.  And it says, "Dear sir, in

10  connection with ED&F Man International, establishing a

11  commodity trading account for Mountain Investments, Ltd.

12  Partnership, the partnership, the undersigned hereby,

13  represents and warrants to MINC the following."  Do you see

14  that?

15  A.   I do.

16  Q.   And do you see that "the following" would be items that

17  you are representing or warranting to ED&F Man

18  International?  Do you understand that?

19  A.   I understand that now.

20        MR. BYBEE:  Would you highlight the paragraph two,

21  please.

22  BY MR. BYBEE:

23  Q.   The partnership -- you are warranting to ED&F Man

24  International:  "The partnership is not subject to

25  registration under the Commodity Exchange Act as amended,

JOHNSON – CROSS

1  including, but not limited to, registration as a commodity
2  pool.  And, therefore, the investors of the partnership are
3  not subject to registration as commodity pool operators."
4      Now, you are representing to the FCM here that -- that
5  you don't have to register as a commodity pool and don't
6  have to register as commodity pool operators, aren't you?
7  A.  That wasn't highlighted, of course.  But I made that
8  representation then and make it now; yes, sir.
9  Q.  So you knew then what a commodity pool is, didn't you?
10 A.  I had a general understanding what a commodity pool
11 was.  It was only when I was in here and saw definitions
12 given by the CFTC's lawyer that I ever see the minute
13 details.  I was more familiar with the CTA, or certified
14 trading advisor.
15 Q.  Well, you knew enough to make this representation,
16 didn't you?
17 A.  I knew enough to say that I'm not one of them, because
18 I'm not taking these people's money and putting it into some
19 sort of a general pool, because I knew that that wouldn't be
20 right and I wouldn't do that.
21 Q.  Mr. Johnson, we have been talking for two weeks about
22 how you took investors' money and put it into Mountain
23 Investments.  And you are now telling us that you didn't
24 take that money and put it into that commodity pool?
25 A.  I was never involved in a commodity pool.  I took the

JOHNSON – CROSS

1    money because I borrowed the money and I gave them a note.

2    Q.   What do you think a commodity pool is, Mr. Johnson?

3    A.   I don't know if I'm qualified to say.

4    Q.   Let's look at paragraph 3, please.

5         "There are only two general partners in the

6    partnership.  No new investors in the partnership are being

7    currently solicited.  And no solicitation is contemplated.

8    All money to be deposited in the account is proprietary."

9         Now, do you know what "proprietary" means, Mr. Johnson?

10   A.   I think so.

11   Q.   What?

12   A.   It means that this money that was going in there was

13   our money.  It was earmarked.  It was no one else's.  It was

14   our funds to do --

15   Q.   Now, that's not true, is it?

16   A.   We thought it was.  I thought it was.  I thought when I

17   borrowed that money -- I didn't say it was my money.  But

18   when I borrowed that money and gave a note, then I thought

19   that those funds were my funds to do with as long as I paid

20   everybody what I owed.

21   Q.   Did you hear the investors in this case testify,

22   Mr. Johnson?

23   A.   I did that.

24   Q.   Did you hear them all say, "That was not Mr. Johnson's

25   money.  That was our money"?

JOHNSON – CROSS

1    A.  I heard that.  And they were correct on that.  Any time

2    you borrow money, you know that you owe it back.

3          MR. BYBEE:  Would you go to 5-16, please.

4    BY MR. BYBEE:

5    Q.  You recognize what this is, don't you, Mr. Johnson?

6    This, again, is a letter from you on 12/00 to commodity

7    future commission merchant?

8    A.  Yes, sir.

9    Q.  "I, Ted Johnson, Frank Farrier, partners of Mountain

10   Investment, Ltd., certify that the funds that are being

11   deposited with you are proprietary funds of Mountain

12   Investment and do not represent the interest of any

13   individuals or other entities."  That's not true, is it,

14   Mr. Johnson?

15   A.  I think it is true, yes, sir.  I sure do think it is

16   true.  If it were not true, I wouldn't have signed it.  I

17   believe that those funds were ours to try to develop and to

18   make sure that they got their monthly interest checks or

19   that they would have interest, whatever it is, that we had

20   agreed to.

21   Q.  So all of that money, the five million that you took in

22   through '92 to '99 and the four million you took in from,

23   you know, '99 to 2004, was all your money, not investors'

24   money?

25   A.  I didn't say that, no, sir.  I just said that we were

JOHNSON - CROSS

1    responsible to these investors, is why I kept on doing what
2    I could to make sure they got all of their money back.  I
3    don't know the amount of money that was taken in, because
4    sometimes there was interest and compoundings, etc.  I do
5    not know -- and I don't have my books -- the exact dollar
6    that came in.  But whatever it is, I felt a deep sense of
7    responsibility to make sure they got their money back.
8    Q.   Mr. Johnson, you have traded in stocks, haven't you?
9    A.   Back in the '70s, maybe.
10   Q.   And you are familiar with brokerage houses, equity
11   brokerage houses, like, you know, Goldman Sachs or Merrill
12   Lynch or Bear Stearns?
13   A.   Yes, sir.   Yes, sir.
14   Q.   And when you give them $50,000 to invest for you, are
15   you giving your money to Bear Stearns or Merrill Lynch?  Is
16   that their money now?
17   A.   If they give me a note back, then I don't have any
18   control over it.  If I give them that money and say I'm now
19   going into some sort of fund, then all of a sudden, no, it
20   is not their money.  But if they get a -- give a note to me
21   and says, "Okay, we now have taken your money and we have
22   taken control of your money and we sign the note and you
23   have got a promissory note," and in the end individual -- if
24   I were that individual and I got X number of dollars from
25   that account for that year and if I take and put that on a

JOHNSON - CROSS

1    Schedule B as interest income, then all of those individual

2    things would constitute that it was not supposed to have

3    gone into a fund.  Now, if it goes into a fund, then it is a

4    total different structure or different type of tax record,

5    etc.  Everything is different if it goes into a fund, is my

6    understanding, from my limited knowledge.

7              MR. BYBEE:  Now, Mary, could you display 31-11,

8    please.  And would you go to page three.  And would you

9    highlight this.

10   BY MR. BYBEE:

11   Q.  Well, first of all, you recognize what this is, don't

12   you, Mr. Johnson?

13   A.  I believe it to be an e-mail that Don Church has either

14   sent to me or that I received from him; I'm not sure that I

15   sent him.  I don't really know.  But I think that's what it

16   represents to be.

17   Q.  Right.

18        Now, if you look right -- if I could highlight this.

19             MR. BYBEE:  Can you bring that up?

20   BY MR. BYBEE:

21   Q.  This is Mr. Church's question.  And this is your

22   answer.  Isn't that right?

23   A.  If you would give me a moment, I would like to look at

24   it, but I believe it to be, yes, sir.

25   Q.  Sure.

JOHNSON – CROSS

1   A.   I'm not sure this dual trading account -- I think

2   that's something that Mr. Church has said.  But I sense

3   that, from what he's saying, I responded by saying that I

4   would like to be compensated for my efforts, and that if he

5   set up an account, then I had the right to trade under the

6   -- under the provisions of the CFTC exemption of a CTA, then

7   this is how I would like to split the profits, if we can

8   work that out.

9   Q.   I understand.  I'm going to ask you a question about

10  this; that wasn't it.

11       But, first of all, I want to establish, this is your

12  answer, isn't it?

13  A.   It appears to be, yes, sir.

14  Q.   Do you have any question or any dispute that it is?

15  A.   I don't -- I don't really dispute it.  But I don't know

16  what I believe anymore.  But I believe that's probably an

17  answer that I had given back.

18  Q.   Now, the bottom paragraph says, "With that said, I

19  might add that the methodology I intend on applying to your

20  account is rather conservative.  And we shouldn't see more

21  than a losing day every so often.  By law I can't guarantee

22  how much return the account could yield over a period of

23  time, but with the history of the approach I am talking

24  about, I am in hopes of limited losing days and a few

25  marginal-type days and an occasional home-run day."

JOHNSON – CROSS

1    Do you see that, Mr. Johnson?

2    A.    Yes, sir.

3    Q.    Now, this is in March of 2002.  Mr. Johnson

4    -- Mr. Church's money is gone by this time, isn't it?

5    A.    This is setting up an account.  I had borrowed money

6    from him on a Dogwood Farms thing.  But this account that

7    we're talking about is where he's setting up an account

8    where I would have the right under the brokerage agreement

9    to be able to trade his account.  And then if there's money

10   to be made, that we would do a split on profits.  That's

11   what this is about.

12   Q.    I'm talking about the 200,000 he has already given

13   you.  That's gone now, isn't it?

14   A.    It appears to be.  Yes, sir.

15   Q.    And you never advised Mr. Church of that, did you?

16   A.    No.  He had a -- he had a deed of trust.

17   Q.    Oh, you felt that the deed of trust somehow absolved

18   you for spending all of his money?

19   A.    Not absolved, but it gave me the right under a

20   different thing than if you were saying "I want you to set

21   up an account and I want you to put it in my name and your

22   name" and all of the other provisos that you might see if,

23   in fact, it was a commodity pool operation or even a CTA.

24   But as far as to the $200,000, 150, 200, eventually the deed

25   of trust that we recorded, the deed of trust was actually --

JOHNSON – CROSS

1   when it was recorded, was less than the value of the

2   property when we added them all up.

3   Q.   Well, let's be clear on this, Mr. Johnson, because this

4   is an important point.  You felt that as long as you gave

5   somebody a promissory note, that no matter what else you

6   said, as long as they had that note or deed of trust, you

7   could use that money any way you wanted for any purpose

8   whatsoever?

9   A.   On those that were receiving deeds of trust or they

10  received promissory notes, I had the right to take that

11  money and to do the best I could to make sure that we could

12  get their return on their note.

13  Q.   So if you said to an investor, "I'm going to take this

14  money and I'm going to put it in a commodity account and I'm

15  going to trade it for you," that didn't make any

16  difference.  You could say whatever you want -- as long as

17  you got the money and as long as you gave them a promissory

18  note or a deed of trust, you could do whatever you wanted

19  with that money; true?

20  A.   No, because you couldn't make some sort of false

21  representation.  But what you can say is that on that -- if

22  you put it in that account for that individual, and if

23  that's the agreement you had, and then if you lost 200,000

24  in the markets, then that person would not be able to come

25  back and say, "Well, you gave me a note.  I'm entitled to my

1  guaranty of my 200,000 plus my interest."  And so always to

2  protect these individuals, to make sure that they were not

3  exposed, because I looked at these things for hundreds of

4  times, actually, I wanted to make sure that that individual

5  did not lose their principal or any interest that I promised

6  them.  So I always gave them a note and I always guaranteed

7  them that as an individual as well as a company.

8  Q.  So you would agree with me that you could not make a

9  false statement or a statement to somebody and -- to get

10  their money, and then do the opposite with it or something

11  different with it; would you agree that that's true?

12  A.  I would agree that that is true and that I would not do

13  such a thing.  So, yes, I agree with both of them.

14  Q.  At any point in time, prior to that July 25th meeting

15  in '02, did you ever tell Don Church, "Hey, that 200,000 you

16  gave me is gone.  I spent it"?

17  A.  I don't recall telling him anything, no, sir.

18  Q.  And you didn't tell him prior to that meeting that the

19  state corporation commission was investigating you and had

20  sanctioned you, did you?

21  A.  Yes, sir, I did tell him that.

22  Q.  And Mr. Church's response to that was, "Hey, no

23  problem"?

24  A.  I don't know what his response was.  But when he first

25  called me, I didn't know him.  And I had been out of the

JOHNSON – CROSS

1    courthouse for a little bit.  And I just didn't know him at
2    all.  And I just didn't know exactly why he was calling me.
3    I didn't know anything about him, had never met him.  I
4    later find that he was maybe friends with some acquaintances
5    of ours.  But I didn't know him.
6        But I -- my first statement when he called me on that
7    evening, it was what -- "I probably am not going to do
8    anything because I'm under an obligation to the state
9    corporation commission not to take any funds in."  And that
10   was it.  And then later, as we were talking, that's when we
11   got into talking about the exemption because it would be
12   paid off less than nine months, and so therefore it didn't
13   constitute a note; it was a personal note to me and I needed
14   the money.  And so I put "personal note" on there.  And then
15   finally we enlarged it to a deed of trust.  And he recorded
16   that as he -- I think he negotiated with several different
17   people --
18   Q.  So you are telling me that from the very beginning,
19   when Mr. Church first called you, you disclosed to him that
20   the state corporation commission had taken some
21   administrative action and that you had settled with them and
22   you were under some stricture, some consent agreement, not
23   to issue any more promissory notes?  He knew that?
24   A.  He should have, yes, sir.
25   Q.  Well, did he or didn't he?  Did you tell him or not?

1    A.    I told him.  But whether he knows anything or not,

2    that's -- I just don't know.  I'm not being argumentative.

3    I'm just telling you I told him.  And the reason I did is I

4    felt it strange that somebody would call me in the evening

5    and start talking to me about investments and all of these

6    things.  And I just -- I just didn't want to be anything

7    that would be in violation of a possible state corporation

8    commission.  I had a huge healthy respect for them.  You can

9    see it from my journals.  I tried to comply.  So when he

10   called me, I am positive --

11   Q.    And so your testimony is that, even knowing that, even

12   when you told him that you had -- were under some

13   administrative sanction for selling unregistered securities,

14   that Mr. Church went ahead and said, "Okay.  Take my

15   $150,000"?

16   A.    I don't know if you could characterize it as that, but

17   he certainly knew, because there would be no reason that I

18   would not tell him, because, candidly, if he didn't want to

19   do it, I didn't want to be amiss with the state corporation

20   commission.  And since I didn't know him and because the

21   other problems that it could lead to, I would have just as

22   soon not done business with him.  I gave him some things

23   about his trading, but that's a total different story at a

24   different time.

25   Q.    Let's talk about Dogwood Farms, Mr. Johnson.  You had

JOHNSON – CROSS

1    these Dour appraisals, I think it was February of 2001, for

2    2.1 million; correct?

3    A.   Approximately that.  Yes, sir.  I think it was a few

4    dollars under that.  But rounded off I think it was about

5    $2.1 million in its entirety.

6    Q.   But you also had some information that the land might

7    not be worth that; in fact, it might be worth much less than

8    that, didn't you?

9    A.   You have people say one way or another.  And the only

10   way you really know is -- in the land business is -- in any

11   real estate business, if you had a willing buyer and a

12   willing seller.  I was convinced, am convinced today, and

13   will be convinced until they put me in the ground, that that

14   land was worth a whole lot more than what they ended up

15   getting at the foreclosure sale.  And I think it was in --

16   whatever the time.  But it was worth a whole lot more than

17   that.

18          MR. BYBEE:  Would you pull up 64, please, Mary.

19          THE WITNESS:  I believe it was in 2005, if I'm not

20   mistaken.

21   BY MR. BYBEE:

22   Q.   Now, you know who Carnell Investments is, don't you,

23   Mr. Johnson?

24   A.   Not actually --

25   Q.   Well, you sought a loan from them, didn't you?

1    A.    I'm sorry, sir?

2    Q.    You sought a loan from them?

3    A.    Oh, yes.  I know by looking at this.  But I would not

4    have known it.  If you had said, "I would like to know"

5    -- "You tell me who Carnell Investments," I would have no

6    idea.  We were going through dozens, because I wanted to get

7    the land refinanced.

8    Q.    And you understand that Carnell Investments -- or

9    Carnell Investments is in the business of residential and

10    commercial mortgages, don't you?

11    A.    I'm not sure about that; no, sir.  I think that they

12    hold themself out to be, but I don't even know where they

13    are from.  I don't even have any idea.  I think they are

14    supposed to be somebody that is in the business.  And I

15    certainly believed it when I was doing this activity in --

16    where is it?  2001.  I certainly believed it then.  So I

17    -- that would be my statement.  They must be in the

18    business --

19    Q.    And they rejected you for a loan, did they not, on the

20    land?

21    A.    According to this, they did, yes, sir.

22          MR. BYBEE:  Page two, please, Mary.

23    BY MR. BYBEE:

24    Q.    And one of the reasons that they rejected you on this

25    land -- and, again, this is dated January 24th, 2001 -- was

1    that "Market conditions have changed.  The subject property

2    is speculative property, which doesn't fare well in the

3    current environment."  Isn't that one of the reasons they

4    gave?

5    A.   The California firm gave me an opinion on a property

6    that is across the country.  And that's the opinion that

7    they gave me, yes, sir.  Whether it is true or not, I don't

8    know.  But that's what they said.

9    Q.   But at least you had some information, you had some

10   idea that there was a group of knowledgeable commercial

11   mortgage brokers who felt that the value of the land wasn't

12   sufficient to give you a loan on?

13   A.   I wouldn't give -- I wouldn't give them that much

14   credit.  I wouldn't have said they were knowledgeable.  When

15   I saw it, I said they don't know what they were talking

16   about.  No, I wouldn't have accepted that.  They were from

17   California.  The market in California is as different as

18   talking about the market from northern Virginia to someplace

19   that is in a rural setting.  It is just -- they are not even

20   the same.  We found out to be later that they were wrong,

21   that the market conditions were quite -- quite possible to

22   do something with that Dogwood property and Shumate.

23           MR. BYBEE:  Would you go to 24-13, please.  Go to

24   page two, I believe.

25   BY MR. BYBEE:

JOHNSON – CROSS

1  Q.  Now, you recognize this, don't you, Mr. Johnson?  This

2  is something you sent to the state, 2003?

3  A.  I'm sure I sent that, yes, sir.

4  Q.  Okay.  I would like you to look at this very bottom

5  paragraph here, where you say "Not only was 9/11" -- I

6  assume you are referring to September 11th, 2001 -- "a

7  setback in the trading sector of our business, a resulting

8  downturn in the economy occurred, thus causing further

9  softening of the real estate market and dampening efforts in

10  the sale of the real estate."  Now, that's your words, isn't

11  it, Mr. Johnson?

12  A.  No question about it, that the market is up and down,

13  just like the stock market is up and down.  It could be down

14  2300 points last week and be up a thousand the next.  I'm

15  not saying that this is a ticker tape.  But I'm saying that,

16  yes, there certainly were some huge financial ramifications

17  as a result of that terrible tragedy here in the country.

18  Q.  And one of those ramifications was a dampening and a

19  softening in the real estate market, dampening efforts to

20  sell the real estate; isn't that true?

21  A.  It certainly was dampening at that time.

22  Q.  And you knew that in 2002, didn't you, because that

23  would have been after 9/11/2001, wouldn't you?

24  A.  Yeah.  But markets recover in weeks and days, etc.

25  This particular property I knew; I had known it since I was

1    a boy.  And I knew what its value was.  I have since been

2    proved to be correct.  At least the market in our area has

3    proven me correct in that.

4    Q.   Now, when you issued that --

5          MR. BYBEE:  We don't need that exhibit anymore.

6    BY MR. BYBEE:

7    Q.   -- the $5.6 million Dogwood Farms note, Mr. Johnson, do

8    you know how much liens were already on the land?

9    A.   Approximately, yes, sir.

10   Q.   What?

11   A.   Approximately 1.8 million.

12   Q.   And how much was the Dogwood Farms note for, the '86

13   investor one?

14   A.   With the interest added and everything, I think it

15   showed up to over $5 million.

16   Q.   5.6 to be more accurate; would you agree with that?

17   A.   Well, it was over $5 million.  5.6 -- I don't have the

18   document and haven't had it for three years.  But if 5.6 is

19   it, then that's what it is, yes, sir.

20   Q.   So that would add up to --

21         MR. BYBEE:  Can you display 56-7, please.

22   BY MR. BYBEE:

23   Q.   That would add up to over seven and a half million

24   dollars, doesn't it, Mr. Johnson?

25   A.   That's what they total, yes, sir.

JOHNSON - CROSS

1    Q.    But as far as you knew, you had an appraisal for $2.1

2    million and 9/11 had occurred, further dampening the real

3    estate market, yet you liened up this land for over $7

4    million, didn't you?

5    A.    The 9/11 certainly dampened the market, no question

6    about that.  But then all of a sudden I believe there's a

7    rebounding.  And because of this particular pocket where

8    this property is located, and because $5,600,000 represents

9    not only the principal but also the interest that had

10   accrued to these various accounts over a period of time and

11   they were all plus 20 percenters, that's why it went so

12   high.

13        My hope was that even if it were to only bring four or

14   five million dollars, at least we would be able to get some

15   of these principals knocked out.  And that would leave me

16   open to get interest to negotiate over a period of whatever

17   it took me, 20 years, 5 years, 10 years, whatever it took.

18   Q.    Mr. Johnson, you didn't record that deed, did you?

19   A.    No, sir.  I had the deed for anyone who wanted to

20   record it to record it.  I had it and lodged it at my

21   house.  When the FBI came in 2005, they took it from my

22   house.

23   Q.    Well, let's be clear about this, Mr. Johnson.  You are

24   the clerk of the court -- or were the clerk of the court for

25   16 years, were you not?

JOHNSON – CROSS

1  A.   Yes, sir, I was.

2  Q.   This was a fact well-known to all of the investors,

3  wasn't it?

4  A.   I would think that every one of them, except maybe a

5  couple that aren't from the area, would have known that; I

6  would think so.

7  Q.   And you told us earlier, when you were recounting your

8  experience as clerk of the court, that one of the prime

9  duties of the clerk of the court was to record deeds of

10  trust; isn't that true?

11  A.   Yes, sir.  I've recorded many of them, hundreds of

12  them.

13  Q.   How many in your lifetime would you say you have

14  recorded?

15  A.   No idea.

16  Q.   Hundreds?

17  A.   Probably.  I had deputies that worked for me and --

18  Q.   Thousands?

19  A.   I don't have an answer to that.  I don't have any

20  idea.  I did many of them.  Most every recording I ever saw

21  was always done where an attorney or bank or someone who is

22  representing the lender would come in and they would bring

23  that document.  And so the lender had the responsibility to

24  place the document on record.  And so when they put that

25  record on, I would record it.  Or they would present a deed

1  of trust, I would record it.

2      Since I wasn't the lender, I was the recipient of the

3  funds that had been loaned me, then I did leave that deed of

4  trust there for any one of those that wanted to record it.

5  And I didn't record it, foolishly, perhaps, but it cost

6  probably 10 to $15,000 to record something that showed all

7  of that interest.  In hindsight, maybe I should have just

8  shown the principal.

9      But the essence of it is it is the lender's

10  responsibility.  Of all of the hundreds of thousands I have

11  ever seen, they are the ones I have seen to bring it in.  I

12  have never seen the other side.

13  Q.  Well, Mr. Johnson, did you tell people that -- when you

14  were getting them to swap out their Dogwood notes, that you

15  were going to make one giant note that would cost $15,000 to

16  file and that they were going to have to foot that bill?

17  A.  I didn't tell them a giant note.  I told them we had a

18  deed of trust.  I also told people, as was testified, they

19  said it was overpledged, and so I told people there are

20  deeds of trust against this property, but it has got to be

21  -- have such a significant value that all we need to do is

22  to hang on and we'll be -- I think we'll be okay.

23  Q.  You didn't tell other investors that -- you didn't tell

24  the investors that there were other people on this deed of

25  note -- deed of trust note, Mr. Johnson?

JOHNSON - CROSS

1   A.   I don't recall about that.  I just know that I gave

2   them their individual deeds of trust -- excuse me, deeds of

3   trust notes.  And at that point I took and put that in my

4   safe and waited to see if anybody recorded it.  If they did,

5   it would have been there for them.  And, of course, it would

6   have been public record for all people to see.

7   Q.   Why didn't you send them the deed of trust?

8   A.   I would have been glad to.  I wish I had've now.

9   Q.   Why didn't you?

10  A.   Because there were so many different people on the

11  thing.  And I said, well, if I had to send each one of

12  these, I can't make an original for them all, and so I just

13  gave everybody a deed of trust note --

14  Q.   Why couldn't you send them a copy?

15  A.   I could have easily done it.  I would have given copies

16  to anybody that had requested it.  Nobody requested it.  And

17  so I just left it there.

18  Q.   But you are saying that all of these investors knew

19  that you had this deed of trust at your home?

20  A.   I assumed they did, yes, sir.

21  Q.   What do you mean you assumed they did?  Did you tell

22  them or did you not tell them?

23  A.   I didn't say anything.  I just assumed that they knew

24  that somebody was going to have to come forth to record it;

25  I didn't.

JOHNSON - CROSS

1  Q.  So you didn't tell any of these people that you had the

2  deed of trust at your house?

3  A.  I don't recall telling them that, no, sir.

4  Q.  Did it -- did it strike you as odd, Mr. Johnson, that

5  not one of the 86 people on that deed of trust note ever

6  came to your house to pick it up and get a copy?

7  A.  It didn't strike me odd.  It didn't do anything.  It is

8  just simply the fact that it wasn't -- wasn't discussed.  We

9  gave them the note.  Some people accepted that note and did

10  a release or satisfied the Mountain Investment note or notes

11  they might have had, and the rest of them didn't.  And so it

12  just depends on who you were and whether or not they did it

13  or not.

14  Q.  Are you still living in the 8,000-square-foot house

15  with five acres, Mr. Johnson?

16  A.  I am for the time being, yes, sir.

17  Q.  Are you going to sell that to help repay investors?

18  A.  There was no equity in it.  I had used the equity

19  already and given it to the investors.  I did two or three

20  deeds of trust on it.

21  Q.  Are you saying that you have liened up your house more

22  than it is worth?

23  A.  I think I have liened it up to what it is worth.  And

24  in the given market condition now, where we have had the

25  close to a collapse, a little bit different from what we had

JOHNSON – CROSS

1  when we had a 9/11 -- we have had a major, almost close to a

2  depression scare here.  We may come to it.  I'm not smart

3  enough to answer that.  But the deed of trusts that are

4  against the house right now would not exceed the value, but

5  it could certainly come close to it with the market that we

6  presently have as far as real estate is concerned.

7  Q.  And in 2003, 2004, 2005, '6, '7, you didn't sell the

8  house and take whatever proceeds that you could make to

9  repay investors?

10  A.  I did not.

11  Q.  Were you living in that house when Betty Lafon wrote

12  you, asking for her money?

13  A.  I was.

14  Q.  And were you living in that house when Scott Geller

15  wrote you, asking for his money?

16  A.  I was.  I have been in the house since '97.

17  Q.  And when Thomas Buchanan wrote you, asking for his

18  money?

19  A.  Yes.

20  Q.  Were you in that house when Barbara Falls called you

21  and asked you for the money back for the $25,000 down

22  payment on the house she wanted to buy?

23  A.  I was in that house.

24  Q.  Mr. Johnson, you intended to speak the words that you

25  spoke to the investors, didn't you?  None of those words

1    came out of your mouth by accident, did they?

2    A.    I don't know what you mean, sir.

3    Q.    I mean, did you intend to say every sentence that you

4    said to the investors when you spoke with them?

5    A.    It was more of just casual conversations.  I didn't

6    have a fixed script that I would try to memorize and talk to

7    them about, if that's what you are asking me.

8    Q.    Well, you never spoke to them when you were delirious,

9    were you?

10   A.    Not to my knowledge.  I guess if I were --

11   Q.    You were always in full possession of your faculties,

12   weren't you?

13   A.    I hope so, yes, sir.

14   Q.    So whatever you said to them you intended to say to

15   them, didn't you?

16   A.    Whatever we said was just more of a conversation

17   between people when they came and discussed, you know,

18   whatever certain business that we could conduct.

19   Q.    When they gave you the money, you intended to deposit

20   those checks in the Mountain Investments account, didn't

21   you?

22   A.    Always a note, always -- they would see it.  I mean, we

23   would endorse the check and they would see it.  There was

24   never anything where we tried to be secretive about it or

25   anything.  They saw the check.

1  Q.   And when you paid one investor with another investor's

2  money, you intended to do that, didn't you?

3  A.   I intended to pay all that I owed.

4  Q.   I mean, that -- you know, writing a check to an

5  investor on a note from funds that came in from another

6  investor, that wasn't an accident, was it?

7  A.   I don't know if you would call it an accident.  No, I'm

8  just trying to pay what I owed.

9  Q.   I mean, you intended to do that, didn't you?

10  A.   Intended to make the payments?

11  Q.   Yes.

12  A.   Yes, sir, I did.

13  Q.   And you intended to submit those documents to the

14  state, didn't you?

15  A.   Which documents are you --

16  Q.   All of them.  Whatever you sent to the state, you

17  intended to send them, didn't you?

18  A.   If I sent them, I intended to send them, yes, sir.

19  Q.   But you didn't send them the Dogwood Farms notes, did

20  you?

21  A.   No, because Dogwood Farms was no longer in the -- they

22  weren't in the process of being investigated.  It was

23  Mountain Investments.  And so when we did the satisfaction,

24  we did satisfaction of the Mountain Investment notes.

25  Dogwood Farms --

1   Q.   Well, when you were swapping out the notes, the

2   Mountain notes for Dogwood notes, you didn't send them the

3   new Dogwood notes, did you?

4   A.   No.  I discussed it, but I didn't send them.

5   Q.   You intended to run the money that you ran through

6   Warren and Schied's trust account, didn't you?

7   A.   Repeat the question again.  Do what?

8   Q.   Do you recall depositing -- do you recall a $355,000

9   deed of trust?

10  A.   Yes, sir.

11  Q.   And do you recall that that money went through the

12  Warren and Schied trust account?

13  A.   Yeah.  It was a deed of trust.

14  Q.   Now, you intended to send that money through that

15  account, didn't you?

16  A.   Most definitely, because I wanted it to be handled by

17  the office down there.

18  Q.   But the office didn't handle it.  No attorney handled

19  that.

20  A.   That office conducts its business like that.  And so

21  where there is a discussion of whether the loan was properly

22  closed or not closed or whether my sister Donna had the

23  right to do those things, she did all of her closings.

24  Q.   None of those were clients of Mr. Schied, were they?

25  A.   When they walked in the door, I assumed that they

JOHNSON – CROSS

1    were.  The only thing that could possibly be assumed is that

2    when they went down there, there was nothing -- they could

3    have easily laid the chit down with any of the secretaries.

4    But because Donna was down there handling it and the deed of

5    trust was properly recorded, because she recorded it and

6    paid for the recordation.

7    Q.  Well, when they walked in the door, they walked in the

8    door because you told them to walk in the door?

9    A.  Most definitely.

10   Q.  You told them that's where they should take their

11   money?

12   A.  Most definitely.  I wanted a deed of trust because the

13   property was of value and I wanted them to be secured with

14   that deed of trust.

15   Q.  Whatever happened, you intended for that money to go

16   through that trust account, didn't you?

17   A.  Yes.

18   Q.  That didn't happen by accident, did it?

19   A.  No.  There was nothing secret about it.  I wanted it to

20   go through it.

21   Q.  You intended to create that $5.6 million note, didn't

22   you?

23   A.  Yes, because I owed that money.

24   Q.  That wasn't an accident, was it?

25   A.  No.  I owed the money.

JOHNSON – REDIRECT

1  Q.  In fact, every single action that you've taken in this

2  case you intended to take, didn't you?

3  A.  There were no mistakes, if that's what you are asking

4  me.  If I did a deed of trust, I wanted the deed done.  If I

5  gave somebody a note for the money, I wanted them to have

6  that note for their protection, yes, sir.

7          MR. BYBEE:  I'm completed, Your Honor.

8          THE COURT:  Anything further of this witness?

9          Mr. Anderson?

10          MR. ANDERSON:  One short redirect before break,

11  please, Your Honor.

12                  REDIRECT EXAMINATION

13  BY MR. ANDERSON:

14  Q.  I said one short redirect before the break.

15      I believe it is Government 54, the date of September

16  the 18th of '02.

17      Mr. Johnson, you were asked about funds that you had

18  received from Mrs. Neville and whether she knew where those

19  funds were going.  Do you recall the question?

20  A.  Yes, sir, I do.

21  Q.  I want to direct your attention there to the date of

22  September the 18th of 2002 in your diary, in Government's

23  Exhibit 54.  And could you read that to the jury, please,

24  and tell us what you are saying.

25  A.  "Huge day.  I got Pat Neville to agree to give me a

1    hundred thousand to get Don Church and some of the investors

2    off of me.  I'm going to Texas by myself, dash, also

3    contacted Church and Jerry Smith."

4    Q.  Is that reflective of what happened with you and

5    Mrs. Neville that day?

6    A.  Yes, sir.

7              MR. ANDERSON:  That's all the redirect I have, Your

8    Honor.

9              MR. BYBEE:  Could I ask a follow-up on that, Your

10   Honor?

11             THE COURT:  Yes, but he'll reserve the right to

12   have a follow-up as well.

13             MR. BYBEE:  All right.  I'll try not to go far

14   afield then.

15                        RECROSS-EXAMINATION

16   BY MR. BYBEE:

17   Q.  Mr. Johnson, I'm going to ask you about that exact

18   question.

19             MR. BYBEE:  Could you display 20-13, please.

20   BY MR. BYBEE:

21   Q.  Do you recognize this as the note that you gave Trisha

22   Neville after you took that $100,000 from her?

23   A.  Yes, sir, I think that's it.  I think this is the

24   correct note, because she had some other money -- is this

25   the one that we consolidated into one note?  Yeah, I think

JOHNSON – RECROSS

1    -- if it is --

2    Q.  Well, let's go to page two and make sure.

3    A.  I might be able to tell you better.

4         MR. BYBEE:  Why don't we highlight this right here,

5    please.  Zoom in on it.

6    BY MR. BYBEE:

7    Q.  "This note is a consolidation of a 50,000 note dated

8    the 12th day of March which was executed by Dogwood Farms,

9    15,000 note dated in July, and additional funds in the

10   amount of $100,000 included in this note."  Is that -- does

11   that help you?

12   A.  Yes, sir.  I think that's --

13   Q.  So this is the note you gave her after she gave you

14   that $100,000?

15   A.  It appears to be, yes, sir.

16   Q.  Now, this note is a little different from other notes

17   that you have done, isn't it, Mr. Johnson?

18        MR. BYBEE:  Let's go back to page one, please.

19   BY MR. BYBEE:

20   Q.  This note not only includes the terms of the interest

21   and all of that, this includes a little contract between you

22   and Ms. Neville, doesn't it?

23   A.  It appears to be, yes, sir.

24   Q.  Well, let's read the terms of this contract.  Let's

25   start with paragraph one.

JOHNSON – RECROSS

1      "Ted Johnson is to place $25,000 in an account that is

2   to be established by Patricia Neville.  This 25,000 reduces

3   this note by the same amount and is to be provided by Ted

4   Johnson, Frank Farrier for the benefit of Patricia Neville

5   of her said account."  Are you with me so far?

6   A.   Yes, sir.

7   Q.   And is this part of the agreement?

8   A.   It appears to be part of the agreement, yes, sir.

9   Q.   "Two, Ted Johnson agrees to trade the established

10  account until $350,000 is earned, at which time Ted Johnson,

11  Frank Farrier, and Patricia Neville will share 50/50 in the

12  profits of the account."  Do you see that?

13  A.   I do.

14  Q.   Is that part of this agreement?

15  A.   Yes.

16  Q.   Now, this is in 2002.  You have just come off a year in

17  2000 and 2001 where you have lost 60 to $70,000, but you are

18  now telling Patricia Neville that you are going to trade her

19  account until it earns $350,000?

20  A.   Yes, sir.

21  Q.   All right.  Let's go to paragraph 3.

22      "Ted Johnson and Frank Farrier agree to continue

23  trading the said account until one million is earned and

24  paid to Patricia Neville."  Does Patricia Neville have any

25  idea that you have lost so much money in the market?

1   A.   Yes, sir, I think so.

2   Q.   You think she knew that you had lost, you know, 40,000

3   or whatever it was in 2000 and lost another 30,000 in 2001?

4   A.   We had very candid discussions, yes, sir, I believe so.

5   Q.   In view of that, Mr. Johnson, this telling her that you

6   are going to trade an account until it is a million dollars,

7   that's a fantasy, isn't it, Mr. Johnson?

8        MR. ANDERSON:  Judge, I will object.  I think this

9   goes a little beyond the redirect.

10       THE COURT:  I overrule your objection.  I'll permit

11  you to examine -- do a redirect again -- re-redirect.

12  BY MR. BYBEE:

13  Q.   Isn't this pie in the sky, Mr. Johnson?

14  A.   No.  I really felt that I would do that, still think I

15  would have.

16  Q.   Let's read four.  "If the said Patricia Neville were to

17  pass away before the account has yielded one million in

18  profits, then Ted Johnson and Frank Farrier agree to

19  continue to trade the account and all proceeds will go to

20  Sheri Neville, daughter of Patricia Neville."  Now, you knew

21  that Sheri Neville was handicapped, didn't you?

22  A.   I did.  That's why we were doing this.

23  Q.   So you are representing to Ms. Neville that you can

24  trade or will -- or could -- or are willing or trying to

25  trade her account up to a million dollars, and some of that,

1  or all of it, if Ms. Neville passes away, will go to her

2  handicapped daughter.  And that's how you get her $100,000,

3  isn't it?

4  A.   No, sir.  No, sir.  It is not how I got it at all.

5       The bottom line is when I talked to Mrs. Neville -- I

6  knew she had a daughter that was handicapped, just from our

7  conversation.  But that didn't have anything to do with it.

8  What -- what Ms. Neville wanted to do was to eventually be

9  able to have something that she could have a perpetual

10  income from, something that she could feel comfortable

11  with.  And if something were to happen to her -- she didn't

12  have anybody else.  I think maybe her mother had died, was

13  an elderly woman, and didn't have anybody else.  And so she

14  wanted to make sure that this little girl -- forgive me.

15  She's like a little girl, but I think I heard she was

16  30-ish.  But this special person was going to have something

17  for her.  We believed it and kept on working.

18  Q.   Believed it on what basis, Mr. Johnson?  What would

19  indicate to you, in all of this, that you could possibly

20  trade and earn a million dollars in trading based on your

21  prior experience up to this point?

22  A.   Based on my prior experience, I felt like I was

23  building a knowledge base that eventually I would have

24  something that would justify this.  We talked about it in

25  some detail.  And Pat knew that I was struggling.  And she

MANN - DIRECT

1  was a great help.  I mean, she did a lot of things.  I just

2  had to say that she knew.  And we talked about it.  She

3  never got an account set up.  It wasn't like that we were

4  not true and faithful to what we said.  She just never got

5  an account set up.

6          MR. BYBEE:  I have no further questions, Your

7  Honor.

8          THE COURT:  Mr. Anderson, anything else?

9          MR. ANDERSON:  No, sir.  I think that's fine.

10          THE COURT:  You may step down.

11          Ladies and gentleman, this would appear to be an

12  appropriate time to take a short recess, so we'll do so.

13      (Jury out.)

14      (Recess at 3:10 p.m.)

15      (Jury in.)

16      (Call to Order of the Court at 3:40 p.m.)

17          THE COURT:  All right, Mr. Anderson, call your next

18  witness.

19          MR. ANDERSON:  Darryl Mann, please, Your Honor.

20          DARRYL RICHARD MANN, DEFENSE WITNESS, SWORN

21                      DIRECT EXAMINATION

22  BY MR. ANDERSON:

23  Q.  Good afternoon, Mr. Mann.

24      Would you please identify yourself for the Court.

25  A.  Yes.  My name is Darryl Richard Mann.  I currently live

1  in West Virginia, Monroe County, in a small community called

2  Wikel.  Mailing Address is Greenville, West Virginia.

3  Q.  Mr. Mann, do you know Ted Johnson?

4  A.  Yes, I do.

5  Q.  And would you tell the jury, please, sir, how long you

6  have known him and in what capacity you have come to know

7  Mr. Johnson?

8  A.  I'm not real good at exact numbers, but it has been

9  about 30 years.  I first met him as a member of the Church

10  of Jesus Christ of Latter-day Saints.  And that was the

11  beginning of our relationship.  Over those years I have

12  stayed very close to he and his family and have been -- he

13  has been very much a part of my family.

14  Q.  And currently do you have a special relationship or

15  designation with Mr. Johnson in terms of how he might seek

16  counsel from you?

17  A.  Yes, I do.

18  Q.  And what is that, Mr. Mann?

19  A.  I'm currently serving in the church as what is called a

20  branch president.  And that is the church leader over a

21  small congregation that Ted Johnson has been attending for

22  the last couple of years.

23  Q.  And prior to that position with Mr. Johnson, did you

24  also hold positions that are similar to the one you

25  currently have with Mr. Johnson?

MANN – DIRECT

1    A.   Yes.   There was a period of time, about seven years,

2    that I was actually a bishop.   And then there was a period

3    of ten years that I served in the state presidency, which is

4    a position that is over bishops and branch presidents.   In

5    both of those situations I would have had responsibility for

6    him as a member.

7    Q.   Now, Mr. Mann, during that time did Mr. Johnson come to

8    talk with you on a frequent or regular basis?

9    A.   Yes, sir.

10   Q.   And did he talk with you about his circumstances with

11   Mountain Investments and Dogwood Farms?

12   A.   I won't say that we talked specifically with

13   definitions and names, but certainly about business

14   situations and circumstances within -- within those areas.

15   Q.   And what, if anything, did Mr. Johnson say to you

16   regarding the people that he owed money to?

17   A.   We have had probably numerous conversations about those

18   situations.   And -- I mean, that could -- I guess I could

19   answer that question for a very, very long time.   But he

20   particularly has always had great concern about having the

21   blessings of being able to meet every obligation that he

22   ever made to anyone, in business or otherwise.

23   Q.   Thank you, Mr. Mann.   That's all that I have.

24           THE COURT:   Any questions?

25           MS. WAERING:   Yes, Your Honor.

```
1                    CROSS-EXAMINATION

2    BY MS. WAERING:

3    Q.   Good afternoon.

4    A.   Good evening.

5    Q.   I would just like to follow up.  When you say

6    Mr. Johnson thought he had a blessing that he would be able

7    to meet every obligation --

8    A.   Yes, ma'am.

9    Q.   -- can you explain what you mean by that, please.

10   A.   Yes.  In our church, in our faith, we live our lives --

11            THE COURT:  Counsel, this -- you know, I know

12   you're on cross-examination, but try to leave religion out

13   of the courtroom.

14   BY MS. WAERING:

15   Q.   Have you been in the courtroom other than today?

16   A.   This courtroom?

17   Q.   Yes, sir.

18   A.   No, ma'am.

19   Q.   So only -- all of what you have heard about this case

20   is what you've heard today?

21   A.   Not exactly.  I have -- I have had a conversation or

22   two and just -- I have heard general comments over the last

23   couple of weeks.  But anything in detail, I know nothing.

24   Q.   But you have not been able to see and hear the

25   witnesses and see the exhibits that the jury has seen in
```

1  this case?

2  A.   Just those today.

3  Q.   Did Mr. Johnson ever approach you about investing?

4  A.   No, ma'am.

5           MS. WAERING:  I have nothing further, Your Honor.

6           THE COURT:  You may step down, sir.

7           Call your next witness.

8           MR. ANDERSON:  Vassie Willis.

9              VASSIE WILLIS, DEFENSE WITNESS, SWORN

10                    DIRECT EXAMINATION

11  BY MR. ANDERSON:

12  Q.   Good afternoon, ma'am.

13      If you would please identify yourself for the Court.

14  A.   My name is Vassie Willis.

15           THE COURT REPORTER:  Could you spell the first

16  name, please.

17           THE WITNESS:  It is V, as in "Victor," A, S, as in

18  "Sam," S, as in "Sam," I, E.

19  BY MR. ANDERSON:

20  Q.   Ma'am, do you know Ted Johnson?

21  A.   I do.

22  Q.   And could you relate to the jury how it is that you

23  know Mr. Johnson?

24  A.   I met Mr. Johnson in May of 2006.  He was seeking

25  employment.  And a lady that was already an employee of mine

1    recommended Mr. Johnson.  And so I met Mr. Johnson.  I hired

2    him.  And I have been extremely satisfied with him.  He has

3    been very dependable, very trustworthy, and willing to do

4    the jobs that most of my employees would not do.

5    Q.  And do you -- does your company and through -- does

6    Mr. Johnson, through your company, provide janitorial

7    services?

8    A.  That's correct.

9    Q.  And he works in that capacity, in all fields of

10   cleaning?

11   A.  Cleaning, yes.

12   Q.  Thank you.  That's all that I have.

13   A.  Thank you.

14          THE COURT:  You need to remain seated, ma'am.

15          THE WITNESS:  I'm sorry.

16                    CROSS-EXAMINATION

17   BY MS. WAERING:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  You say in May of 2006 Mr. Johnson came to work for

21   you?

22   A.  Yes, ma'am.

23   Q.  And this is in a janitorial service?

24   A.  That's correct.

25   Q.  At Virginia Tech?

WILLIS – CROSS

1  A.   At Virginia Tech.

2  Q.   How many days a week does he work in that position?

3  A.   Five days.

4  Q.   40 hours a week?

5  A.   Less than that.

6  Q.   Roughly how many?

7  A.   Anywhere from 25 to 30 hours.

8  Q.   And how much does he earn in a week doing the 25 to 30

9  hours?

10  A.   He was -- he was getting about 22, $2300 a month.

11  Q.   He "was"?

12  A.   Yes, ma'am.  He still works for me.  At the time when I

13  hired him, he was working for -- for me at Virginia Tech

14  Corporate Research Center.  And then back in August of 2007

15  I transferred him from there and placed him at the

16  university, Virginia Tech, cleaning the athletic department

17  over there for me.

18  Q.   Did his income increase over time?

19  A.   I'm sorry?

20  Q.   Did his income from your jobs increase over time?

21  A.   No, it was the same amount.  But that's where I needed

22  him the most.

23  Q.   Did he get an amount per hour?

24       THE COURT:  Counsel -- go ahead.

25       THE WITNESS:  It was not per hour.  It was by the

1  job.

2  BY MS. WAERING:

3  Q.   And are you aware of what his employment was before he

4  came into your employ in May of '06?

5  A.   No, ma'am.

6  Q.   Was he employed with you up until the beginning of this

7  trial and still employed?

8  A.   Up until the beginning of the trial, yes.

9  Q.   Thank you.

10  A.   You are welcome.

11          THE COURT:  You may step down now.

12          Call your next witness.

13          MR. ANDERSON:  The defense rests, Your Honor.

14          THE COURT:  Any evidence from the United States?

15          Anything further?

16          MS. WAERING:  No, Your Honor.

17          THE COURT:  Well, ladies and gentlemen, this

18  concludes all of the evidence in the case.  The evidence

19  having been concluded, what I'm going to do is here in a

20  moment you will adjourn for the day, I'm going to meet with

21  the lawyers and discuss closing instructions with them.  And

22  tomorrow morning you'll return back here and you'll hear

23  closing arguments of counsel, I will instruct you on the

24  law, and you will retire to the jury room to deliberate on

25  your verdict.

1          Please keep in mind the instructions that I have

2     given you about not discussing it.  And I tell you what,

3     I'll have you all back here tomorrow morning at 10 a.m.  And

4     at 10 a.m. we will begin with closing arguments of counsel.

5          So, with that, we will stand in adjournment.  If I

6     can meet counsel back in chambers.

7          (Thereupon, at 3:50 p.m. these proceedings were

8     recessed, to be reconvened on October 15, 2008, at

9     10:00 a.m.)

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19     transcript from the record of proceedings in the above-

20     entitled matter.

21

          _____/s/ Carol Jacobs_____          July 2, 2009

22          Official Court Reporter                    Date

23

24

25

```
1                          INDEX

2       Rule 29 Motion
        BY MR. ANDERSON      . . . . . . . . . . .    2
3
        Defense Rests        . . . . . . . . . .  166
4

5

6

7                    EXAMINATION INDEX

8   TED JAMES JOHNSON, JR., DEFENDANT
        DIRECT BY MR. ANDERSON . . . . . . . . .   19
9       CROSS BY MR. BYBEE . . . . . . . . . .     72
        REDIRECT BY MR. ANDERSON . . . . . . .    153
10      RECROSS BY MR. BYBEE . . . . . .          154

11  DARRYL RICHARD MANN, DEFENSE WITNESS
        DIRECT BY MR. ANDERSON . . . . . . . .    159
12      CROSS BY MS. WAERING  . . . . . . . . .   161

13  VASSIE WILLIS, DEFENSE WITNESS
        DIRECT BY MR. ANDERSON . . . . . . . .    163
14      CROSS BY MS. WAERING  . . . . . . . . .   164

15

16

17

18                      EXHIBIT INDEX
19
                                              MAR  /  ADM
20  Defense
    1      Letter dated 9/16/05 to investors from    54    54
21         Ted Johnson and F. Farrier

22  2      Ted Johnson's 7/16/08 correspondence to   58    58
           IRS
23
    3      IRS receipt of Johnson's correspondence   59    59
24

25
```